## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
YING LI,                                  )
                                          )
                  Plaintiff,              )
                                          )
         v.                               )    Case Number:  1:07CV0662 (RMU)
                                          )
ALBERTO R. GONZALES, Attorney General     )
of the United States,  et al.,            )
                                          )
                  Defendants.             )
                                          )
_____ )

## MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER

Defendants, by and through their attorney, the United States Attorney for the District of

Columbia, respectfully move this Court to dismiss this case for lack of jurisdiction and for failure

to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  In

the alternative, Defendants move to transfer this case to the Northern District of Texas.  In

support of this Motion, Federal Defendants refer the Court to the accompanying memorandum of

points and authorities.  A proposed Order consistent with this Motion also is attached.

Dated: July 19, 2007

                              Respectfully submitted,


                              _____/s/_____
                              JEFFREY A. TAYLOR, D.C. BAR # 498610
                              United States Attorney


                              _____/s/_____
                              RUDOLPH CONTRERAS, D.C. BAR #434122
                              Assistant United States Attorney

___/s/ Robin M. Meriweather___
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**Of Counsel:**

Allen Reid Tilson
United States Citizenship and Immigration Services, Texas Service Center

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| YING LI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case Number:  1:07CV0662 (RMU) |
| | ) |
| ALBERTO R. GONZALES, Attorney General | ) |
| of the United States,  et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE
ALTERNATIVE TO TRANSFER**

**INTRODUCTION AND SUMMARY**

This case concerns a Form I-485 "adjustment of status" application filed by Plaintiff Ying

Li, a Chinese citizen, in which Li requested that Defendant United States Citizenship and

Immigration Services ("USCIS") exercise its discretion and to make her a lawful permanent

resident of the United States.  USCIS has suspended adjudication of Li's I-485 application

because the national security screenings — which the FBI conducts for all adjustment applicants

— are not yet complete.  Li asks the Court to adjudicate her pending adjustment of status

application or, in the alternative, to  remand the case to USCIS with instructions that it

immediately adjudicate the application.  Both requests are outside the Court's jurisdiction, and

Li's complaint should be dismissed.

The Immigration and Naturalization Act does not permit this Court to adjudicate Li's

adjustment application or to review USCIS's processing of that application.  In Section

1252(a)(2)(B) of the INA, Congress expressly withdrew judicial review of all issues concerning

USCIS's "judgments" regarding the granting of an adjustment application, and all discretionary

USCIS actions concerning adjustment applications and other immigration matters.  8 U.S.C.

§ 1252(a)(2)(B).  USCIS's decision to suspend adjudication of Li's application is an exercise of

judgment and a discretionary action.  Those jurisdiction-stripping provisions apply

"notwithstanding any other provision of law," thereby foreclosing reliance on alternative sources

of jurisdiction like the Mandamus Act and the Administrative Procedures Act ("APA").  Id.

Further, the APA expressly provides that if another statute forecloses judicial review of agency

action, the APA cannot be used to challenge that agency action.  See 5 U.S.C. §§ 701(a), 702.

Even if the INA did not bar review under the Mandamus Act and the APA, the Court

would still lack subject matter jurisdiction.  The extraordinary remedy of mandamus is available

only if the plaintiff has a clear right to relief and the defendant owes the plaintiff a clear,

nondiscretionary duty to act.  Li has no right, let alone a clear one, to have her adjustment

application adjudicated within any specific time frames, or to bypass the mandatory background

checks.  Likewise, USCIS has no clear nondiscretionary duty to complete adjudication before

those mandatory background checks have been completed, regardless of how long the checks

have been pending.  Those factors also prevent Li from invoking the APA as a source of

jurisdiction, because the APA precludes judicial review of actions and decisions over which

Congress has given an agency plenary discretion.  That bar applies in any situation in which there

is no "meaningful" statutory or regulatory standard against which to gauge the reasonableness of

the agency's   decision or of any delay in reaching a final decision.  There is no such standard

here, as USCIS has complete discretion to require that adjustment applicants clear background checks prior to obtaining final adjudication of their applications, and there is no regulatory or statutory deadline for completing those adjudications.

Assuming arguendo that this Court did have subject matter jurisdiction, Li's complaint would fail to state a claim for unreasonable agency delay.  The D.C. Circuit has identified several factors courts should consider when determining whether an agency has unreasonably delayed final action, two of which are particularly significant here.  First, as noted, there is no statutory timetable for adjudicating adjustment applications.  Second, USCIS and the FBI have an interest in processing adjustment applications and background checks on a first-in, first-out basis, and in ensuring that lawful permanent residence status is not granted to individuals whose permanent residence in the United States would raise national security concerns.  Moreover, the D.C. Circuit has declined to intervene in agency delay cases when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Giving Li's application precedence over the other applicants whose petitions and background checks have been pending for longer than hers presents exactly that type of situation.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the Northern District of Texas.  The only nexus between this District and the case is the fact that the agency heads named as defendants have offices in D.C.  However, the events giving rise to this complaint — namely, the processing and adjudication of Li's I-485 — all transpired at the USCIS Texas Service Center in Dallas, Texas.  Accordingly, the Norhtern

District of Texas is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

## BACKGROUND

Plaintiff Ying Li, a native and citizen of China, filed a Form I-485 application to register permanent residence or adjust status on June 18, 2004. <u>See</u> Compl. at Exh. 1. That application was filed with United States Citizenship and Immigration Service's ("USCIS") Vermont Service Center, which then transferred the application to the USCIS Texas Service Center ("TSC" or "Texas Service Center"). <u>See</u> Compl. ¶ 2. The TSC currently maintains the records concerning Li's I-485, and is the USCIS office that is processing Li's application. <u>See</u> Declaration of Naboone Puripongs, ¶ 8 (Exh. 1 hereto). The TSC is located in Dallas, Texas. <u>See</u> Exh. 2 hereto (http://149.101.23.2/graphics/fieldoffices/texas/aboutus.htm).

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). The I-485 that Li filed is an application aliens submit to request such adjustments of status. USCIS processes adjustment applications in chronological order based on the date of receipt. <u>See</u> Puripongs Decl. ¶ 2.

USCIS requires national security screenings for all I-485 applications. <u>See id.</u> When the TSC receives an I-485, it confirms that the background check request has been transferred to the FBI. <u>See id.</u> ¶ 3. The FBI performs the background checks, and then transfers the results to USCIS after the investigation is completed. <u>See</u> Declaration of Michael A. Cannon ¶¶ 20-22 (Exh. 3 hereto).

-4-

On or about July 14, 2004, USCIS requested that the FBI conduct background checks in connection with Li's I-485. See id. ¶ 22; Puripongs Decl. ¶ 9. Those checks are not yet complete. See Cannon Decl. ¶ 22. The TSC has suspended adjudication of the I-485 pending completion of the background checks, and makes regular inquiries about their status. See Puripongs Decl. ¶¶ 8-9.

Li initiated this action with a mandamus complaint filed March 11, 2007. The complaint asks the Court to conduct a hearing and adjudicate Li's I-485 application. Compl. at 5. In the alternative, Li seeks a remand to USCIS for "immediate adjudication" of her application. Id.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Li's claims. See Fed. R. Civ. P. 12(b)(1). When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003). In addition, plaintiff bears the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence." Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at

64.

Defendants also move for dismissal under Rule 12(b)(6), because plaintiff fails to state a claim upon which relief can be granted. Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to show that plaintiff can prove no set of facts in support of its claim which would entitle it to relief). The Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of all inferences. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

## I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW LI'S CLAIMS.

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district courts "have only such jurisdiction as the Constitution and the Congress grant them"). Li's complaint must be dismissed because she has failed to establish a statutory basis for the Court to exercise jurisdiction over her claims. Congress has not authorized federal district courts to adjudicate pending adjustment of status applications, or to direct USCIS to "immediately" adjudicate those applications. Instead, Congress has expressly deprived courts of jurisdiction to review USCIS decisions like the one Li challenges here. Section 1252 of the Immigration and Nationality Act ("INA") precludes judicial review of USCIS's "judgments" on applications for adjustment of status, and of numerous other discretionary decisions involving immigration-related

applications and proceedings.  8 U.S.C. § 1252(a)(2)(B).  That provision applies "notwithstanding any other provision of law," thereby trumping any alternative source of jurisdiction.  Id.

Even if the INA did not preempt other sources of jurisdiction, there would be no such alternative source available here.  The discretionary nature of the adjudication of adjustment of status applications removes them from the scope of the Mandamus Act and the Administrative Procedures Act.  In sum, Congress has not given this Court the power to adjudicate adjustment of status applications or to review the TSC's judgment that adjudication of Li's application should be suspended pending completion of background checks.  Therefore, Li's claims must be dismissed pursuant to Rule 12(b)(1).

A.      **The Immigration and Naturalization Act Does Not Confer Subject Matter Jurisdiction to Adjudicate Or Otherwise Review USCIS's Processing of Pending Applications for Adjustment of Status.**

Plaintiff's suggestion that the Court can determine in the first instance whether her adjustment of status application should be granted is entirely lacking in foundation.  Although Plaintiff purports to file this action "pursuant to . . . 8 U.S.C. § 1447(b)," Compl. at 1, that provision does not give this Court jurisdiction to conduct a hearing to review Li's application.  Section 1447(b) allows the Court to review applications for naturalization as a United States citizen if more than 120 days have passed since the background check and USCIS examination of the applicant were completed.  8 U.S.C. § 1447(b); Walji v. Gonzales, ___ F.3d ___, 2007 WL 1747911, at *2 (5th Cir. 2007).  Li has filed a different type of immigration application, which seeks an adjustment of status to become a lawful permanent resident of the United States.  See Compl. ¶ 1 & Exh. 1.  Thus, section 1447(b) is inapplicable to this case.   There is no other portion of the INA that allows Courts to conduct hearings to adjudicate applications that USCIS

has not yet reviewed.

The Court also lacks jurisdiction to remand this case to USCIS for "immediate" adjudication of Li's adjustment of status application, or to grant Li any other form of relief. Section 1252(a) of the INA expressly precludes judicial review of adjustment of status applications and other discretionary decisions. Specifically, 8 U.S.C. § 1252(a)(2)(B), provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), section 2241 of title 28, United States Code, . . . and sections 1361 and 1641 of such title. . .no court shall have jurisdiction to review:
>
> (i)     any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be <u>in the discretion of the Attorney General or the Secretary of Homeland Security</u>, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).

Plaintiff's attempt to compel the adjudication of her adjustment of status application falls squarely within the plain meaning of that provision. First, the authority to adjudicate adjustment of status applications arises under 8 U.S.C. § 1255(a), and subsection (i) expressly bars judicial review of "any judgment regarding the granting" of such an application. 8 U.S.C. §§ 1252(a)(2)(B)(i), 1255(a). It follows that the Court cannot review USCIS's judgment that further adjudication of Li's application should be suspended pending the FBI's completion of background checks. Second, USCIS's review of Plaintiff's adjustment of status petition is a discretionary action or decision covered by subsection (ii) of the jurisdiction-stripping provision. <u>See</u> 8 U.S.C.

§ 1255(a) (providing that an alien's status "may be adjusted by the Attorney General, <u>in his</u> <u>discretion</u>, and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence" if the alien meets certain criteria); <u>see generally</u> <u>Elkins v. Moreno</u>, 435 U.S. 647, 667 (1978) (describing adjustment of status as "a matter of grace, not right.…" ); <u>Wallace v. Gonzales</u>, 463 F.3d 135, 136 (2nd Cir. 2006 ) (noting same and that "the evaluation of such applications is left to the discretion of the Attorney General"). Accordingly, the INA deprives courts of jurisdiction to review decisions involving applications for adjustment of status. <u>See, e.g.</u>, <u>Wilkinson-Okotie v. U.S. Dept. of Homeland Security</u>, 2006 WL 2792405 at 3 (S.D. Tex. Sept. 26, 2006) ("Discretionary decisions involving applications for adjustment of status under 8 U.S.C. § 1255 are expressly included within the jurisdiction-stripping provision found in § 1252(a)(2)(B)(I)."); <u>Dinsey v. Department of Homeland Security</u>, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the discretion of the Attorney General"); <u>see</u> <u>generally</u> <u>Zhu v.</u> <u>Gonzales</u>, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to require party to obtain labor certification prior to obtaining a work visa); <u>Mahaveer, Inc. v. Bushey</u>, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

    To the extent Li's complaint can be construed as challenging the pace at which USCIS is adjudicating her petition, that too involves a discretionary determination that cannot be reviewed in this Court. USCIS made the affirmative decision that adjudication of Li's adjustment application should be suspended until the background checks have cleared. <u>See</u> Puripongs Decl.

¶ 8.  Further, when reviewing challenges to other types of agency action, the D.C. Circuit has recognized that an agency's "failure to act" also may be an "action." American Foreign Serv. Ass'n v. Baker, 895 F.2d 1460, 1461 (D.C. Cir. 1990); Sierra Club v. Thomas, 828 F.2d 783, 793 (D.C. Cir. 1987).  Thus, the suspension of adjudication pending the results of applicable background checks is both an "action" under subsection (ii) of Section 1252(a)(2) and a "judgment" under subsection (i).  See Grinberg v. Swacina, 478 F. Supp. 2d 1350, 1352 (S.D. Fla. 2007) (finding initiation of background checks was action); Safadi v. Howard, 466 F.Supp.2d 696, 699 (E.D.Va. 2006) (same).

USCIS has discretion to withhold adjudication until those background checks are complete, in order to ensure the alien's eligibility for adjustment of status or other immigration benefits.  The pertinent regulations allow USCIS to "direct any necessary investigation," 8 C.F.R. § 103.2(b)(7), and to withhold adjudication and/or hold adjudication in abeyance in light of a pending investigation.  See 8 C.F.R. § 103.2(b)(18); see also Zahani v. Neufeld, No. 6:05cv1857-ORL-18J, 2006 WL 2246211 at *2 (M.D. Fla. June 26, 2006) (finding regulations "provide[] USCIS with discretion to withhold adjudication of the adjustment of status application."); Mustafa v. Pasquerell, No. SA05CA-658-XR, 2006 WL 488399, at *5 (W.D. Tex. Jan 10, 2006) (concluding same).  There are no statutory time limits requiring USCIS to adjudicate an application within a specific period of time.  See Zheng v. Reno, 166 F. Supp. 2d 875, 879 (S.D.N.Y. 2001) (noting lack of time limits on adjustment of status applications); Mustafa, 2006 WL 488399, at *4 (noting USCIS's "wide discretion . . . in matters pertaining to the timing of the adjudication of petitions").  The lack of any legislative time constraints is particularly significant given that the INA imposes specific time limits for other immigration determinations.  See, e.g.,

8 U.S.C. § 1447(b) (requiring that naturalization applications be processed within 120 days after completion of an "examination").  In sum, "the entire process of reviewing an adjustment application, including the completion of background and security checks and the pace at which the process proceeds" is a 'discretionary action' exempt from judicial review pursuant to Section 1252(a).  Safadi, 466 F.Supp. 2d at 700 (emphasis in original); see Zhang v. Chertoff, __ F. Supp. 2d ___, 2007 WL 1753538, at *4 (W.D. Va. June 19, 2007) (finding no jurisdiction to review challenge to delay in adjudicating adjustment of status application because "the preclusion of judicial review over a discretionary act of USCIS encompasses . . . the pace of this process"); Grinberg, 478 F. Supp. 2d at 1352 (concluding that "pace at which immigration decisions are made" is discretionary and finding no jurisdiction to review challenge to delay in processing adjustment of status application).

> **B.    No Other Statute Gives the Court Jurisdiction to Review Li's Claim**.

Even if some other statute conferred jurisdiction to review Li's claim, the INA would foreclose the exercise of that jurisdiction because it applies "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(A).  However there is no alternative source of jurisdiction in this case.  The Mandamus Act does not apply because the suspension of adjudication of Li's petition is a discretionary act.  The Administrative Procedure Act is inapplicable for similar reasons.

> **1.    The Mandamus Act Does Not Confer Jurisdiction Because The Suspension of Adjudication of Li's Application Is a Discretionary Decision.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction stripping provisions of INA § 242 did  not apply.  That statute gives district courts "original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980). District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted). Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'" In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiff lacks a clear right to immediate adjudication, and Defendant has no clear mandatory or ministerial obligation to adjudicate the application within a particular time frame. See Safadi v. Howard, 466 F.Supp.2d at 700; Grinberg, 478 F. Supp. 2d at 1354. The decision whether to grant or deny Plaintiff's adjustment application is plainly discretionary by statute. See 8 U.S.C. § 1255(a). Surely, that discretion permits USCIS to enforce a background check requirement thereby ensuring that immigration benefits are not granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security matters. Further, the regulations expressly permit USCIS to "withhold" adjudication pending the completion of a background investigation. 8 C.F.R. § 103.2(b)(18). In sum, there are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time

frame. Consequently, USCIS has no clear, mandatory duty to adjudicate Plaintiff's application prior to completion of background checks, or to complete adjudication of adjustment applications by a prescribed deadline.

Those factors have led numerous district courts to find mandamus relief unavailable to compel immediate adjudication of applications for adjustment of status. See, e.g., Grinberg, 478 F. Supp. 2d at 1354; Safadi, 466 F. Supp.2d at 700; Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan v. McElroy, No. 02 Civ. 6678(JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Zheng v. Reno, 166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000). This Court should do the same. Li can establish no clear and indisputable right to have her adjustment of status application adjudicated within any specified time constraints, and USCIS has no obligation to adjudicate Li's application before the background investigations are complete. Therefore, Li is not entitled to the extraordinary relief of mandamus, and cannot rely on the Mandamus Act as a source of jurisdiction.

**2.      The Administrative Procedures Act Does Not Permit This Court to Review Plaintiff's Claim.**

Li also has no right to judicial review under the APA. Although the APA is not an independent source of subject matter jurisdiction, it operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions. See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp.2d at 1355; Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005). However, the APA expressly precludes judicial review of agency actions in two circumstances: (1) if another statute "preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by

law."  5 U.S.C.

§ 701(a)(2); <u>Brock v. Pierce County</u>, 476 U.S. 253, 260 n.7 (1986).  Both factors prevent Li from

using the APA as a means of challenging USCIS's processing of her adjustment application.

      First, as discussed above, the INA bars judicial review of Li's claim.  Accordingly,

Section 701(a) of the APA, which "withdraws [an APA] cause of action" to the extent another

statute "precludes judicial review," prevents Li from raising an APA challenge.  <u>Block v.

Community Nutrition Inst.</u>, 467 U.S. 340, 345 (1984); <u>see</u> 5 U.S.C. § 701(a); <u>Beyond Pesticides

v. Whitman</u>, 360 F. Supp. 2d 69, 71 (D.D.C. 2004).  Section 702 forecloses judicial review of Li's

claim for the same reason, as it provides that "nothing herein affects other limitations on judicial

review . . . or confers authority to grant relief if any other statute that grants consent to suit

expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

      Second, the APA bars judicial review because the USCIS actions Li has challenged are

discretionary.  The APA generally permits challenges to "agency action unlawfully withheld or

unreasonably delayed."  5 U.S.C. § 706(1); <u>see</u> also 5 U.S.C. § 555(b) (indicating that agencies

should conclude matters "within a reasonable time").  However, such claims are unreviewable by

the courts if the relevant agency action is "committed to agency discretion by law."  5 U.S.C. §

701(a)(2).  In <u>Heckler v. Chaney</u>, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean

that "review is not to be had if the statute is drawn so that the court would have no meaningful

standard against which to judge the agency's exercise of discretion."  470 U.S. 821, 830 (1985).

As the Court explained, "if no judicially manageable standards are available for judging how and

when an agency should exercise its discretion, then it is impossible to evaluate agency action for

'abuse of discretion.'"  <u>Id.</u>; <u>see also</u> <u>Steenholdt v. Federal Aviation Admin.</u>, 314 F.3d 633, (D.C.

Cir. 2003) (articulating same standard). "The principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion . . . ." Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

Li has no APA cause of action for "unreasonable agency delay" because the timing of USCIS's adjudication of her adjustment of status application is expressly committed to agency discretion, as are all other aspects of processing of the application. Section 1255(a) permits the Attorney General to adjust an alien's status "in his discretion and under such regulations as he may prescribe." 8 U.S.C. § 1255(a) (emphasis added). That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA. Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006). No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such an application. Heckler, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine "how and when" to adjudicate the application. See id. In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff's adjustment of status application provide no time frame for when such an application must be adjudicated. See Zheng v. Reno, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]"). Consequently, there is no standard against which the Court can measure whether the Agency has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1).

Given the absence of a specified time frame for adjudicating adjustment applications, the Court should find that Section 701(a)(2) of the APA precludes review of Li's claims. That ruling

would be in accord with other courts' conclusion that claims relating to alleged delays in the adjudication of an adjustment of status application are unreviewable under the APA because the adjudicatory process is committed to agency discretion by law.  See Safadi v. Howard, 466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878-89; Karan v. McElroy, 2003 WL 21209769, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. at 787-88.  In addition, at least two Supreme Court cases suggest that the presence of a specified time period triggers courts' ability to compel agency action that is "unreasonably delayed" under § 706(1).  See Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); Brock v. Pierce County, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has "unreasonably delayed" adjudication of his application, this Court would have to create a temporal standard out of whole cloth.  This is a perilous task given the national security considerations that affect USCIS's adjudicative process.  It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government.  See United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide

-18-

variety of classifications must be defined in the light of changing political and economic

circumstances, such decisions are frequently of a character more appropriate to either the

Legislature or the Executive than to the Judiciary.").  Moreover, as other courts have cautioned, in

"'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the

judicial creation of such a duty would have the potential for mischievous interference with the

functioning of already overburdened administrative agencies.'"  Rahman, 884 F. Supp. at 787

(quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler v.

Chaney, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to

deal with the many variables involved in the proper ordering of its priorities").  Those principles

counsel against the imposition of a judicially-created standard to gauge how long USCIS may

wait for assurance that the background checks have identified no national security reasons that

would merit denial of an applicant's adjustment petition.

## II.    IF THE COURT HAD SUBJECT MATTER JURISDICTION, DISMISSAL WOULD BE APPROPRIATE FOR FAILURE TO STATE A CLAIM.

Even if the Mandamus Act or  the APA could be construed as permitting this Court to

review the reasonableness of the delay in completing the processing of Li's adjustment

application, Rule 12(b)(6) would require dismissal of the complaint for failure to state a claim.

The D.C. Circuit has identified six factors courts should consider when reviewing claims that

allege unreasonable agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of

expediting delayed action on agency activities of a higher or competing priority;
(5) the court should also take into account the nature and extent of the
interests prejudiced by delay; and (6) the court need not "find any impropriety lurking
behind agency lassitude in order to hold that agency action is 'unreasonably
delayed.' "

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999) (quoting

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984)

("TRAC").  Where, as here, Congress has declined to establish a specific timetable for agency

action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific

timetable."  In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d 503, 506 (D.C. Cir.

1988).  The D.C. Circuit also has emphasized the importance of considering the agency's

competing priorities, noting that agencies should be given "great latitude in determining their

agendas."  In re Monroe Comms. Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).

The complaint does not allege facts sufficient to support Li's claim that USCIS has

unreasonably delayed processing her adjustment application.  As noted, Congress has established

no timetable for processing adjustment applications.  Further, the competing interests at issue in

this case militate against granting Plaintiff the relief she seeks.  The D.C. Circuit has "declined to

grant relief, even when all the other factors considered in TRAC favored it, where a judicial order

putting the petitioner at the head of the queue would simply move all others back one space and

produce no net gain."  Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100

(D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991).  Yet that is

precisely what Li asks this Court to do.  Defendants and the numerous individuals with pending

adjustment applications have a strong interest in processing the applications in an orderly fashion

and ensuring that all applicants are treated the same.  Allowing any alien that files a lawsuit to

leapfrog to the head of the queue would be contrary to those interests, and potentially would lead applicants with pending background checks to flood the federal courts with mandamus actions in order to obtain that advantage.  While Plaintiff would like immediate adjudication of the application, she has no entitlement to that relief.

Finally, Defendants' obligation to protect national security is another "competing interest" that makes any delay reasonable.  Background checks serve an important law-enforcement and public safety purpose. See Li v. Chertoff, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007); Cannon Decl. ¶ 4.  Accordingly, courts have found it reasonable for an adjustment application to remain pending for long periods of time when the delay is attributable to an ongoing security investigation.  See Zahani, 2006 WL 2246211, at *3 (noting "[c]ourts have routinely found delays caused by FBI background checks to be justifiable delays" and citing cases); Zheng v. INS, 933 F. Supp. 338, 341 (S.D.N.Y. 1996) (dismissing case pursuant to 12(b)(6) because delaying processing of application pending completion of background checks was not an unreasonable delay); Jabr v. Chertoff, No. 4:06cv00543, 2006 WL 3392504, at *2 (E.D. Mo. Nov. 21, 2006) (finding plaintiffs failed to state a claim for unreasonable agency delay although adjustment application had been pending for more than two years due to background checks).  For all the foregoing reasons, Li has failed to state a claim.

## III.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE NORTHERN DISTRICT OF TEXAS.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes default rules for venue that apply to federal lawsuits where the underlying statutes do not specify their own venue rules.  See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise provided by law.").  Section 1391 identifies three possible bases for venue for claims against

federal government officials or agencies: (1) where a defendant "resides;" (2) the district where

"a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the

plaintiff resides, if no real property is involved in the action."  28 U.S.C. § 1391(e).  Plaintiff

appears to rely on the first prong of this test, and alleges that venue is proper in this Court because

the agency heads named as Defendants have offices in the District of Columbia.  Compl. ¶ 13.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence

in Washington D.C., and the federal defendants oppose venue, the venue challenge should be

examined  "very closely."  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That

close scrutiny has led courts in this District to invoke their transfer authority pursuant to 28

U.S.C.

§ 1404(a) and transfer cases to a district with a closer nexus to the parties' dispute.  See, e.g.,

Cameron, 983 F.2d at 256 (ruling Washington, D.C. was not the proper venue because the sole

connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of

Prisons and the Attorney General in their official capacities); Rosales v. United States, 477 F.

Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which

the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d

82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where

D.C. officials only set general policies and did not make specific decisions being appealed);

Joyner v. District of Columbia, 267 F. Supp.2d 15, 20-21 (D.D.C. 2003) (holding that the case's

only connection to Washington, D.C. was the situs of named federal government defendants and

transferring to a district with which the case had several connections).  Otherwise, "[b]y naming

high government officials as defendants, a plaintiff could bring suit here that properly should be

pursued elsewhere." <u>Cameron</u>, 983 F.2d at 256.

The fact that Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court should transfer this case to the Northern District of Texas. Section 1404(a) permits the Court to transfer this case to "any other district or division where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). A threshold question is whether the case could have been brought in the district to which transfer is sought. <u>See</u> <u>Stewart Organization v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988) (citing <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 613 (1964)). The Court then must engage in a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness. <u>Id.</u> at 29. The moving party bears the burden to establish that it is proper to transfer the case. <u>See</u> <u>Southern Utah</u>, 315 F. Supp. 2d at 86. <u>Trout Unlimited v. United States Dep't of Agriculture</u>, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing <u>Air Line Pilots Ass'n v. Eastern Air Lines</u>, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted). Li could have brought this case in the Northern District of Texas, and both the private and public interests favor transfer to that court.

The Northern District of Texas clearly is a district in which this case "might have been brought." USCIS adjudicates its applications for adjustment of status locally; therefore any delay in the processing of Plaintiff's application is a matter related to the Texas Service Center, which is located in Dallas, Texas. <u>See</u> Puripongs Decl. ¶ 8; Exh. 2. Indeed, Plaintiff admits in her complaint that the Vermont Service Center transferred her application to the Texas Service Center. <u>See</u> Compl. ¶ 2. As a result, the events or omissions giving rise to Plaintiff's claim occurred in the Northern District of Texas, making venue proper in that court under 28 U.S.C. §

-23-

1391.

The private interests of the parties favor transfer.  The factors courts consider when assessing those interests include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted). Although Courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum.  See  Shawnee Tribe v. United States, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).  Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case.  See Southern Utah Wilderness Alliance, 315 F. Supp.2d at 86.

Li's choice of forum deserves little deference because she does not reside in this District, and because this District "lacks meaningful ties to the controversy."  Id.; see Compl. at 1 (listing Virginia address for Li).  The Northern District of Texas is a more appropriate forum than this Court because that is where the relevant decisions were made, and where Li's claims arose.  As noted, the Texas Servie Center is charged with adjudicating Li's adjustment application. See Puripongs Decl. ¶ 8.  None of the named agency defendants have been involved in the adjudication of that application, or will be involved in any future adjudication.  Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters.  Southern Utah Wilderness Alliance, 315 F. Supp.2d at 87; see, e.g., Rosales, 477 F. Supp. 2d at 216; Shawnee Tribe v. United States, 298 F. Supp.2d at 24; Sierra Club v. Flowers, 276 F.Supp. 62, 67-68 (D.D.C. 2003) (transferring case because federal officials in

-24-

Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision-making process); <u>see also</u> <u>Airport Working Group of Orange County, Inc. v. United States Dep't of Defense</u>, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision). The Court should reach the same conclusion here.

The FBI's involvement in the background name check process also does not establish a close nexus to this District. The background checks are not initiated by the FBI. <u>See</u> Puripongs Decl. ¶ 2; Cannon Decl. ¶¶ 17-19. The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Texas Service Center. <u>See</u> Puripongs Decl. ¶¶ 2, 9. The decision-making process and final decision are conducted by local officials at the TSC. <u>See</u> <u>id.</u> ¶ 8. In sum, the FBI has a very routine role in Plaintiff's application — to conduct the (background) name check and simply send the results to USCIS. <u>See</u> Cannon Decl. ¶ 21. It does not determine whether, when, or how the adjustment application will be adjudicated. <u>See</u> <u>id.</u> Accordingly, even if the FBI officer(s) processing Li's name check were located in Washington, D.C., that would not make this Court the proper forum.

Other private interest factors also support transfer. The Northern District of Texas is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. That district is the home jurisdiction of the TSC, which is charged with and is responsible for adjudicating Plaintiff's pending adjustment application. <u>See</u> Puripongs Decl. ¶ 8. Since this case arose in the Northern District of Texas, there is local interest in resolving it there. <u>See</u> <u>Schmidt v. American Institute of Physics</u>, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise.) That also makes the Northern District

of Texas a more convenient jurisdiction in which to litigate this case because:  (1) the people involved in making the determination as to Plaintiff's application are located in Dallas; and (2) documents or records related to the case are all located in Dallas.  See Puripongs Decl. ¶ 8.

The public interest also favors transfer.  The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted); Airport Working Group of Orange County, Inc., 226 F. Supp.2d at 229.  Since this action concerns federal law, the Northern District of Texas is as familiar with the applicable law as the District of Columbia.  In addition, there is no evidence that the Northern District of Texas's docket is more congested than the District of Columbia's docket.  See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16.  Both factors weigh in favor of the Court transferring this case to the Northern District of Texas.

**CONCLUSION**

For the foregoing reasons, the Court should GRANT Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Northern District of Texas.

Dated: July 19, 2007

Respectfully submitted,

_____/s/_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____

ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198
Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**Of Counsel:**
Allen Reid Tilson
United States Citizenship and Immigration Services, Texas Service Center

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of July, 2007, I caused the foregoing Motion to be filed and served via the Court's Electronic Case Filing system or, should I receive notice from the ECF system that electronic service was unsuccessful, to be served upon plaintiff by first-class mail, postage prepaid, addressed as follows:

Noam B. Fischman, Esquire
Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
701 Pennsylvania Avenue, N.W.
Washington D.C. 20004


      /s Robin M. Meriweather
ROBIN M. MERIWEATHER, D.C. Bar # 490114

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
YING LI,                                  )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )    Case Number:  1:07CV0662 (RMU)
                                          )
ALBERTO R. GONZALES, Attorney General     )
of the United States,  et al.,            )
                                          )
                    Defendants.           )
                                          )
_____)

**ORDER**

Upon consideration of Defendants' _____, it is this

_____ day of _____, 2007,

_____ ORDERED that Defendants' Motion to Dismiss be and is hereby GRANTED.

_____ ORDERED that Defendants' Motion to Transfer be and is hereby GRANTED.  It is

        further ORDERED that this case be and is hereby transferred to the United States

        District Court for the Northern District of Texas.

SO ORDERED.


                                    _____

                                    United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| Ying Li<br><br>        Plaintiff,<br><br>v.<br><br>Department of Homeland Security, et. Al<br><br>        Defendants. | Civ. Act. Number: **1:07-CV-00662-rmu** |

PERSONAL DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind. I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services. TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC has 51,221 pending employment based I-485s and projects receiving another 95,000 by the end of the FY 2007. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

3. Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY. An FBI Name Check that has been completed will be indicated by various entries depending on the result.

4. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check

request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

5. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

6. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

7. The Service Centers, to increase efficiency and provide better service on immigration benefits, reorganized, in a process called bi-specialization, so that two Service Centers would specialize in certain applications and petitioners, instead of each Service Center handling all types of applications and petitions. To implement this reorganization each center transferred pending applications to other centers that specialized in that type of application. Thus, a center that instituted a process, as is the case here, is not the center that completes the process on certain pending or transition cases.

8. I have custody of the TSC records of Ying Li, A98416314, and I supervise TSC officers who are processing Ying Li's applications. After reviewing the information pertaining to Ying Li, I attest that USCIS has referred this case for lawfully required security screening of aliens and that USCIS suspended adjudication in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

9. During the normal processing of this case, a national security screening was requested. The information and records pertaining to Ying Li shows that TSC Officers under my supervision make regular inquiries about the status of her security screening.


_____
Naboone Puripongs
Supervisory Adjudications Officer
Texas Service Center

_10-MAY-2007_
Date

# U. S. Citizenship and Immigration Services

**TEXT ONLY · HOME · WHAT'S NEW · FAQs · SEARCH · GLOSSARY · FEEDBACK · PRINTPAGE**



**Texas**
**Service Center**

**Services Field Office Addresses and Information**

   **About USCIS Field Offices**

   **U.S. Field Office State Map**

   **List of U.S. Field Offices**

      **Texas**

         **Overview**

         **About Us**

         **Forms and Fees**

   **Application Support Centers Map**

   **Application Support Centers**

   **National Benefit Center**

## About Us

General Information
Organizational Structure
Service Area
Where Are We?
Applications We Accept and/or Process
Mailing Your Application/Petition to Us
Contacting Us
Other Immigration Offices Serving This Area

**Director:** Evelyn Upchurch

Note: certain filing instructions and information is common to all USCIS Service Centers. Read more about them on our National Service Center page:

·        Documents Not in English

·        Preparing Your Application for Filing

·        Paying Fees

·        Your Receipt

·        Motions to Reopen (MTR)

·        Denials

·        How we Process Your Application at a Service Center

·        General Tips on Assembling Applications for Mailing

See also:

·        LIFE Act

·        Finding the Status of Your Case

·        Processing Dates

·        Special Registration (on the Immigration & Customs Enforcement website)

**Service Area:**

The Texas Service Center accepts and processes certain applications and

petitions from individuals residing in the following states:

**Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, South Carolina, Oklahoma, Tennessee, and Texas.**

Applications for asylum (Form I-589) may require filing at a different Service Center than indicated above; please check the instructions for Form I-589 to determine where you should file your application.

**Please Note:** If you live outside the service area of this Center, please file your application or petition with the Center serving your area. If you are unsure of which Service Center serves people living in your state, consult the List of USCIS Field Offices for your state. If you know which Service Center you wish to visit, you may use the following links:

California Service Center
Vermont Service Center
Nebraska Service Center

**Where Are We?**

The Texas Service Center is located in Dallas, Texas.

**SPECIAL NOTE:** Separate PO Box numbers and Zip codes are required for the different form types.

For General Correspondence, please use the following address:

USCIS TSC
P.O. Box 851488
Mesquite, TX 75185-1488

**Applications We Accept and/or Process:**

**Direct Mail Cases We Accept:**

**NOTE EXCEPTIONS:**
**Forms I-131,** Applications for Travel Document **(Re-entry Permit or Refugee Travel Document only)**, are filed with the Nebraska Service Center.
**Forms I-360, Self-Petitions** filed by Battered Spouse or Child petitions are filed at Vermont Service Center.
**Forms I-360 for G-4 International Organization Officers**, Employees, and their family members are filed at the Nebraska Service Center effective 2/23/04
**Forms I-485** for those individuals filed concurrently with an I-360 are also filed Only at the Nebraska Service Center effective 2/23/04
Forms I-730, Refugee/Asylee Relative petitions are filed with the Nebraska Service Center.
**Forms I-485, Refugee/Asylee/Haitian** applications are filed with the Nebraska Service Center.

All concurrently filed Forms I-140/I-485 should be submitted to the Nebraska Service Center effective 4/1/06.

Effective 7/24/06, all stand alone Forms I-485 based on a pending or an approved Form I-140 should be mailed directly to the Nebraska Service Center. Forms accompanying the I-485 (e.g., Form I-131 and/or I-765)

should also be filed at the Nebraska Service Center;

**Preparing Your Application for Filing:**

**Mailing Your Application/Petition to Us:**

You may also be eligible to file some forms electronically. For more information, see Introduction to E-Filing.

| Texas Service Center Direct Mail Address by Application | |
|---|---|
| **I-90 "B" and "D"** | **USCIS TSC**<br>**ATTN: I-90 "b" or "d"**<br>**P.O. Box 851983**<br>**Mesquite, TX 75185-1983** |
| **I-129 (Except I-129F)** | **Vermont ServiceCenter** |
| **I-129F, I-212, I-612, I-751, I-817**<br>**Family Services** | **USCIS TSC**<br>**P.O. Box 850965**<br>**Mesquite, TX 751185-0965** |
| **I-130** | **USCIS TSC**<br>**PO Box 850919**<br>**Mesquite, TX 75185-0919** |
| **I-131, I-102, Legalization,**<br>**Residents** | **USCIS TSC**<br>**PO Box 851182**<br>**Mesquite, TX 75185-1182** |
| **I-131 E-Filed – Supporting**<br>**Documentation** | **USCIS TSC**<br>**ATTN: E-Filed I-131**<br>**PO Box 852685**<br>**Mesquite, TX 75185-2685** |
| **I-526, I-829, EB/Business** | **USCIS TSC**<br><br>**PO Box 852135**<br>**Mesquite, TX 75185-2135** |
| **I-140 E-Filed – Supporting**<br>**Documentation** | **USCIS TSC**<br>**ATTN: E-Filed I-140**<br>**PO Box 851391**<br>**Mesquite, TX 75185-1391Nebraska Service**<br>**Center** |
| **I-360, I-526, I-829** | **USCIS TSC**<br>**PO Box 852135**<br>**Mesquite, TX 75185-2135** |
| **I-140**<br><br>**I-140/I-485 Concurrent Filing** | **Nebraska Service Center** |
| **Premium Processing** | **USCIS TSC**<br>**PO Box 279030**<br>**Dallas, TX 75227-9030** |
| **I-485** | **Nebraska Service Center** |
| **I-181, I-865 Adjustment** | **USCIS TSC**<br>**PO Box 851804**<br>**Mesquite, TX 75185-1804** |
| **I-539** | **USCIS TSC**<br>**PO Box 851182**<br>**Mesquite, TX 75185-1182** |
| **I-539 E-Filed – Supporting**<br>**Documentation** | **USCIS TSC**<br>**ATTN: E-Filed I-539** |

| | PO Box 852523<br>Mesquite, TX 75185-2523 |
|---|---|
| I-589, I-213, FD258 | USCIS TSC<br>PO Box 851892<br>Mesquite, TX 75185-1892 |
| I-765 | USCIS TSC<br>PO Box 851041<br>Mesquite, TX 75185-1041 |
| I-765 E-Filed – Supporting Documentation | USCIS TSC<br>ATTN: E-Filed I-765<br>PO Box 852401<br>Mesquite, TX 75185-2401 |
| I-824 | USCIS/TSC<br>PO Box 851182<br>Mesquite, TX 75185-1182 |
| N-400<br>Naturalization | USCIS TSC<br>PO Box 851204<br>Mesquite, TX 75185-1204 |
| RFE/I-72 Returns, All Naturalization | USCIS TSC<br>PO Box 852381<br>Mesquite, TX 75185- 2381 |
| Motions and Appeals | USCIS TSC<br>PO Box 852841<br>Mesquite, TX 75185-2841 |
| Address and<br>Attorney Change<br>Notification | USCIS TSC<br>P.O. Box 850891<br>Mesquite, TX 75185-0891 |
| General<br>Correspondence | USCIS TSC<br>PO Box 851488<br>Mesquite, TX 75185-1488 |
| Courier Delivery | USCIS TSC<br>4141 St. Augustine Rd.<br>Dallas, TX 75227 |

**Note: Use the box number for the principal application if more than one application is concurrently submitted. For example, if an I-485 is submitted with an I-131, and I-765, the application should be mailed to the P.O. Box number for the I-485 application.**

**If you are submitting Form I-485, Form I-131 and/or Form I-765 with your Form I-140, please send the entire package to the P.O. Box listed for concurrent filings for Form I-140.**

**With exceptions noted above, separate P.O. Box numbers and Zip codes are required for the different form types.**

**If a case has been improperly rejected, you should resubmit by Double Bagging and indicate on the inner bag "DO NOT OPEN IN THE MAILROOM" . Mail to the Attention of Noel Watts, CPAU Supervisor.**



**Contacting Us**

**" Age Outs" :**

"Age Out" cases involve the children of principal aliens or U.S. citizens. Sometimes, if these children turn 18 or 21 (depending on the type of benefit sought) before their case is processed, they will lose the benefit they are seeking. If your case falls within this category, please indicate on your application that it is an "Age Out" case.

Please note: The above statement may no longer apply to your individual case. On August 6, 2002, President Bush signed into law the Child Status Protection Act (CSPA). This law changes the "Age Out" rules in effect prior to signing of the CSPA which was were previously defined under the Immigration and Nationality Act (INA). Under the new law, a child will be prevented from "aging out" due to service processing delays.

Please read guidance here to see if the "Age Out" policy affects you or your children.

We ask that you bring age outs to our attention a minimum of six months before the 18th or 21st birthday depending on the type of benefit sought. We may not be able to complete dire circumstances age outs sooner than six weeks because of fingerprint processes and requirements, which mandate that FBI clearances be completed prior to adjudication.

**Change of Address:**

Customers with pending applications may report their change of address to Customer Service at 1 (800) 375-5283.

**You also need to file Form AR-11 in all cases of change of address.**

**Customer Feedback:**
We strive to provide quality service to our customers. If we have not lived up to this commitment, we would like to know. If we have met or exceeded your expectations, please let us know that as well. To comment on the services provided at this office, please write to the Center Director, at:

U.S. Citizenship and Immigration Services
Texas Service Center
P.O. Box 851488
Mesquite, TX 75185-1488

Note in the heading of the letter and on the envelope: " FOR THE PERSONAL ATTENTION OF THE DIRECTOR."

If you feel you were mistreated by a USCIS employee, or wish to make a complaint of misconduct by a USCIS employee, you may write to the Service Center Director, or write directly to the:

Director, Office of Internal Audit
425 Eye Street, NW
Room 3260
Washington, DC 20536

Please be specific and reference specific case numbers and dates to provide the best way for us to understand and assess your complaint.

**Designated Civil Surgeons:**

For general information on the required medical examination, please see "Designated Civil Surgeons" . Most applicants for adjustment of status are required to have a medical examination. A civil surgeon who has been designated by USCIS must conduct the medical examination. See the listing of Designated Civil Surgeons in your area. You may also call Customer Service at 1 (800) 375-5283. You will be asked to provide your zip code. Have a pen or pencil ready to write down the list of civil surgeons in your area.

Doctors interested in being registered as a Designated Civil Surgeon in should submit the following to the local District Office:

·        A letter to the District Director requesting consideration

·        A copy of a current medical license

·        A current resume that shows 4 years of professional experience, not including a residency program

·        Proof of citizenship and lawful status

·        Two signature cards showing name typed and signature below

**Employment Opportunities:**

To obtain information about employment opportunities with USCIS, please search the USA Jobs Website for current Department of Homeland Security vacancy announcements.

**Employer-related Immigration Matters** (USCIS Office of Business Liaison)**:**

CALL: 1 (800) 357-2099
TDD: 1 (800) 278-5732

**General Expedite Procedures**

Please call customer service at 1-800-375-5283 to discuss the criteria for consideration of a request to expedite a case.

AILA members must process their requests through one of the AILA Liaison Co Chairs.

Cases that are not clearly approvable will not be expedited. Requests to expedite petitions or applications that are incomplete will not be granted. All supporting documents not in English must include a certified translation. See "Documents Not in English" on our National Service Center page. There is no appeal of the denial of an expedite request. Please see our USCIS Expedite Criteria guidance.

**Fee Waivers:**

Fee waivers are given at the sole discretion of the Center Director and may be granted or denied on a case-by-case basis. Please direct requests to the Center Director's attention and include all relevant information with each request. Decisions will be based solely on the supporting documents submitted.

**Forms:**

Forms are *not* available at the Texas Service Center. Forms are available through the local USCIS offices, through the Government

Printing Office (GPO), at GPO bookstores, or call 1 (800) 870-3676 to have forms mailed to you. You can find USCIS forms online or make an on-line request that they be mailed to you.

### Freedom of Information Act (FOIA):

To submit a request for information pursuant to the Freedom of Information Act or Privacy Act, visit www.dhs.gov for instructions about how and where to send your request.

### Information:

Call Customer Service at 1 (800) 375-5283.

### LIFE Act

### National Customer Service Center:

Call Customer Service at 1 (800) 375-5283 for information and help on matters concerning immigration services and benefits.

### Naturalization Information:

In addition to the information provided on the TSC home page, please visit the Naturalization Website. Included on the site is information on who can be naturalized, what is required, how and where to apply, frequently asked questions, and *A Guide to Naturalization*, which provides an overview of the naturalization process. From that Website, you can access and download Naturalization Forms including Form N-400, Application for Naturalization.

### Processing Dates:

Processing time varies by case type. The projected processing time is included on each receipt notice (Form I-797) sent to applicants and petitioners. See also Processing Dates.

### Status of Applications Inquiries:

See Finding the Status of Your Case.

### Supplemental Information:

Notices for additional information or clarification mailed from the Service Center will contain a colored cover sheet to be used in responding to the notice.   In all cases, responses to a notice must include the colored copy of the notice on top of the response to ensure that the response is directed for review in a priority manner.

### Other Immigration Offices Serving This Area:

### Application Support Centers (ASCs) (where fingerprinting can be obtained):

For information, including directions, call Customer Service (800) 375-5283.

### List of USCIS Field Offices by State



*Last Modified 07/27/2006*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YING LI,

               Plaintiff,

               v.

ALBERTO R. GONZALES,
        et al.,

               Defendants.

Case No:
1:07-CV-00662-RMU

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Ying Li, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central

Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)     FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

2

      (7)     Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

      (8)     The entries in the General Indices fall into two categories:

      (a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

      (b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

      (9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

      (a)     Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

      (b)     Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

3

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c) Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.7 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10) The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11) When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

5

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)   Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)   Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)   In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

6

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)     The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI generally processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)     The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)     It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

7

## PLAINTIFF'S NAME CHECK REQUEST

(22)    The name check request for plaintiff Ying Li was received by the FBI from USCIS on or about July 14, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this **22**<sup>nd</sup> day of June 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8