## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
YING LI,                                            )
                                                    )
                        Plaintiff,                  )
                                                    )
            v.                                      )    Case Number: 1:07CV662(RMU)
                                                    )
MICHAEL CHERTOFF, Secretary of the                  )
United States Department of Homeland                )
Security, et al.,                                   )
                        Defendants.                 )
_____)

## ERRATA

Defendants submit this errata to correct errors on pages 4 and 5 of the Memorandum In Support of Defendants' Motion to Dismiss or in the Alternative to Transfer (Dkt. Entry 12). The memorandum contained citations to a "Vaughan Declaration" which was not attached to the Motion to Dismiss. Those citations should have referenced a USCIS Fact Sheet, which should have been attached as Exhibit 4 to the Motion to Dismiss. The Vaughan Declaration was an exhibit to a motion to dismiss filed in a similar mandamus action involving the Texas Service Center. Counsel for Defendants inadvertently cited that declaration, instead of the Fact Sheet, because she was drafting both briefs simultaneously. The undersigned first became aware of this error today, December 13, 2007, upon receiving an inquiry from Plaintiff's counsel concerning the Vaughan Declaration.

A corrected Motion to Dismiss, which substitutes citations to the USCIS Fact Sheet for the citations to the Vaughan Declaration and includes Exhibit 4 to the Motion to Dismiss, is attached hereto. For ease of reference, this corrected Motion to Dismiss also contains copies of Exhibits 1 through 3 of the Motion to Dismiss, which were electronically filed with the Motion

to Dismiss on November 19, 2007.

Dated:  December  13, 2007                 Respectfully submitted,


                 /s/                           .
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


                 /s/                           .
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


             /s/ Robin M. Meriweather       .
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| YING LI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 1:07CV662(RMU) |
| | ) | |
| MICHAEL CHERTOFF, Secretary of the | ) | |
| United States Department of Homeland | ) | |
| Security, et al., | ) | |
| Defendants. | ) | |

_____)

## MOTION TO DISMISS OR TRANSFER

Defendants Michael Chertoff, et al., through undersigned counsel, hereby move for dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. In the alternative, Defendants move that the case be transferred to the Northern District of Texas. A proposed order and memorandum of points and authorities are attached hereto.

Dated: November 19, 2007        Respectfully submitted,

                            /s/
                         JEFFREY A. TAYLOR, D.C. BAR # 498610
                         United States Attorney

                            /s/
                         RUDOLPH CONTRERAS, D.C. BAR #434122
                         Assistant United States Attorney

                            /s/ Robin M. Meriweather
                         ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                         Assistant United States Attorney
                         555 Fourth St., N.W.
                         Washington, D.C.  20530
                         Phone: (202) 514-7198 Fax: (202) 514-8780
                         Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
YING LI,                                              )
                                                      )
                          Plaintiff,                  )
                                                      )
          v.                                          )    Case Number: 1:07CV662(RMU)
                                                      )
MICHAEL CHERTOFF, Secretary of the                    )
United States Department of Homeland                  )
Security, <u>et al.</u>,                              )
                          Defendants.                 )
_____)

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR**
**IN THE ALTERNATIVE TO TRANSFER**

**<u>INTRODUCTION AND SUMMARY</u>**

Congress has expressly withdrawn federal court jurisdiction over the discretionary

judgments, actions, and decisions United States Citizenship and Immigration Services ("USCIS")

makes when reviewing petitions for immigration benefits.  Nonetheless, Plaintiff Ying Li asks

this Court to intervene in that process, and order USCIS to complete its adjudication of a Form I-

485 "adjustment of status" application Plaintiff filed to seek lawful permanent resident status.

USCIS has not completed its adjudication of Plaintiff's I-485 application because the national

security screenings — which the FBI conducts for all adjustment applicants — are not yet

complete.  Recognizing that fact, Plaintiff also asks the Court to order the FBI to immediately

complete its national security investigation.  However, there is no statute or regulation requiring

the FBI to limit its national security investigations to a fixed period of time.  Nor has Congress

limited the FBI's discretion to determine how and when to conduct its national security

investigations into applicants' background.  It follows that the Court lacks jurisdiction to review

1

those claims, and that Plaintiff's complaint should be dismissed.

Assuming <u>arguendo</u> that this Court did have subject matter jurisdiction to review Plaintiff's challenge to the pace of USCIS's adjudication of her I-485 and the FBI's completion of its national security investigation, she would be unable to state a claim for unreasonable agency delay. The D.C. Circuit has identified several factors courts should consider when determining whether an agency has unreasonably delayed final action, two of which are particularly significant here. First, as noted, there is no statutory timetable for adjudicating adjustment applications. Second, USCIS and the FBI have an interest in processing adjustment applications and background checks on a first-in, first-out basis, and in ensuring that lawful permanent residence status is not granted to individuals whose permanent residence in the United States would raise national security concerns. Moreover, the D.C. Circuit has declined to intervene in agency delay cases when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." <u>Mashpee Wampanoag Tribal Council, Inc. v. Norton</u>, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Giving Plaintiff's application and background checks precedence over others' presents exactly that type of situation.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the Northern District of Texas. The only nexus between this District and the case is the fact that the agency heads named as defendants have offices in D.C. However, most of the events giving rise to this complaint — namely, the processing and adjudication of Plaintiff's I-485 — have transpired in the Texas Service Center of USCIS. Accordingly, the Northern District of Texas is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

2

**BACKGROUND**

A.    **Statutory and Regulatory Background**

      1.    <u>Adjustments of Status and Background Investigations</u>

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Aliens that seek such adjustments of status file applications referred to as an "I-485." The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of receipt. Neither the statute nor the regulations establish a time frame in which adjudication must occur. The applicant must show that (s)he is not inadmissible to the United States under any statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds. <u>See</u> 8 U.S.C. § 1255(a)(2). An alien seeking adjustment of status bears at all times the burden of persuading the Attorney General to exercise his discretion in the alien's favor. <u>See</u> <u>Randall v. Meese</u>, 854 F.2d 472, 474 (D.C. Cir. 1988); <u>Jain v. Immigration and Naturalization Service</u>, 612 F.2d 683, 687 (2d Cir. 1979); <u>see</u> <u>generally</u> <u>Elkins v. Moreno</u>, 435 U.S. 647, 667 (1978) ("... adjustment of status is a matter of grace, not right ...").

Before a decision is rendered on an alien's I-485 application for adjustment of status, USCIS, in conjunction with the FBI, conducts several forms of security and background checks to ensure that the alien is admissible, is not a risk to national security, and merits a favorable exercise of discretion. <u>See</u> USCIS Fact Sheet (Exh. 4 hereto); <u>see</u> <u>generally</u> 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and

exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States). These checks currently include: (a) an FBI fingerprint check; (b) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security and contains records and "watch list" information from more than twenty law enforcement and intelligence agencies; and (c) an FBI name check. Id. at 2; see also 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States).

These security checks sometimes raise significant derogatory information which affect an applicant's eligibility for an immigration benefit. See Fact Sheet at 1. In those cases, USCIS must conduct further inquiry to resolve any outstanding issues. Id. at 2-3. USCIS cannot complete its adjudication of a request for permanent residence until all security checks have been completed, and until any and all issues that arise from those checks have been resolved. Id. at 1.

Because of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002. See Decl. of Michael A. Cannon, ¶ 17 (Exh. 1) ("Cannon Decl."). It was determined that more detailed, in-depth clearance procedures were required in order to better protect the people and the interests of the United States. See id. The name check clearance performed by the FBI was one of the procedures that needed revision. See id. Prior to November 2002, only those "main" files that could be positively identified with an individual were considered responsive. See id. The FBI subsequently altered its search criteria because the risk of missing a match to possible derogatory record(s) was too great. See id. Therefore, the search criteria were expanded to access reference files in addition to the main files. See id. From a processing standpoint, this change meant the

4

FBI would have to review many more files for each individual.  See id.

In December 2002 and January 2003, USCIS resubmitted 2.7 million name check requests to the FBI in addition to the regular submissions.  See id. ¶ 18.  Over 440,000 of the responses to the 2.7 million resubmitted name check requests indicated that the FBI may have information relating to the subjects.  See id.  The FBI's processing of the more than 440,000 resubmissions that require follow-up to resolve the name checks has delayed the processing of the regular submissions from USCIS.  See id. ¶ 19.  Several other factors contribute to potential delays in processing background checks for an applicant.  See id. ¶ 20.  The FBI generally processes name check requests on a first-in, first-out basis (unless USCIS specifically requests that a particular name check be expedited).  See id. ¶ 19.  Although approximately 70 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS within 2-3 days, the remaining name check requests require additional review.  See id. ¶ 13.

2.    Judicial Review of Immigration-Related Decisions

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial review of certain immigration-related decisions made by the former Immigration and Naturalization Service ("INS").  See Sec. 306, Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996).  In particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or action of the Attorney General the authority for which is specified … to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against

5

judicial review applies regardless of whether the discretionary judgment, decision or action is made in removal proceedings. <u>See</u> Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231; <u>see also</u> House Conference Report 109-72 at 170 (May 3, 2005). The REAL ID Act also added references to the Secretary of Homeland Security consistent with the reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS (under the Department of Homeland Security). <u>Id</u>. After passage of the Real ID Act, the statute reads as follows:

> (B) Denials of discretionary relief
>
> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review–
> **(i)** any judgment regarding the granting of relief under section 1182(h), 1182(I), 1229b, 1229c, or 1255 of this title, or
> **(ii)** any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

**B.    Plaintiff's Application**

Plaintiff Ying Li, a native and citizen of China, filed a Form I-485 application to register permanent residence or adjust status on June 18, 2004. <u>See</u> Am. Compl. ¶ 6. That application was filed with United States Citizenship and Immigration Service's ("USCIS") Vermont Service Center, which then transferred the application to the USCIS Texas Service Center ("TSC" or "Texas Service Center"). <u>See id.</u> ¶ 10. The TSC currently maintains the records concerning Li's I-485, and is the USCIS office that is processing Li's application. <u>See</u> Declaration of Naboone Puripongs, ¶ 8 (Exh. 2). The TSC is located in Dallas, Texas. <u>See</u> Exh. 3

6

(http://149.101.23.2/graphics/fieldoffices/texas/aboutus.htm).

Shortly after Plaintiff's application for adjustment of status was filed, USCIS requested that the FBI conduct background checks in connection with the I-485s.  See  Puripongs Decl. ¶ 9; Cannon Decl. ¶ 22.  Those checks are not yet complete.  See Cannon Decl. ¶ 22.  The Texas Service Center regularly checks the status of the background checks, but cannot complete its adjudication of the I-485s until it receives the results of those checks.  See Puripongs Decl. ¶ 9. The FBI will transfer the results of the background check to USCIS after the investigation is complete.  See Cannon Decl. ¶ 22.

Plaintiff initiated this action with a mandamus complaint filed March 11, 2007, and amended her complaint October 19, 2007.  Plaintiff asks the Court to order Defendants to complete the security clearances and to complete adjudication of her I-485 application.  Am. Compl. at 7.

STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiff's claims.  See Fed. R. Civ. P. 12(b)(1).  When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999).  "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003).  In addition, plaintiff bears the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of the evidence."  Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98.  To determine the

7

existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

Defendants also move for dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted. Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to show that plaintiff can prove no set of facts in support of its claim which would entitle it to relief). The Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of all inferences. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFF'S CLAIMS.

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district courts "have only such jurisdiction as the Constitution and the Congress grant them"). The statutes cited in the complaint do not establish a statutory basis for the Court to exercise jurisdiction over Plaintiff's claims. The Court lacks jurisdiction to review Plaintiff's challenge to USCIS's processing of her I-485 application because Section 1252 of the INA precludes judicial review of USCIS's "judgments" on applications for adjustment of status, and of numerous other

discretionary decisions and actions involving immigration-related applications and proceedings.

8 U.S.C. § 1252(a)(2)(B). That provision applies "notwithstanding any other provision of law,"

thereby trumping any alternative source of jurisdiction. Id. The FBI has complete discretion to

determine the scope and pace of its national security investigations. Accordingly neither the

Administrative Procedures Act ("APA") nor the Mandamus Act permits this Court to review that

discretionary process. USCIS has equally broad discretion to determine the pace and manner of

adjudicating adjustment of status applications. Accordingly, there would be no APA or

mandamus jurisdiction over Plaintiff's challenge to that process even if the INA did not preempt

other sources of jurisdiction.

## A.     8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction Over Plaintiff's Challenge to USCIS's Adjudication of Her I-485 Application.

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status

applications and other discretionary decisions. As noted supra, Section 1252(a)(2)(B), provides

that "no court shall have jurisdiction to review:"

> (i)     any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)     any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added). In seeking to compel the adjudication of an

adjustment of status application under 8 U.S.C. § 1255, Plaintiff's claim falls squarely within the

plain meaning of each of these terms.

First, the authority to adjudicate adjustment of status applications arises under 8 U.S.C. §

1255(a), and subsection (i) expressly bars judicial review of "any judgment regarding the

granting" of such an application. 8 U.S.C. §§ 1252(a)(2)(B)(i), 1255(a). It follows that the Court

9

cannot review USCIS's judgment that its adjudication of Plaintiff's application cannot be completed until the FBI has completed processing the background checks.

Second, Section 1252(a)(2)(B)(ii) also divests this Court of subject matter jurisdiction over Plaintiff's claim because the adjudication of an adjustment of status application is a discretionary act and decision. "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378. Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II. The "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General," pursuant to Section 1255(a). See 8 U.S.C. § 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe." Id. (emphasis added)). The statute provides no time frame for the adjudication of I-485 applications, and gives the Attorney General complete discretion to prescribe any appropriate regulations. See id. The Attorney General's discretion over the process of adjudicating an I-485 application necessarily extends to the assessment of when, whether, and how to grant an adjustment application. That statutory language has led numerous courts to conclude that Section 1252(a)(2)(B)(ii) bars judicial review of claims challenging aspects of the I-485 adjudicative process. See, e.g., "); Luo v. Keisler, No. 07-0395, Mem. Op. at 4-6 (D.D.C. Nov. 14, 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss action to compel adjudication of plaintiffs' I-485s) (Exh. 4 hereto); Grinberg v. Swacina, 2007 WL 840109 (S.D.Fla. March 20, 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss); Safadi v. Howard, 2006 WL 3780417 (E.D. Va.)(same); Sharkey v. Ganter, 2006 WL 177156 (S.D.N.Y.)(same); Dinsey v. Department of Homeland Security, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no

10

jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the discretion of the Attorney General.  But see e.g., Duan v. Zamberry, 2007 WL 626116 (W.D.Pa. 2007) (finding jurisdiction notwithstanding Section 1252(a)(2)(B)(ii)); Elmalky v. Upchurch, 2007 WL 940330 (N.D.Tex. 2007) (same). Section 1252(a)(2)(B)(ii) applies broadly to bar courts from reviewing any "decision or action" (other than asylum determinations) the "authority for which is specified . . . to be discretion[ary]" under "this subchapter"); see generally Zhu v. Gonzales, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to  require party to obtain labor certification prior to obtaining a work visa); Mahaveer, Inc. v. Bushey, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

    Plaintiff attempts to sidestep section 1252(a)(2)(B) by alleging that USCIS's decision to wait for the results of the FBI's mandatory background checks is not an 'action' or a 'decision,' and instead is a "failure to act."  Am. Compl. ¶ 4.  However, USCIS has, at this time, made a *decision* that it cannot immediately complete its adjudication of the application because it is awaiting potentially relevant information from the mandatory security checks.  See Puripongs Decl. ¶ 9.  This case also involves agency *action*.  The word "action" is not limited to a single act, but also includes an ongoing process or a series of acts.  See Safadi, 466 F. Supp. 2d at 699 (citing Black's Law Dictionary 28 (6th ed. 1990) defining action as "[c]onduct; behavior; something done; the condition of acting; an act or series of acts."); Luo, Mem. Op. at 5 (citing same); see also Grinberg v. Swacina, 478 F. Supp. 2d 1350, 1352 (S.D. Fla. 2007) (finding initiation of background checks was action); Zhang v. Chertoff, ___ F. Supp. 2d ___, 2007 WL 175358, at *4 (W.D. Va. June 19, 2007) ("the preclusion of judicial review over a discretionary act of USCIS

11

encompasses . . . the pace of this process").   Here, USCIS has taken steps to adjudicate Plaintiff's application, and is actively awaiting the results of the national security investigation and checking the status of the background checks.  See Puripongs Decl. ¶¶  8-9. Thus, this is not a case in which an agency has refused to act.  Instead, the alleged delay is a direct consequence of USCIS's conclusion that national security interests preclude it from completing its adjudication of Plaintiff's application until all background investigations are complete.  See Li v. Chertoff, 482 F. Supp. 2d 1172, 1177-78 (S.D. Cal. 2007).

At bottom, Plaintiff takes issue with the fact that USCIS is still engaging in investigative and evaluative activities to determine her eligibility.  However, USCIS's *decision* to continue evaluating Plaintiff's application and the *action* it is taking in doing so lie within the discretion of the Attorney General under § 1255(a).  As another member of this Court recently noted, "given the national security implications of immigration regulation, the broad discretion afforded the Attorney General permits the agency to adjudicate applications only after conducting a careful and thorough investigation."  Luo, Mem. Op. at 5 (Exh. 4).  Thus, Section 1252(a)(2)(B)(ii) precludes judicial intervention in USCIS's adjudicative process.  That withdrawal of subject matter jurisdiction is consistent with the well-established proposition that judicial review in immigration matters is narrowly circumscribed, see Reno v. Flores, 507 U.S. 292 (1993), and that control over immigration is largely entrusted to the political branches of the government, see United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976).

Defendants recognize that federal district courts are split on this issue, and that some judges have concluded that they have jurisdiction to review the reasonableness of any delays in completing adjudication of an I-485 petition.  Compare, e.g., Liu v. Novak, No. 07-263, ___ F.

12

Supp. 2d ___, 2007 WL 2460425 (D.D.C. Aug. 30, 2007) (exercising jurisdiction over claim alleging unreasonable delay in resolving adjustment of status application); Alsharqawi v. Gonzales, No. 06-1165, 2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) (same) with Luo, Mem. Op. at 5-6 (dismissing claim alleging unreasonable delay in resolving adjustment of status application for lack of jurisdiction); Elzer v. Mueller, No. 07-01666, 2007 WL 1221195 (E.D. Pa. Apr. 23, 2007) (dismissing challenge for lack or jurisdiction); Grinberg, 478 F. Supp. 2d at 1352 (same). However, the D.C. Circuit has not yet addressed the issue, and the other courts' rulings are not binding on this Court. As the foregoing discussion makes clear, the INA's jurisdiction-stripping provisions are best read as precluding judicial review of Plaintiff's claims concerning the adjustment of status application. "[T]he Court's insertion into [the I-485 adjudication] process would be inappropriate and could be detrimental to national security." Luo, Mem. Op. at 5.

> **B.** **No Other Statute Gives the Court Jurisdiction to Review Plaintiff's Challenge to the Pace of the Adjudication of Her I-485 Application or the FBI's National Security Investigation.**

Even if some other statute conferred jurisdiction to review Plaintiff's request for immediate adjudication of her adjustment of status application, the INA would foreclose the exercise of that jurisdiction because it applies "notwithstanding any other provision of law (statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(A); see Luo, Mem. Op. at n. 4 (citing INA and noting that it specifically precludes judicial review "notwithstanding any other provision of law"); Danilov v. Aguirre, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction."). However there is no alternative source of jurisdiction in this case. The Mandamus Act does not apply because the process of adjudicating Plaintiff's application

involves discretionary acts and decisions.  The Administrative Procedure Act is inapplicable for similar reasons.  The FBI has plenary discretion over the terms on which its national security investigations are conducted.  Accordingly, neither the Mandamus Act nor the APA empowers this Court to compel the FBI to complete its investigation of Plaintiff's background.

1.    **The Mandamus Act Does Not Confer Jurisdiction Because The Adjudication of Adjustment of Status Applications Is Discretionary.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-stripping provisions of INA § 242 did not apply.  That statute gives district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980). District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted). Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'"  In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiff lacks a clear right to immediate adjudication or immediate completion of her background checks, and Defendants have no clear mandatory or ministerial obligation to adjudicate the application or complete background checks within a particular time frame.  See

14

Luo, Mem. Op. at 6 n.4; Safadi v. Howard, 466 F.Supp.2d at 700; Grinberg, 478 F. Supp. 2d at

1354.  The decision whether to grant or deny Plaintiff's adjustment application is plainly

discretionary by statute.  See 8 U.S.C. § 1255(a).  Surely, that discretion permits USCIS to

enforce a background check requirement thereby ensuring that immigration benefits are not

granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security

matters.  There are no statutory provisions or regulations that mandate the adjudication of

adjustment applications within a particular time frame.  Consequently, USCIS has no clear,

mandatory duty to finish adjudicating Plaintiff's application prior to completion of background

checks, or by a prescribed deadline. Likewise, Plaintiff can point to no clear and indisputable

right to have the background checks completed within a specific time frame, and the FBI has no

statutory or regulatory duty to limit background examinations to a fixed period of time.  See

Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying

plaintiff's request that the court compel that plaintiff's background check be expedited).  Those

factors have led numerous district courts to find that mandamus relief is unavailable in cases such

as this.  See, e.g., Li, 482 F. Supp. 2d at 1177; Grinberg, 478 F. Supp. 2d at 1354; Safadi, 466 F.

Supp.2d at 700; Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan v. McElroy,

No. 02 Civ. 6678 (JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Zheng v. Reno,

166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453

(S.D.N.Y. 2000).  This Court should do the same.

        **2.**       **The Administrative Procedures Act Does Not Permit This Court to Review Plaintiff's Challenge to USCIS's and the FBI's Processing of Her I-485 and the Mandatory Background Checks.**

      Plaintiff also has no right to judicial review under the APA.  Although the APA is not an

independent source of subject matter jurisdiction, it operates in tandem with federal question

jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions. See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355; Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005). However, the APA expressly precludes judicial review of agency actions in two circumstances: (1) if another statute "preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986). Both factors prevent Plaintiff from using the APA as a means of challenging USCIS's processing of her adjustment application and/or the FBI's processing of the background checks.

First, as discussed above, the INA bars judicial review of challenges to the adjustment of status adjudication process. Accordingly, Section 701(a) of the APA, which "withdraws [an APA] cause of action" to the extent another statute "precludes judicial review," prevents Plaintiff from raising an APA challenge concerning the adjudication of her adjustment of status application. Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984); see 5 U.S.C. § 701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a visa decision). Section 702 forecloses judicial review of Plaintiff's challenge to the adjudication of her I-485 for the same reason, as it provides that "nothing herein affects other limitations on judicial review . . . or confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

Second, the APA bars judicial review of all of Plaintiff's claims because the USCIS and FBI actions Plaintiff has challenged are discretionary. The APA generally permits challenges to "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); see also 5

16

U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time").

However, such claims are unreviewable by the courts if the relevant agency action is "committed

to agency discretion by law." Id. § 701(a)(2).  In Heckler v. Chaney, the Supreme Court

interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so

that the court would have no meaningful standard against which to judge the agency's exercise of

discretion."  470 U.S. 821, 830 (1985).  As the Court explained, "if no judicially manageable

standards are available for judging how and when an agency should exercise its discretion, then it

is impossible to evaluate agency action for 'abuse of discretion.'"  Id.; see also Steenholdt v.

Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard).  "The

principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus

from which they were derived—is to protect agencies from undue judicial interference with their

lawful discretion . . . ."  Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

     Plaintiff has no APA cause of action for "unreasonable agency delay" against USCIS

because the timing of USCIS's adjudication of her adjustment of status application is expressly

committed to agency discretion, as are all other aspects of processing that application.  Section

1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such

regulations as he may prescribe."  8 U.S.C. § 1255(a) (emphasis added).  That is the type of

"plenary" grant of discretion which renders agency actions unreviewable under the APA.

Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006).  No statutory or

regulatory provisions provide a "meaningful standard" against which to measure USCIS's process

of adjudicating such an application.  Heckler, 470 U.S. at 830.  Rather, the agency maintains

complete discretion to determine "how and when" to adjudicate the application.  See id.  In

contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and

17

regulations governing Plaintiff's adjustment of status application provide no time frame for when such an application must be adjudicated. See Zheng, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]"). Consequently, there is no standard against which the Court can measure whether USCIS has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1). The fact that the adjudicatory process is committed to agency discretion by law renders claims relating to alleged delays in the adjudication of an adjustment of status application unreviewable under the APA. See Luo, Mem. Op. at 6 n.4; Safadi, 466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878-89; Karan, 2003 WL 21209769, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. 782, 787-88 (S.D.N.Y. 1995). In addition, at least two Supreme Court cases suggest that the presence of a specified time period triggers courts' ability to compel agency action that is "unreasonably delayed" under § 706(1). See Norton, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); Brock, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

The FBI's discretion to conduct its national security investigations bars APA jurisdiction over Plaintiff's challenge to the pace of that investigation. The FBI has determined that "its mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results." Cannon Decl. ¶ 20. Plaintiff has cited no statute or

regulation constraining the FBI's discretion to determine how and when to conduct its investigation, and Defendants are aware of none. Instead, courts have recognized that they lack jurisdiction to dictate the terms of FBI background investigations, under the APA or any other statute. See, e.g., Omar v. Mueller, 501 F. Supp. 2d 636, 640 (D.N.J. 2007) (finding no APA jurisdiction to review 'unreasonable delay' claim concerning FBI's completion of background check for naturalization applicant); Shalabi, 2006 WL 3032413, at * 5 (concluding court lacked jurisdiction to compel FBI to complete background checks); Sozanski v. Chertoff, 2006 WL 4516968, at *1 (N.D. Tex. Dec. 11, 2006) (finding no APA or Mandamus Act jurisdiction to compel FBI to complete background check).

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS and the FBI have "unreasonably delayed" adjudication of her application and the processing of her background checks, this Court would have to create a temporal standard out of whole cloth. This is a perilous task given the national security considerations that permeate USCIS's adjudicative process and the obvious national security interest in through and complete FBI background checks. It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See Valenzuela-Bernal, 458 U.S. at 864; Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary."). Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the

19

functioning of already overburdened administrative agencies.'"  Rahman, 884 F. Supp. at 787

(quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler, 470

U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the

many variables involved in the proper ordering of its priorities"); Luo, Mem. Op. at 5 (concluding

judicial intervention would be "inappropriate" given national security concerns).  Those

principles counsel against the imposition of a judicially-created standard to gauge how long

USCIS may wait for assurance that the background checks have identified no national security

reasons that would merit denial of an applicant's adjustment application, or how much time the

FBI may devote to its investigation.

## II.      IF THE COURT HAD SUBJECT MATTER JURISDICTION, PLAINTIFF'S CLAIMS  WOULD BE SUBJECT TO DISMISSAL UNDER RULE 12(b)(6).

Even if the Mandamus Act or  the APA could be construed as permitting this Court to

review the reasonableness of the delay in completing the processing of Plaintiff's adjustment

application, Rule 12(b)(6) would require dismissal of any such claim.  The D.C. Circuit has

identified six factors courts should consider when reviewing claims that allege unreasonable

agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999) (quoting

20

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984) ("TRAC").  Where, as here, Congress has declined to establish a specific timetable for agency action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific timetable." In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d 503, 506 (D.C. Cir. 1988).  The D.C. Circuit also has emphasized the importance of considering the agency's competing priorities, noting that agencies should be given "great latitude in determining their agendas." In re Monroe Comms. Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).

The complaint does not allege facts sufficient to support Plaintiff's claim that USCIS has unreasonably delayed processing her adjustment application and that the FBI has unreasonably delayed completing the national security investigations.  As noted, Congress has established no timetable for processing adjustment applications or national security investigations.  Further, the competing interests at issue in this case militate against granting Plaintiff the relief she seeks.  The D.C. Circuit has "declined to grant relief, even when all the other factors considered in TRAC favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)).  Yet that is precisely what Plaintiff asks this Court to do.  Defendants and the numerous individuals with pending adjustment applications have a strong interest in processing the applications in an orderly fashion and ensuring that all applicants are treated the same.  Allowing any alien that files a lawsuit to leapfrog to the head of the queue would be contrary to those interests, and potentially would lead applicants with pending background checks to flood the federal courts with mandamus actions in order to obtain that advantage.  As the Eastern District of Virginia has recognized,

> to grant relief in this case would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer. Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

Dmitrenko v. Chertoff, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); see also id. at n. 1 ("To grant relief to today's petitioners, compelling adjudication of their application over persons that have waited even longer, would be far from equitable."). While Plaintiff may desire immediate adjudication of the application, she has no entitlement to that relief.

Finally, Defendants' obligation to protect national security is another "competing interest" that makes any delay reasonable. Background checks serve an important law-enforcement and public safety purpose. See Li v. Chertoff, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007); Cannon Decl. ¶¶ 17,20. Accordingly, courts have found it reasonable for an adjustment application to remain pending for long periods of time when the delay is attributable to an ongoing security investigation. See Zahani, 2006 WL 2246211, at *3 (noting "[c]ourts have routinely found delays caused by FBI background checks to be justifiable delays" and citing cases); Zheng v. INS, 933 F. Supp. 338, 341 (S.D.N.Y. 1996) (dismissing case pursuant to 12(b)(6) because delaying processing of application pending completion of background checks was not an unreasonable delay); Jabr v. Chertoff, No. 4:06cv00543, 2006 WL 3392504, at *2 (E.D. Mo. Nov. 21, 2006) (finding plaintiffs failed to state a claim for unreasonable agency delay although adjustment application had been pending for more than two years due to background checks). For all the foregoing reasons, Plaintiff has failed to state a claim for unreasonable delay in adjudicating her I-485.

## III.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE NORTHERN DISTRICT OF TEXAS.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes default rules for venue that apply to federal lawsuits where the underlying statutes do not specify their own venue rules.  See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise provided by law.").  Section 1391 identifies three possible bases for venue for claims against federal government officials or agencies: (1) where a defendant "resides;" (2) the district where "a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the plaintiff resides, if no real property is involved in the action."  28 U.S.C. § 1391(e).  Plaintiff appears to rely on the first prong of this test, and alleges that venue is proper in this Court because the agency heads named as Defendants have offices in the District of Columbia.  See Am. Compl. ¶ 5.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence in Washington D.C., the venue challenge should be examined  "very closely."  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has led courts in this District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to a district with a closer nexus to the parties' dispute.  See, e.g., Cameron, 983 F.2d at 256 (ruling Washington, D.C. was not the proper venue because the sole connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9 (D.D.C. July 23, 2007) (transferring mandamus action seeking adjudication of I-485 to Southern District of Texas because that was where the application was being adjudicated); Rosales v. United States, 477 F. Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d 82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where

23

D.C. officials only set general policies and did not make specific decisions being appealed); Joyner v. District of Columbia, 267 F. Supp.2d 15, 20-21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections).  Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring suit here that properly should be pursued elsewhere."  Cameron, 983 F.2d at 256.

The fact that Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court should transfer this case to the Northern District of Texas.  Section 1404(a) permits the Court to transfer this case to "any other district or division where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  A threshold question is whether the case could have been brought in the district to which transfer is sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1964)).  The Court then must engage in a case-by-case analysis and balance the private interests of the parties with public interests such as efficiency and fairness.  Id. at 29; Abusadeh, 2007 WL 2111036, at *3.  The moving party bears the burden to establish that it is proper to transfer the case.  See Southern Utah, 315 F. Supp. 2d at 86.  Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).  Plaintiff could have brought this case in the Northern District of Texas, and both the private and public interests favor transfer to that court.

The Northern District of Texas clearly is a district in which this case "might have been brought."  The Texas Service Center is responsible for adjudicating Plaintiff's adjustment of

status applications; therefore any delay in the processing of that application concerns that office, which is located in Dallas, Texas. <u>See</u> Puripongs Decl. ¶ 9. As a result, the events or omissions giving rise to Plaintiff's claim occurred in the Northern District of Texas, making venue proper in that court under 28 U.S.C. § 1391. <u>See</u> <u>Abusadeh</u>, 2007 WL 2111036, at * 6 (concluding venue was proper in Southern District of Texas because I-485 was being adjudicated there).

The private interests favor transfer. The factors courts consider when assessing those interests include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to sources of proof. <u>See</u> <u>Trout Unlimited</u>, 944 F.Supp. at 16 (citation omitted). Although courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum. <u>See</u> <u>Shawnee Tribe v. United States</u>, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235 (1981)). Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case. <u>See</u> <u>Southern Utah Wilderness Alliance</u>, 315 F. Supp.2d at 86.

Plaintiff's choice of forum deserves little deference because she does not reside in this District, and because this District lacks meaningful ties to the controversy. The Northern District of Texas is a more appropriate forum, because that is where the relevant decisions were and will be made. As noted, the Texas Service Center is charged with adjudicating Plaintiff's adjustment application. <u>See</u> Puripongs Decl. ¶ 9. The named agency defendants will have no direct involvement in the adjudication of that application. Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters. <u>Southern Utah Wilderness Alliance</u>, 315 F. Supp.2d at 87; <u>see, e.g.,</u> <u>Rosales</u>, 477 F. Supp. 2d at

25

216; <u>Shawnee Tribe</u>, 298 F. Supp.2d at 24; <u>Sierra Club v. Flowers</u>, 276 F.Supp. 62, 67-68 (D.D.C. 2003) (transferring case because federal officials in Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision-making process); <u>see also</u> <u>Airport Working Group of Orange County, Inc. v. United States Dep't of Defense</u>, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision).

The FBI's involvement in the background name check process also does not establish a close nexus to this District. The background checks are not initiated by the FBI. <u>See</u> Puripongs Decl. ¶ 8. The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Texas Service Center. <u>See</u> <u>id.</u> ¶ 9. Local officials at the Texas Service Center conduct the decision-making process and will make the final decision. <u>See</u> <u>id.</u> ¶ 8. In sum, the FBI has a very routine role regarding Plaintiff's application — to conduct the background checks and send the results to USCIS. It does not determine whether, when, or how the adjustment application will be adjudicated. <u>See</u> Cannon Decl. ¶ 21. Accordingly, even if the FBI officer(s) processing Plantiff's national security investigations were located in Washington, D.C., that would not make this Court the proper forum.

Other private interest factors also support transfer. The Northern District of Texas is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. That district is the home jurisdiction of the Texas Service Center, which is charged with and is responsible for adjudicating Plaintiff's pending adjustment application. <u>See</u> Puripongs Decl. ¶ 8. Since this case arose in the Northern District of Texas, there is local interest in resolving it there. <u>See</u> <u>Schmidt v. American Institute of Physics</u>, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise); <u>Abusadeh</u>, 2007

26

WL 2111036 at *8 (transferring case to jurisdiction where USCIS field office was located because of that district's interest in resolving the dispute).  That also makes the Northern District of Texas a more convenient jurisdiction in which to litigate this case because the people directly involved in making the determination as to Plaintiff's application are located in Texas.  See Puripongs Decl. ¶¶ 8-9.

The public interest also favors transfer.  The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted); Airport Working Group of Orange County, Inc., 226 F. Supp.2d at 229.  Since this action concerns federal law, the Northern District of Texas is as familiar with the applicable law as the District of Columbia.  In addition, there is no evidence that the Northern District of Texas's docket is significantly more congested than the District of Columbia's docket.  See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16; see also Exh. 5 (spreadsheet demonstrating caseload of both districts).  In 2006 the districts had a similar number of pending cases (4,326 in the Northern District and 4,114 in this Court), and civil cases in the Northern District were resolved more quickly than civil cases in this Court.  See id.  Accordingly, both factors weigh in favor of the Court transferring this case to the Northern District of Texas.

The Court's analysis in Abusadeh v. Chertoff is instructive.  There, as here, the Plaintiff filed a mandamus complaint seeking to compel USCIS to complete its adjudication of a pending immigration application.  See 2007 WL 2111036 at *2.  The Plaintiff's application was pending in a local USCIS field office in Texas.  See id. at *6.  Plaintiff filed suit in this District, and named agency officials with offices in Washington, D.C. as defendants.  See id.  District Judge

27

Kollar-Kottelly concluded that Abusadeh's choice of forum was entitled to little deference because there were no meaningful ties between this District and pending immigration applications being adjudicated by a USCIS field office outside Washington, D.C. See id. at * 6-*8. Further, the public interests favored transfer because both districts were equally familiar with the applicable law but the Southern District of Texas had a "superior interest in addressing the instant controversy because 'there is a local interest in having localized controversies decided at home.'" Id. at *8. The same is true here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court GRANT Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Northern District of Texas.

Dated:  November 19, 2007                 Respectfully submitted,

                                          _____/s/_____
                                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                                          United States Attorney

                                          _____/s/_____
                                          RUDOLPH CONTRERAS, D.C. BAR #434122
                                          Assistant United States Attorney

                                          _____/s/ Robin M. Meriweather_____
                                          ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                          Assistant United States Attorney
                                          555 Fourth St., N.W.
                                          Washington, D.C.  20530
                                          Phone: (202) 514-7198 Fax: (202) 514-8780
                                          Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                     )
YING LI,                                             )
                                                     )
                        Plaintiff,                   )
                                                     )
          v.                                         )    Case Number: 1:07CV662(RMU)
                                                     )
MICHAEL CHERTOFF, Secretary of the                   )
United States Department of Homeland                 )
Security, <u>et al.</u>,                             )
                        Defendants.                  )
_____)

**ORDER**

Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this

_____ day of _____, 200____,

_____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and that

complaint be and hereby is DISMISSED;

_____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and that the

case be and hereby is TRANSFERRED to the United States District Court for the

Northern District of Texas.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Ying Li

                    Plaintiff,

v.                                              Civ. Act. Number: **1:07-CV-00662-rmu**

Department of Homeland Security, et. Al

                    Defendants.

PERSONAL DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.  I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services.  TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC has 51,221 pending employment based I-485s and projects receiving another 95,000 by the end of the FY 2007. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created.  Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests.  Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

3. Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication.  FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY.  An FBI Name Check that has been completed will be indicated by various entries depending on the result.

4. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check

EXHIBIT 1 TO MOTION TO DISMISS AND TRANSFER

request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

5.  All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

6.  Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

7.  The Service Centers, to increase efficiency and provide better service on immigration benefits, reorganized, in a process called bi-specialization, so that two Service Centers would specialize in certain applications and petitioners, instead of each Service Center handling all types of applications and petitions. To implement this reorganization each center transferred pending applications to other centers that specialized in that type of application. Thus, a center that instituted a process, as is the case here, is not the center that completes the process on certain pending or transition cases.

8.  I have custody of the TSC records of Ying Li, A98416314, and I supervise TSC officers who are processing Ying Li's applications. After reviewing the information pertaining to Ying Li, I attest that USCIS has referred this case for lawfully required security screening of aliens and that USCIS suspended adjudication in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

9.  During the normal processing of this case, a national security screening was requested. The information and records pertaining to Ying Li shows that TSC Officers under my supervision make regular inquiries about the status of her security screening.


Naboone Puripongs
Supervisory Adjudications Officer
Texas Service Center

_10-MAY-2007_
Date


EXHIBIT 1 TO MOTION TO DISMISS AND TRANSFER

# U. S. Citizenship and Immigration Services

**TEXT ONLY   HOME   WHAT'S NEW   FAQs   SEARCH   GLOSSARY   FEEDBACK   PRINTPAGE**



Services Field Office
Addresses and
Information

  About USCIS Field
  Offices

  U.S. Field Office
  State Map

  List of U.S.
  Field Offices

    Texas

      Overview

      **About Us**

      Forms and Fees

  Application Support
  Centers Map

  Application Support
  Centers

  National Benefit
  Center

## About Us

General Information
Organizational Structure
Service Area
Where Are We?
Applications We Accept and/or Process
Mailing Your Application/Petition to Us
Contacting Us
Other Immigration Offices Serving This Area

**Director:** Evelyn Upchurch

Note: certain filing instructions and information is common to all USCIS Service Centers. Read more about them on our National Service Center page:

·        Documents Not in English

·        Preparing Your Application for Filing

·        Paying Fees

·        Your Receipt

·        Motions to Reopen (MTR)

·        Denials

·        How we Process Your Application at a Service Center

·        General Tips on Assembling Applications for Mailing

See also:

·        LIFE Act

·        Finding the Status of Your Case

·        Processing Dates

·        Special Registration (on the Immigration & Customs Enforcement website)

**Service Area:**

The Texas Service Center accepts and processes certain applications and

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

petitions from individuals residing in the following states:

**Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, South Carolina, Oklahoma, Tennessee, and Texas.**

Applications for asylum (Form I-589) may require filing at a different Service Center than indicated above; please check the instructions for Form I-589 to determine where you should file your application.

**Please Note:** If you live outside the service area of this Center, please file your application or petition with the Center serving your area. If you are unsure of which Service Center serves people living in your state, consult the List of USCIS Field Offices for your state. If you know which Service Center you wish to visit, you may use the following links:

California Service Center
Vermont Service Center
Nebraska Service Center

**Where Are We?**

The Texas Service Center is located in Dallas, Texas.

**SPECIAL NOTE:** Separate PO Box numbers and Zip codes are required for the different form types.

For General Correspondence, please use the following address:

USCIS TSC
P.O. Box 851488
Mesquite, TX 75185-1488

**Applications We Accept and/or Process:**

**Direct Mail Cases We Accept:**

**NOTE EXCEPTIONS:**
**Forms I-131,** Applications for Travel Document **(Re-entry Permit or Refugee Travel Document only)**, are filed with the Nebraska Service Center.
**Forms I-360, Self-Petitions** filed by Battered Spouse or Child petitions are filed at Vermont Service Center.
**Forms I-360 for G-4 International Organization Officers**, Employees, and their family members are filed at the Nebraska Service Center effective 2/23/04
**Forms I-485** for those individuals filed concurrently with an I-360 are also filed Only at the Nebraska Service Center effective 2/23/04
Forms I-730, Refugee/Asylee Relative petitions are filed with the Nebraska Service Center.
**Forms I-485, Refugee/Asylee/Haitian** applications are filed with the Nebraska Service Center.

All concurrently filed Forms I-140/I-485 should be submitted to the Nebraska Service Center effective 4/1/06.

Effective 7/24/06, all stand alone Forms I-485 based on a pending or an approved Form I-140 should be mailed directly to the Nebraska Service Center. Forms accompanying the I-485 (e.g., Form I-131 and/or I-765)

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

should also be filed at the Nebraska Service Center;

**Preparing Your Application for Filing:**

**Mailing Your Application/Petition to Us:**

You may also be eligible to file some forms electronically. For more
information, see Introduction to E-Filing.

| Texas Service Center Direct Mail Address by Application | |
|---|---|
| I-90 "B" and "D" | USCIS TSC<br>ATTN: I-90 "b" or "d"<br>P.O. Box 851983<br>Mesquite, TX 75185-1983 |
| I-129 (Except I-129F) | Vermont ServiceCenter |
| I-129F, I-212, I-612, I-751, I-817<br>Family Services | USCIS TSC<br>P.O. Box 850965<br>Mesquite, TX 751185-0965 |
| I-130 | USCIS TSC<br>PO Box 850919<br>Mesquite, TX 75185-0919 |
| I-131, I-102, Legalization,<br>Residents | USCIS TSC<br>PO Box 851182<br>Mesquite, TX 75185-1182 |
| I-131 E-Filed – Supporting<br>Documentation | USCIS TSC<br>ATTN: E-Filed I-131<br>PO Box 852685<br>Mesquite, TX 75185-2685 |
| I-526, I-829, EB/Business | USCIS TSC<br><br>PO Box 852135<br>Mesquite, TX 75185-2135 |
| I-140 E-Filed – Supporting<br>Documentation | USCIS TSC<br>ATTN: E-Filed I-140<br>PO Box 851391<br>Mesquite, TX 75185-1391Nebraska Service<br>Center |
| I-360, I-526, I-829 | USCIS TSC<br>PO Box 852135<br>Mesquite, TX 75185-2135 |
| I-140<br><br>I-140/I-485 Concurrent Filing | Nebraska Service Center |
| Premium Processing | USCIS TSC<br>PO Box 279030<br>Dallas, TX 75227-9030 |
| I-485 | Nebraska Service Center |
| I-181, I-865 Adjustment | USCIS TSC<br>PO Box 851804<br>Mesquite, TX 75185-1804 |
| I-539 | USCIS TSC<br>PO Box 851182<br>Mesquite, TX 75185-1182 |
| I-539 E-Filed – Supporting<br>Documentation | USCIS TSC<br>ATTN: E-Filed I-539 |

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

|  |  |
|---|---|
|  | PO Box 852523<br>Mesquite, TX 75185-2523 |
| I-589, I-213, FD258 | USCIS TSC<br>PO Box 851892<br>Mesquite, TX 75185-1892 |
| I-765 | USCIS TSC<br>PO Box 851041<br>Mesquite, TX 75185-1041 |
| I-765 E-Filed – Supporting<br>Documentation | USCIS TSC<br>ATTN: E-Filed I-765<br>PO Box 852401<br>Mesquite, TX 75185-2401 |
| I-824 | USCIS/TSC<br>PO Box 851182<br>Mesquite, TX 75185-1182 |
| N-400<br>Naturalization | USCIS TSC<br>PO Box 851204<br>Mesquite, TX 75185-1204 |
| RFE/I-72 Returns, All<br>Naturalization | USCIS TSC<br>PO Box 852381<br>Mesquite, TX 75185- 2381 |
| Motions and Appeals | USCIS TSC<br>PO Box 852841<br>Mesquite, TX 75185-2841 |
| Address and<br>Attorney Change<br>Notification | USCIS TSC<br>P.O. Box 850891<br>Mesquite, TX 75185-0891 |
| General<br>Correspondence | USCIS TSC<br>PO Box 851488<br>Mesquite, TX 75185-1488 |
| Courier Delivery | USCIS TSC<br>4141 St. Augustine Rd.<br>Dallas, TX 75227 |

**Note: Use the box number for the principal application if more than one application is concurrently submitted. For example, if an I-485 is submitted with an I-131, and I-765, the application should be mailed to the P.O. Box number for the I-485 application.**

**If you are submitting Form I-485, Form I-131 and/or Form I-765 with your Form I-140, please send the entire package to the P.O. Box listed for concurrent filings for Form I-140.**

**With exceptions noted above, separate P.O. Box numbers and Zip codes are required for the different form types.**

**If a case has been improperly rejected, you should resubmit by Double Bagging and indicate on the inner bag "DO NOT OPEN IN THE MAILROOM" . Mail to the Attention of Noel Watts, CPAU Supervisor.**



**Contacting Us**

**" Age Outs" :**

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

"Age Out" cases involve the children of principal aliens or U.S. citizens. Sometimes, if these children turn 18 or 21 (depending on the type of benefit sought) before their case is processed, they will lose the benefit they are seeking. If your case falls within this category, please indicate on your application that it is an "Age Out" case.

Please note: The above statement may no longer apply to your individual case. On August 6, 2002, President Bush signed into law the Child Status Protection Act (CSPA). This law changes the "Age Out" rules in effect prior to signing of the CSPA which was were previously defined under the Immigration and Nationality Act (INA). Under the new law, a child will be prevented from "aging out" due to service processing delays.

Please read guidance here to see if the "Age Out" policy affects you or your children.

We ask that you bring age outs to our attention a minimum of six months before the 18th or 21st birthday depending on the type of benefit sought. We may not be able to complete dire circumstances age outs sooner than six weeks because of fingerprint processes and requirements, which mandate that FBI clearances be completed prior to adjudication.

**Change of Address:**

Customers with pending applications may report their change of address to Customer Service at 1 (800) 375-5283.

**You also need to file Form AR-11 in all cases of change of address.**

**Customer Feedback:**

We strive to provide quality service to our customers. If we have not lived up to this commitment, we would like to know. If we have met or exceeded your expectations, please let us know that as well. To comment on the services provided at this office, please write to the Center Director, at:

U.S. Citizenship and Immigration Services
Texas Service Center
P.O. Box 851488
Mesquite, TX 75185-1488

Note in the heading of the letter and on the envelope: " FOR THE PERSONAL ATTENTION OF THE DIRECTOR."

If you feel you were mistreated by a USCIS employee, or wish to make a complaint of misconduct by a USCIS employee, you may write to the Service Center Director, or write directly to the:

Director, Office of Internal Audit
425 Eye Street, NW
Room 3260
Washington, DC 20536

Please be specific and reference specific case numbers and dates to provide the best way for us to understand and assess your complaint.

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

**Designated Civil Surgeons:**

For general information on the required medical examination, please see "
Designated Civil Surgeons" . Most applicants for adjustment of status are
required to have a medical examination. A civil surgeon who has been
designated by USCIS must conduct the medical examination. See the
listing of Designated Civil Surgeons in your area. You may also call
Customer Service at 1 (800) 375-5283. You will be asked to provide your
zip code. Have a pen or pencil ready to write down the list of civil surgeons
in your area.

Doctors interested in being registered as a Designated Civil Surgeon in
should submit the following to the local District Office:

·        A letter to the District Director requesting consideration

·        A copy of a current medical license

·        A current resume that shows 4 years of professional experience,
not including a residency program

·        Proof of citizenship and lawful status

·        Two signature cards showing name typed and signature below

**Employment Opportunities:**

To obtain information about employment opportunities with USCIS,
please search the USA Jobs Website for current Department of
Homeland Security vacancy announcements.

**Employer-related Immigration Matters** (USCIS Office of Business
Liaison)**:**

CALL: 1 (800) 357-2099
TDD: 1 (800) 278-5732

**General Expedite Procedures**

Please call customer service at 1-800-375-5283 to discuss the criteria for
consideration of a request to expedite a case.

AILA members must process their requests through one of the AILA
Liaison Co Chairs.

Cases that are not clearly approvable will not be expedited. Requests to
expedite petitions or applications that are incomplete will not be granted.
All supporting documents not in English must include a certified translation.
See "Documents Not in English" on our National Service Center page.
There is no appeal of the denial of an expedite request. Please see our
USCIS Expedite Criteria guidance.

**Fee Waivers:**

Fee waivers are given at the sole discretion of the Center Director and
may be granted or denied on a case-by-case basis. Please direct
requests to the Center Director's attention and include all relevant
information with each request. Decisions will be based solely on the
supporting documents submitted.

**Forms:**

Forms are *not* available at the Texas Service Center. Forms are
available through the local USCIS offices, through the Government

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

Printing Office (GPO), at GPO bookstores, or call 1 (800) 870-3676 to have forms mailed to you. You can find USCIS forms online or make an on-line request that they be mailed to you.

**Freedom of Information Act (FOIA):**

To submit a request for information pursuant to the Freedom of Information Act or Privacy Act, visit www.dhs.gov for instructions about how and where to send your request.

**Information:**

Call Customer Service at 1 (800) 375-5283.

**LIFE Act**

**National Customer Service Center:**

Call Customer Service at 1 (800) 375-5283 for information and help on matters concerning immigration services and benefits.

**Naturalization Information:**

In addition to the information provided on the TSC home page, please visit the Naturalization Website. Included on the site is information on who can be naturalized, what is required, how and where to apply, frequently asked questions, and *A Guide to Naturalization*, which provides an overview of the naturalization process. From that Website, you can access and download Naturalization Forms including Form N-400, Application for Naturalization.

**Processing Dates:**

Processing time varies by case type. The projected processing time is included on each receipt notice (Form I-797) sent to applicants and petitioners. See also Processing Dates.

**Status of Applications Inquiries:**

See Finding the Status of Your Case.

**Supplemental Information:**

Notices for additional information or clarification mailed from the Service Center will contain a colored cover sheet to be used in responding to the notice.   In all cases, responses to a notice must include the colored copy of the notice on top of the response to ensure that the response is directed for review in a priority manner.

**Other Immigration Offices Serving This Area:**

**Application Support Centers (ASCs)** (where fingerprinting can be obtained)**:**

For information, including directions, call Customer Service (800) 375-5283.

**List of USCIS Field Offices by State**



*Last Modified 07/27/2006*

EXHIBIT 2 TO MOTION TO DISMISS AND TRANSFER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YING LI,

       Plaintiff,

       v.

ALBERTO R. GONZALES,
       et al.,

       Defendants.

Case No:
1:07-CV-00662-RMU

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Ying Li, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)      The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)      FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

2

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

    (a)    "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

    (b)    "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

    (a)    Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

    (b)    Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

3

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

computerized system. All serials originated by the Office
of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as
"UNI", continues the universal concepts of the ACS system
by providing a complete subject/case index to all
investigative and administrative cases. Only the Office of
Origin is required to index. However, the Lead Offices
may index additional information as needed. The Universal
Index, which consists of an index of approximately 98.7
million records, functions to index names to cases, and to
search names and cases for use in the FBI investigative and
administrative cases. Names of individuals or entities are
recorded with identifying information such as the date or
place of birth, race, sex, locality, social security number,
address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a
discretionary decision made by the investigative FBI Special Agent, the supervisor in the field
division conducting the investigation, and the supervising FBI Special Agent at FBI
Headquarters. The FBI does not index every name in its files, but indexes only that information
considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this
mass information, information essential to ongoing investigations could not be readily retrieved.
The FBI files would thus be merely archival in nature and could not be effectively used to serve
one of the mandated missions of the FBI, to investigate violations of federal criminal statutes.
Therefore, the General Indices to the CRS files are the means by which the FBI can determine
what retrievable information, if any, the FBI may have in its CRS files on a particular subject
matter.

(11)    When the FBI searches a person's name, the name is electronically
checked against the FBI's Universal Index. The searches seek all instances of the individual's
name, social security number, and dates close to his or her date of birth, whether a main file or
reference. As previously stated, any "main" file name would be that of an individual who is,
himself or herself, the subject of an FBI investigation, whereas any "reference" would be an
individual whose name appears as part of an FBI investigation. For example, "references"
include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)   If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)   Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)   For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

5

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(15)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

(17)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(18)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

6

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI generally processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

7

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

## PLAINTIFF'S NAME CHECK REQUEST

(22)    The name check request for plaintiff Ying Li was received by the FBI from USCIS on or about July 14, 2004, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this **22**ⁿᵈ day of June 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8

EXHIBIT 3 TO MOTION TO DISMISS AND TRANSFER

# Fact Sheet

**Immigration Security Checks—How and Why the Process Works**

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

EXHIBIT 4 TO MOTION TO DISMISS AND TRANSFER

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns.  USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States.  Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit.  Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement.  Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the

EXHIBIT 4 TO MOTION TO DISMISS AND TRANSFER

sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS.  Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

3

EXHIBIT 4 TO MOTION TO DISMISS AND TRANSFER