# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
YING LI,                                      )
                                              )
                     Plaintiff,               )
                                              )
          v.                                  )     Case Number: 1:07CV662(RMU)
                                              )
MICHAEL CHERTOFF, Secretary of the            )
United States Department of Homeland          )
Security, et al.,                             )
                     Defendants.              )
_____)

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR TRANSFER

### SUMMARY

Federal district courts lack jurisdiction to review mandamus or Administrative Procedures Act ("APA") "unreasonably delay" complaints which challenge United States Citizenship and Immigration Services ("USCIS's") ability to enforce its requirement that all applicants seeking lawful permanent resident status clear security investigations and background checks prior to final adjudication of their applications. The contrary precedent on which Plaintiff relies reflects the minority view among the judges in this District who have reviewed that jurisdictional issue, and is not binding upon this Court. Defendants urge the Court to adopt the reasoning of Luo v. Keisler and Orlov v. Howard, in which District Judges Leon and Bates held that USCIS's decision to wait for background check results before completing its adjudication is a discretionary action which, like other discretionary aspects of the adjudicative process, fall within the Immigration and Nationality Act's proscription of judicial review of USCIS's discretionary actions and decisions. Luo v. Keisler, __ F. Supp. 2d ___, 2007 WL 3357241 (D.D.C. Nov. 14, 2007); Orlov v. Howard, __ F. Supp. 2d ___, 2007 WL 4293490, at *9 (D.D.C.

Dec. 10, 2007).  Moreover, district courts have nearly unanimously held that they lack jurisdiction to dictate the pace at which the FBI completes its security investigations and background checks.  Judicial intrusion in those law enforcement related activities would severely undermine national security interests in thorough and accurate background check results.  The case should therefore be dismissed for lack of jurisdiction.

Although judges are split on the jurisdictional issues, the venue question raised in Defendants' motion to transfer is straightforward:  whether a mandamus complaint which seeks an order compelling an agency to complete its adjudication of an adjustment of status application should be transferred to the district in which such adjudication will occur.  Three members of this Court have addressed this issue, and they unanimously concluded that the district in which the USCIS office or service center that will adjudicate the application is located is a more appropriate forum than the District of Columbia.  See Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9 (D.D.C. July 23, 2007) (transferring mandamus action seeking adjudication of naturalization application and replacement of alien registration card to Southern District of Texas because that was where the application was being adjudicated); Fayyaz v. Dep't of Homeland Security, No. 06-2016 (D.D.C. Oct. 25, 2007) (unpublished Order) (transferring mandamus action concerning I-485 to the Southern District of Texas because that is where plaintiff resided and the district in which the USCIS office with jurisdiction over their applications was located) (attached as Exh. 4 hereto); Poliakova v. Gonzales, No. 07- 1210 (D.D.C. Dec. 17, 2007) (Order attached hereto as Exh. 1) (transferring mandamus action concerning I-485 to Southern District of Florida for the same reason).  Plaintiff has not cited a single case holding that a mandamus action seeking to compel field office employees to grant relief should instead be heard in the district in which the Director of an agency is located, and Defendants are aware of none.

Accordingly, if the Court does not dismiss this action, Defendants' alternative motion for transfer should be granted.

## STANDARD OF REVIEW

Defendants addressed the standard of review in their motion to dismiss. See Mem. In Support of Mot. To Dismiss Or in the Alternative to Transfer (Corrected), Dkt. Entry 14 at 7-8 (hereafter "MTD"). As stated therein, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003). A court's consideration of that extrinsic information does not convert a Rule 12(b)(1) motion to dismiss into a motion for summary judgment. See Phoenix Consult., Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987). Plaintiff's contrary assertions conflict with the law of this Circuit. See Mem. In Opposition to Mot. To Dismiss, Dkt. Entry 16, at 4-5 (hereafter "Opp.").

## ARGUMENT

I.  **THE COURT LACKS JURISDICTION OVER PLAINTIFF'S CHALLENGE TO USCIS'S DETERMINATION THAT IT CANNOT COMPLETE THE ADJUDICATION OF HER APPLICATION UNTIL THE SECURITY INVESTIGATIONS AND BACKGROUND CHECKS ARE COMPLETE.**

   **A.  Section 1252(a) of the Immigration And Nationality Act Forbids Review of Plaintiff's Claims.**

As numerous district courts have recognized, Section 1252(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(a), deprives courts of jurisdiction over challenges to the I-485 adjudication process. See, e.g., Orlov, 2007 WL 4293490, at *9; Sun v. Gonzales, No.

3

07-504, Order (D.D.C. Dec. 10, 2007) (attached hereto as Exhibit 2); <u>Luo</u>, 2007 WL 3357241 at

*2; <u>id.</u> at *1 (citing cases from other districts reaching same conclusion); <u>Grinberg v. Swacina</u>,

478 F. Supp. 2d 1350 (S.D. Fla. 2007); <u>Safadi v. Howard</u>, 466 F. Supp. 2d 696 (E.D.V.A. 2006);

MTD at 8-12 (analyzing statutory language and citing cases from other districts[1]).   Section

1255(a) of the INA provides that an alien's status "*may* be adjusted by the Attorney General, *in*

*his discretion* and under such regulations as he may prescribe."  8 U.S.C. § 1255(a) (emphasis

added)).  Section 1252(a) expressly withdraws judicial review of all discretionary USCIS actions

or decisions concerning adjustment applications and other immigration matters, and all issues

concerning USCIS's "judgments" regarding the granting of an adjustment application.  8 U.S.C.

§ 1252(a)(2)(B).  Plaintiff seeks judicial review of USCIS's determination that it cannot

complete adjudication of her I-485 until the national security investigation into her background is

complete, and asks the Court to issue an order forcing Defendants to complete the adjudication.

<u>See</u> Compl. at 7.  It follows that section 1252(a)'s proscription against judicial review of all

"judgments" concerning adjustment of status, and of any discretionary "act" or "decision"

forecloses review of Plaintiff's claims.

 Plaintiff's opposition memorandum discounts and ignores the national security

implications of her contention that courts may direct USCIS to complete its adjudication of an

adjustment of status application before the national security investigations and background

checks have been completed.  Although she does not dispute that the final decision to grant or

deny her application is unreviewable, she contends that there is a presumption that the

adjudication process itself <u>can</u> be reviewed.  Plaintiff then argues that USCIS lacks discretion to

---

[1] Plaintiff contends that the majority of courts have found that they have jurisdiction to review such claims.  However, in this District, the majority of District Judges that have reviewed similar mandamus and APA actions have concluded that they lack subject matter jurisdiction.  In other districts, the courts appear to be split relatively evenly.

enforce its background check requirement because Congress gave USCIS broad "discretion" over adjustment applications instead of specifically listing the pace of the process and the background check requirements as examples of decisions encompassed within that discretion. Plaintiff also relies heavily on Liu v. Novak, arguing that there are no "decisions," "acts," or "judgments," at issue in this case, because Defendants allegedly have failed to act.  However, Liu is not binding upon this Court, and represents the minority view in this District.  Compare Orlov, 2007 WL 4293490 at *9 (dismissing mandamus challenge to pace of adjudicating adjustment application for lack of jurisdiction); Sun, No. 07-504 (Order attached hereto as Exhibit 2) (same); Luo, 2007 WL 3357241 at *2.  Defendants respectfully urge the Court to follow the jurisdictional analysis adopted in Orlov, Luo, and precedent from other districts in which courts have dismissed claims similar to Plaintiff's for lack of subject matter jurisdiction.[2]

### A.  There is A Presumption Against Judicial Review of Immigration Matters.

Plaintiff's assertion that there is a strong presumption in favor of judicial review in the immigration context, Opp. at 11, conflicts with D.C. Circuit precedent, and ignores the national security issues that this case implicates.  The D.C. Circuit has recognized that "[w]hen it comes to matters touching on national security or foreign affairs . . . the presumption of review runs aground."  Bruno v. Albright, 157 F.3d 1153, 1162 (D.C. Cir. 1999) (dismissing challenge to denial of visa for lack of jurisdiction).  Although the Court made that statement in connection with a visa application, the same principles apply here.

This case clearly involves "matters touching on national security."  Bruno, 157 F.3d at 1162.  Plaintiff's complaint challenges USCIS's right to ensure that each individual who is

---

[2]  Plaintiff incorrectly asserts that Defendants "chiefly rely" on *Safadi v. Howard*, 466 F. Supp. 2d 696 (E.D. Va. 2006).  Opp. at 13.  *Safadi* is but one of the numerous cases cited in Defendants' brief.

granted lawful permanent residency status has successfully cleared security investigations and background checks, and poses no threat to national security.   Plaintiff dismisses the investigations as "valueless" and "dangerous."[3]  Opp. at 26.  But the FBI determined in 2002 that "deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively."  Second Cannon Decl.  ¶ 23 (Exh. 3 hereto); First Cannon Decl. ¶ 17 (Exh. 2 to MTD).  The name check and security check process determines, inter alia, whether the applicant's identifying information (i.e., name, social security number, or date of birth) matches that of an individual whose name has been recorded in the FBI's databases in connection with an FBI investigation.  See Second Cannon Decl. ¶ 11.  Thus, if an applicant is a suspected criminal and/or terrorist, or a known associate of such a person, the name check process should reveal that information.   It may be necessary to search paper files in order to determine whether that derogatory information exists.  See id. ¶¶ 13-17, 29.  The number and format of the records and files that must be checked in order to determine whether the applicant's identifying information yields a "hit" in the FBI records may lengthen the time necessary to complete the background check.  See id. ¶¶ 18, 27.

Defendants must ensure that the results of the investigatory process are "accurate and thorough,"  id. ¶ 39, and those security interests cannot yield to speed.  See Luo, 2007 WL 3357241, at *2 (stating that "given the national security implications of immigration regulation, the broad discretion afforded the Attorney General permits the agency to adjudicate applications only after conducting a careful and thorough investigation").  USCIS cannot be certain that the

---

[3]  The "USCIS" Ombudsman whose remarks Plaintiff has cited is not a part of USCIS. The Ombudsman reports to the Secretary of the Department of Homeland Security.  See 5 U.S.C. § 452.  The Ombudsman's function is to identify problems individuals and employers have with USCIS, and to propose solutions to those problems.  See id. § 452(b).  The Ombudsman does not have the authority to dictate the terms upon which adjustment of status applications will be adjudicated, or to eliminate the background check requirement.  See id.

applicant is eligible for lawful permanent residency status and does not pose a threat to national security until it has received and reviewed the results of the FBI's investigation and background checks. <u>See</u> Puripongs Decl. ¶ 8 (Exh. 1 to MTD); Fact Sheet at 1-2 (Exh. 4 to MTD). Judicial "[i]nterference . . ., therefore, could have national security implications." <u>Orlov</u>, 2007 WL 4293490, at *6; <u>id.</u> at * 9 ("judicial intervention into the adjustment of status process would improperly interfere with national security interests"); <u>Luo</u>, 2007 WL 3357241, at *2 ("[T]he Court's insertion into [the I-485 adjudication] process would be inappropriate and could be detrimental to national security.").

        Plaintiff's reliance on <u>I.N.S. v. St. Cyr</u>, 533 U.S. 289, 298 (2001) is misplaced. In that case, the Supreme Court referenced the general presumption that administrative action is reviewable, but centered its analysis on the "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." <u>Id.</u>; <u>see also</u> <u>id.</u> at 299-308 (discussing constitutional and historical significance of the writ). Unlike <u>St. Cyr</u>, this case does not involve the writ of habeas corpus. Accordingly, even if the constitutional protections that preserve habeas review may in some cases trump the presumption against judicial review of national-security- related immigration matters, those protections are inapposite in this mandamus action.

### B.  Plaintiff's Arguments Rest on an Incorrect Interpretation of Section 1252(a).

#### 1.  Congress Has Imposed No Limits on USCIS's Ability To Enforce A Background Check Requirement As Part of Its Evaluation of Aliens' Eligibility for Permanent Resident Status.

Plaintiff places undue emphasis on the phrase "specified. . . to be in the discretion of the Attorney General," 8 U.S.C. § 1252(a)(ii), and contend that Section 1252(a)(ii) is inapplicable because the text of Section 1255 "does not specifically confer . . . the discretion to indefinitely delay the adjudication of an application for adjustment of status." Opp. at 12. However, the

D.C. Circuit has declined to read Section 1252(a)(ii) so narrowly.  See Zhu v. Gonzales, 411 F.3d 292, 294-95 (D.C. Cir. 2005) (rejecting argument that 1252(a)(ii) applies only to decisions which Congress has explicitly stated are matters of "discretion").  Section 1255 is worded broadly, and provides that adjustments of status are available to aliens in the Attorney General's "discretion and under such regulations as he may prescribe."  8 U.S.C. § 1255.  The explicit reference to "discretion" and use of the word "may" confirm Congress's intent to grant plenary authority to the Attorney General over adjustment applications.[4]  See Zhu, 411 F.3d at 295-96 (discussing import of "may" and "discretion" when assessing scope of discretion granted by a statutory provision).  When a statute confers such broad discretion, the relevant question is whether there is language withdrawing and/or expressly limiting that discretion — not whether there is additional language specifically articulating each type of decision encompassed within that grant of discretion.  See Zhu, 411 F.3d at 296 (noting that plaintiffs could point to no language indicating that decision being challenged had been withdrawn from the Attorney General's discretion).

Thus, under Zhu, the presumption is that DHS and USCIS have discretion over all aspects of the adjustment of status process unless the text of Section 1252(a)(2)(B)(ii) specifically constrains that discretion.  As explained supra, legislative silence would support a ruling that the Court lacks jurisdiction, not that jurisdiction is present.  Nothing in Section 1252(a)(2)(B)(ii) purports to dictate the pace at which USCIS conducts its adjudications.  Nor does the statute limit USCIS's ability to require favorable background check results as part of its eligibility determination for I-485 applicants, or to enforce that background check requirement.  Instead, Congress has authorized a  "direct and continuous liaison" with the Directors of the FBI

---

[4] The Attorney General delegated that authority to USCIS, a component of the Department of Homeland Security.

and CIA to obtain and exchange information for use in enforcing the INA and in the interest of national and border security. <u>See</u> 8 U.S.C. § 1105(a). In sum, "Congress clearly intended to leave the pace of processing adjustment applications within the discretion of USCIS." <u>Sun</u>, Order at 3 (Exh. 2 hereto); <u>see Orlov</u>, 2007 WL 4293490, at *5; <u>Luo</u>, 2007 WL 3357241, at *2.

### 2. USCIS's Enforcement of the Background Check Requirement and the Remainder of the Adjudication Process Constitute Agency "Action."

Plaintiff next argues that there has been no "action" in this case, and that Section 1252(a)(ii) — which bars judicial review of any discretionary "action" or "decision" — is therefore inapplicable. Plaintiff also suggests that only the final outcome of the adjudicative process is a discretionary "action," and that courts can review intermediate steps in that process, such as USCIS's decision to require that Plaintiff clear national security investigations prior to being deemed eligible for permanent resident status. Both arguments lack merit.

The D.C. Circuit has endorsed reference to the ordinary usage of a word as a starting point for interpreting statutory language, and has held that courts may presume that Congress intended the common usage to apply. <u>Inner City Broad. Corp. v. Sanders</u>, 733 F.2d 154, 158 (D.C. Cir. 1984). The "plain meaning of the word action . . . [is] 'an act or series of acts.'" <u>Orlov</u>, 2007 WL 4293490, at *6 (quoting <u>Safadi</u>, 566 F. Supp. 2d at 699 (quoting Black's Law Dictionary)). The Administrative Procedure Act is even broader, and includes "failure to act" as part of the definition of "agency action." 5 U.S.C. § 551(13). Thus, given the absence of any language or legislative history to the contrary, Section 1252(a)(ii)'s reference to discretionary "action" should be read as encompassing the full adjudicative process. It follows that the portions of the process in which USCIS is actively awaiting the completion of the background checks constitute agency "action" to the same extent as other portions of the process. <u>See</u> <u>Orlov</u>, 2007 WL 4293490, at *6; <u>Grinberg v. Swacina</u>, 478 F. Supp. 2d 1350, 1352 (S.D. Fla.

2007) (finding initiation of background checks was action).

Plaintiff's suggestion that only the final ruling on her application constitutes agency "action" also would render portions of section 1252(a)(ii) superfluous.  See Luo, 2007 WL 3357241, at *2; Orlov, 2007 WL 293490, at * 6; Safadi, 466 F. Supp. 2d at 699.  Plaintiff does not appear to dispute that the final ruling is a "decision."   If those final rulings are the only "actions" that are insulated from review, there would be no need to include the term "action" in section 1252(a)(ii) in addition to the term "decision."  See Orlov, 2007 WL 4293499, at *6.

Moreover, Plaintiff's allegation that there has been no action on the case, Opp. at 14, is factually incorrect.  USCIS initiated the background check.  See Puripongs Decl. ¶¶ 8-9; Decl. of Robert D. Meyer, ¶ 9 (Exh. 5 hereto).  USCIS staff at the Texas Service Center make regular inquiries concerning the status of the security screening.  See Meyer Decl. ¶ 9.  Although Plaintiff may wish to know additional specific details about the FBI's security investigation and the steps currently being taken as part of that investigation, see Opp. at 14, that is sensitive law enforcement information which traditionally has been protected from disclosure.  The salient point is that this is not a case in which Defendants have intentionally discarded or otherwise declined to take any actions on an application.  Thus, the Court need not decide whether section 1252(a)(ii) would permit judicial review in those extreme circumstances in order to determine whether jurisdiction exists in this case.

### 3.  This Case Also Involves Judgments and Decisions.

Finally, this case involves unreviewable "decisions" and "judgments"  concerning the adjustment process.  USCIS has decided to enforce its security investigation requirement, and has decided that it cannot complete the adjudication until Plaintiff has cleared the relevant background checks.  As discussed supra, Section 1252(a)(ii) precludes judicial review of "any

action or decision." Thus, that provision's reference to "decision[s]" also supports Defendants' jurisdictional arguments.

Some of the decisions USCIS has made in this case also constitute a "judgment regarding the granting" of the adjustment application — i.e., USCIS's determination that the application cannot be granted until USCIS has reviewed the results of the name checks and investigations into Plaintiff's background. Although an Eastern District of Pennsylvania Judge appears to have read Section 1252(a)(i) differently, that ruling is not binding on this Court. Most of the courts that have reviewed the jurisdictional issues presented in this case have not addressed the meaning of "judgment" under section 1252(a)(i), and instead have focused on Section 1252(a)(ii). Thus the lack of precedent does not mean that Defendants have miscomprehended the law. See Opp. at 9-10. Most judges simply have not been presented with this precise statutory interpretation. As noted supra, the ordinary usage of a word is an appropriate tool for statutory interpretation where, as here, the statute does not define the term. Defendants' proposed interpretation of "judgment" is consistent with that word's definition as an 'authoritive opinion' or evaluation.

### C. Even If the INA Did Not Expressly Bar Judicial Review of Plaintiff's Claims, The Court Would Still Lack Mandamus and APA Jurisdiction.

As Plaintiff admits, there is no mandamus jurisdiction unless Defendants have a clear duty to act. See Opp. at 16. The law of this Circuit also requires that Plaintiff establish a "clear right to relief." In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005). The Mandamus Act does not provide a remedy where, as here, the act that the plaintiff seeks to compel is discretionary. See Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted).

Defendants have no "clear duty" to complete adjudication of Plaintiff's adjustment

application before the background checks have been completed.  Likewise, Plaintiff has no

"clear right" to such relief.  As explained <u>supra</u>, USCIS has discretion over the entire

adjudication process, including the pace at which the adjudication is completed.  <u>See</u> <u>Sun</u>, Order

at 4; <u>Orlov</u>, 2007 WL 4293490, at *8; <u>Luo</u>, 2007 WL 3357241, at *2 n. 4; <u>see also</u> MTD at 14-15

(citing additional cases from other districts).  That discretion precludes mandamus jurisdiction.

   There is no APA jurisdiction for similar reasons.   Section 706(1), which permits review

of complaints seeking to "compel agency action unlawfully withheld or unreasonably delayed,"

5 U.S.C. § 706(1), applies "only where a plaintiff asserts that an agency failed to take a <u>discrete</u>

<u>agency action that it is</u> <u>required to take</u>."   <u>Orlov</u>, 2007 WL 4293490, at * 7 (internal quotation

marks omitted) (emphasis in original).   Moreover, Congress expressly removed agency actions

"committed to agency discretion by law" from the scope of the APA.  5 U.S.C. § 701(a)(2).

This Circuit has interpreted Section 701(a)(2) to mean that a "plenary" grant of discretion

renders agency actions unreviewable under the APA.  <u>Secretary of Labor v. Twentymile Coal</u>

<u>Co.</u>, 456 F.3d 151, 157 (D.C. Cir. 2006).   USCIS has "plenary" discretion to enforce the

background check requirement because Congress has given it broad "discretion" over adjustment

of status applications.  <u>See</u> <u>Orlov</u>, 2007 WL 4293490, at *8.  That discretion precludes Plaintiff

from asserting an APA claim.[5]  <u>See id.</u>; <u>see also, e.g.</u>, <u>Safadi</u>, 466 F.Supp.2d at 700; <u>Zheng v.</u>

<u>Reno</u>, 166 F. Supp.2d 875, 878-79 (S.D.N.Y. 2001); <u>Karan</u>, 2003 WL 21209769, at *1

("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion

of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff

seeks."); <u>see also</u> <u>Rahman v. McElroy</u>, 884 F.Supp. 782, 787-88 (S.D.N.Y. 1995).

---

[5] Section 701(a) of the APA, which "withdraws [an APA] cause of action" to the extent another
statute "precludes judicial review," also prevents Plaintiff from raising an APA challenge.  <u>Block</u>
<u>v. Community Nutrition Inst.</u>, 467 U.S. 340, 345 (1984).

## II. TO THE EXTENT PLAINTIFF SEEKS REVIEW OF THE PACE OF THE FBI'S COMPLETION OF ITS NAME CHECK AND SECURITY INVESTIAGATIONS, THE COURT ALSO LACKS JURISDICTION TO REVIEW THOSE CLAIMS.

The FBI's discretion to conduct its national security investigations bars APA and mandamus jurisdiction over Plaintiff's challenge to the pace of those investigations and the background check process.[6]  Given the obvious national security implications, and the traditional privileges governing law enforcement activities, there is a heavy presumption against judicial review.  See generally Bruno, 157 F.3d at 1162.  Plaintiff has cited no statute or regulation constraining the FBI's discretion to determine how and when to conduct its investigations, and Defendants are aware of none.

The FBI has determined that "its mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results."  Second Cannon Decl. ¶ 20.  No statutes or regulations force the FBI to limit its background examinations to a fixed period of time.  See Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying plaintiff's request that the court compel that plaintiff's background check be expedited).   Thus, courts have recognized that they lack jurisdiction to dictate the terms of FBI background investigations, under the APA or any other statute.  See, e.g., Omar v. Mueller, 501 F. Supp. 2d 636, 640 (D.N.J. 2007) (finding no APA jurisdiction to review 'unreasonable delay' claim concerning FBI's completion of background check for naturalization applicant);  Shalabi, 2006 WL 3032413, at *5 (concluding court lacked jurisdiction to compel FBI to complete background checks); Sozanski v. Chertoff, 2006 WL 4516968, at *1 (N.D. Tex. Dec. 11, 2006) (finding no APA or Mandamus Act jurisdiction to compel FBI to complete

---

[6]  Although the prayer for relief does not expressly reference the FBI's completion of background checks, Plaintiff named the FBI as a Defendant and alleges that it has not fulfilled its alleged 'duty' to complete the background checks quickly.  See Am. Compl. ¶¶ 9, 11.

background check).   For those reasons, any claim in which Plaintiff seeks an order dictating the amount of time the FBI can devote to the name check process must be dismissed  for lack of jurisdiction.

**III.    THE NORTHERN DISTRICT OF TEXAS IS A MORE APPROPRIATE FORUM FOR THIS CASE BECAUSE THAT IS WHERE PLAINTIFFS' APPLICATIONS ARE PENDING.**

The Northern District of Texas is the jurisdiction in which Plaintiff's application will be adjudicated.  Plaintiff is not a resident of Washington, D.C.  The only nexus between this District and the case is the fact that two of the agency heads named as defendants have offices in Washington, D.C.  However those officials will have no direct involvement in the adjudication of Plaintiffs' applications or the completion of the security investigations.  Accordingly, this is a case in which "[b]y naming high government officials as defendants, a plaintiff [is attempting to] bring suit here that properly should be pursued elsewhere."  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).

Plaintiff ignores most of the cases from this District and Circuit holding that cases seeking review of actions being taken by agency field offices should be transferred to the district in which the field office is located, rather than being heard in Washington, D.C..  See MTD at 23-27 (citing cases).  If this District heard every case involving an agency whose headquarters are located, or policies are set, in Washington, D.C., the Court's docket would quickly become unmanageable.  Accordingly, the D.C. Circuit closely scrutinizes venue arguments based solely on federal agency defendants' presence in the District of Columbia.  See Cameron, 983 F.2d at 256.  Even when such defendants' presence makes venue technically proper in this District, courts frequently invoke their discretionary transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to districts with a closer nexus to the parties' dispute.  See, e.g., Abusadeh,

2007 WL 2111036, at *6-*9; <u>Rosales v. United States</u>, 477 F. Supp. 2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); <u>Southern Utah Wilderness Alliance v. Norton</u>, 315 F. Supp. 2d 82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where D.C. officials only set general policies and did not make specific decisions being appealed); <u>Joyner v. District of Columbia</u>, 267 F. Supp. 2d 15, 20-21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections).

Courts have applied those principles to mandamus actions concerning immigration benefits, transferring such cases to the district in which the USCIS office adjudicating the immigration application resides.   <u>See, e.g.</u>, <u>Abusadeh v. Chertoff</u>, 2007 WL 2111036, at *6-*9 (D.D.C. July 23, 2007) (transferring mandamus action seeking adjudication of naturalization application and replacement of alien card to Southern District of Texas because that was where the application was being adjudicated); <u>Fayyaz v. Dep't of Homeland Security</u>, No. 06-2016 (same) (attached hereto as Exhibit 2); <u>Poliakova</u>, No. 07- 1210 (Order attached hereto as Exh. 1) (transferring mandamus action concerning I-485 to Southern District of Florida for the same reason).  Plaintiff's attempt to distinguish <u>Abusadeh</u> on the grounds that it involved a different type of application misperceives the crux of that case.  The Court's analysis did not turn on the <u>nature</u> of the benefit being sought but, rather, on the <u>location</u> of the office that would make the decision concerning that benefit.  Here, the Texas Service Center is the office that will complete the adjudication of Plaintiff's adjustment application once the background checks and security investigations are complete.

The Northern District of Texas has a more significant interest in this case than this Court. There is a local interest in resolving controversies where the relevant decisions are made. That interest applies to "controversies requiring judicial review of an administrative decision" to the same extent that it applies to cases involving real property or environmental issues. Abusadeh, 2007 WL 2111036, at * 8 (quoting Sierra Club, 276 F. Supp. 2d at 70). The administrative decisions at issue in this case have been or will be made in Texas.

It bears noting that Plaintiff's complaint seeks an order compelling Defendants to complete the adjudication of her adjustment applications. Neither Director Mueller nor any other FBI employee has authority to perform that function. Accordingly, the pace of their investigations is not the core issue in this case. Instead, "the action that Plaintiff[s] seek[] this Court to compel is one that will occur in" Dallas, Texas. Abusadeh, 2007 WL 2111036, at *6; see also id. at *7 (concluding "the fact that the FBI . . . may play a role in the processing of Plaintiff's application . . . does not alter the fact that the ultimate decision on Plaintiff's application for naturalization . . . will be made" at the USCIS field office).

The FBI's involvement in the security investigations does not make this an appropriate forum for Plaintiffs' mandamus action. The complaint and Plaintiffs' opposition memorandum focus on USCIS's alleged duty to complete its adjudication of Plaintiffs' applications. The FBI does not determine whether, when, or how the adjustment application will be adjudicated. Instead, the FBI conducts the background investigation and sends the results to USCIS. See Second Cannon Decl. ¶ 40. The USCIS office with jurisdiction over the case (here, the Texas Service Center) monitors the FBI's completion of the background investigation, and that office will make the final decision on Plaintiffs' applications. See Puripongs Decl. ¶¶ 8-9. Moreover, the record does not support Plaintiff's assertion that the "name check" will be conducted in this

district.  The Cannon declaration simply states that the Central Records System can be accessed

by FBI headquarters and field divisions.

### CONCLUSION

For the foregoing reasons and those set forth in Defendants' Motion to Dismiss,

Defendants respectfully request that the Court GRANT Defendants' motion to dismiss or, in the

alternative, TRANSFER this case to the Northern District of Texas.

Dated:  January 9, 2008                          Respectfully submitted,


                                          /s/                                              .
                                         JEFFREY A. TAYLOR, D.C. BAR # 598610
                                         United States Attorney


                                          /s/                                              .
                                         RUDOLPH CONTRERAS, D.C. BAR $ 434122
                                         Assistant United States Attorney


                                          /s/ Robin M. Meriweather                        .
                                         ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                         Assistant United States Attorney
                                         555 Fourth St., N.W.
                                         Washington, D.C.  20530
                                         Phone: (202) 514-7198 Fax: (202) 514-8780
                                         Robin.Meriweather2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be served upon Plaintiff through the Court's ECF system this 9th day of January, 2008.

_____/s/ Robin M. Meriweather_____.
ROBIN M. MERIWEATHER, DC BAR # 490114

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATALIA V. POLIAKOVA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 07-1210 (RCL) |
| | § | |
| EMILIO T. GONZALEZ, DIRECTOR | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| MICHAEL CHERTOFF, SECRETARY, | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, | § | |
| ROBERT S. MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF INVESTIGATION, | § | |
| LINDA SWACINA, DIRECTOR, MIAMI | § | |
| DISTRICT OFFICE, USCIS | § | |
| | § | |
| Defendants. | § | |

## ORDER

Upon consideration of Defendants' Motion [11] to Transfer Venue and for Enlargement of

Time to File Answer, it is this 17th day of December, 2007,

ORDERED that Defendants' Motion be, and hereby is, granted, for the reasons stated well in

Defendants' response to Plaintiff's sur-reply; it is further hereby

ORDERED that this case be, and hereby is, TRANSFERRED to the Southern District of Florida;

it is further hereby

ORDERED that Defendants' Answer or other response to the complaint shall be due no sooner

than 15 days after the Southern District of Florida dockets the case in that district.

SO ORDERED.


Signed by United States District Judge Royce C. Lamberth on December 17, 2007.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JIANPING SUN,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  07-504  (JDB)** |
| **ALBERTO GONZALES, et al.,** | |
| **Defendants.** | |

## ORDER

     Plaintiff Jianping Sun, a native and citizen of the People's Republic of China, brings this action against the United States Department of Justice, the United States Citizenship and Immigration Services ("USCIS"), the United States Department of Homeland Security ("DHS"), the Federal Bureau of Investigation ("FBI"), and related officials within these departments. Plaintiff asks this Court to compel defendants to adjudicate without further delay his pending Form I-485 application for an adjustment of immigration status to become a lawful permanent resident.

     Plaintiff filed his Application to Register Permanent Residence or Adjust Status (Form I-485) on April 24, 2004, along with a visa petition (Form I-140).  Petition ¶ 9.  After an alien applies for an adjustment of status, USCIS conducts a number of investigations to ensure that the alien is eligible for the benefit sought and is not a risk to national security.  See Decl. of Naboone Puripongs ¶ 2; Fact Sheet at 1.  Specifically, USCIS requests (a) an FBI fingerprint check for information relating to an applicant's criminal history within the United States; (b) a check against the DHS-managed Interagency Border Inspection System that "combines information

from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns"; and (c) an FBI name check, which reviews records maintained in "administrative, applicant, criminal, personnel and other files compiled by law enforcement."  Fact Sheet at 2.  USCIS also maintains the discretion and the authority to conduct other background investigations when necessary.  Id.

According to the USCIS Fact Sheet regarding immigration security checks, "some cases legitimately take months or even several years to resolve" due to the complex, highly sensitive information that is involved in the process.  Id. at 2-3.  Yet, "USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take."  Id. at 1.

Plaintiff's fingerprints were taken and submitted on April 14, 2005.  Petition ¶ 9. However, two background checks remain outstanding for plaintiff's application: the FBI name check and the national security background investigation.  The FBI name check request for plaintiff was received by the FBI on May 18, 2004, and remains pending.  See Decl. of Michael A. Cannon ¶ 22.  Also, during the processing of plaintiff's application, USCIS requested a national security screening of plaintiff, which remains ongoing.  See Decl. of Naboone Puripongs ¶¶ 8-9.

Believing USCIS has unreasonably delayed the adjudication of his adjustment of status application, plaintiff filed with this Court a petition for mandamus on March 14, 2007. Defendants have now moved to dismiss plaintiff's case for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  The issues in this matter are controlled by this Court's decision in Orlov v. Howard, Civil Action No. 07-350, issued on this

Exh 2 to Defendants' Reply

date.  The Court refers the parties to the memorandum opinion issued in Orlov for a full

discussion of the issues.

Stated succinctly, this Court lacks jurisdiction to review the ongoing pace at which

plaintiff's application is being adjudicated.  The Immigration and Nationality Act, 8 U.S.C. §

1255(a), provides that: "The status of an alien . . . may be adjusted by the Attorney General, in

his discretion and under such regulations as he may prescribe, to that of an alien lawfully

admitted for permanent residence if" certain conditions are met.[1]  In the absence of statutorily

prescribed time limitations or statutory factors to guide USCIS in crafting regulations for the

adjustment process, Congress clearly intended to leave the pace of processing adjustment

applications within the discretion of USCIS.  Because 8 U.S.C. § 1252(a)(2)(B)(ii) divests

federal courts of jurisdiction to review a discretionary decision or action of USCIS, and an

"action" includes any discretionary act or series of acts within the adjustment of status process

(including the pace of completing various security checks), this Court lacks jurisdiction over

plaintiff's petition.[2]

_____

[1]Although the text of 8 U.S.C. § 1255 refers to the Attorney General, the discretionary
authority to adjudicate adjustment applications and promulgate regulations has been transferred
to the Secretary of Homeland Security and the United States Citizenship and Immigration
Services.  See 6 U.S.C. §§ 271(b), 557.  The Court will therefore refer to USCIS as the entity
with discretionary authority.

[2]Section 1252(a)(2)(B), provides that:

Notwithstanding any other provision of law (statutory or nonstatutory), including section
2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of
such title, and except as provided in subparagraph (D), and regardless of whether the
judgment, decision, or action is made in removal proceedings, no court shall have
jurisdiction to review--
(i) any judgment regarding the granting of relief under section . . . 1255 [adjustment of
status] . . . , or

The Administrative Procedures Act ("APA") also does not confer jurisdiction upon this Court to review plaintiff's claim because the APA does not apply where "statutes preclude judicial review" or "where agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(1), (2).  And finally, mandamus may not issue here because plaintiff has failed to demonstrate that defendants have a clear duty to increase the pace at which they are processing his application and because plaintiff has failed to demonstrate that he has a clear right to the relief sought.  See In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005) (explaining that "a district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff'") (quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)).

Accordingly, upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, and for the reasons stated in the memorandum opinion issued on this date in Orlov v. Howard, it is this 10th day of December, 2007, hereby

**ORDERED** that [8] defendants' motion to dismiss is **GRANTED**; and it is further

**ORDERED** that the case is dismissed against all defendants.

**SO ORDERED.**

                    /s/ John D. Bates
                    JOHN D. BATES
               United States District Judge

---

(ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

Exh 3 to Defendants' Reply

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YING LI, Individually<br>1320 North Veitch Street<br>Apartment No. 1934<br>Arlington, VA 22201 | )<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| ALBERTO R. GONZALES<br>Attorney General of the United States<br>950 Pennsylvania Avenue, N.W<br>Washington D.C. 20530-0001, | )<br>)<br>)<br>)<br>) |
| MICHAEL CHERTOFF<br>Secretary of the Department of Homeland Security<br>U.S. Department of Homeland Security<br>Washington, D.C. 20528 | )<br>)<br>)<br>)<br>) |
| EMILIO T. GONZALEZ<br>Director of the United States Citizenship and<br>Immigration Services ("CIS")<br>20 Massachusetts Avenue, N.W.<br>Washington D.C. 20529, | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| ROBERT S. MUELLER<br>Director<br>Federal Bureau of Investigation<br>J. Edgar Hoover Building<br>935 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530 | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Case No:
1:07-cv-00662

Exh 3 to Defendants' Reply

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program
Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in
Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name
Check Units. The statements contained in this declaration are based upon my personal
knowledge, upon information provided to me in my official capacity, and upon conclusions and
determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures
followed by the FBI in responding to requests for information from its files pursuant to the policy
and the procedures of the United States Citizenship and Immigration Services ("USCIS").
Specifically, I am aware of the name check request for YING LI, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of
disseminating information from the FBI's Central Records System in response to requests
submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign
police and intelligence agencies, and state and local criminal justice agencies. The Central
Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.
The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower
Administration. That executive order addresses personnel security issues and mandates National
Agency Checks as part of the pre-employment vetting and background investigation process for

2

Exh 3 to Defendants' Reply

prospective Government employees. The FBI performs the primary National Agency Check

conducted on all United States Government employees. From this modest beginning, the

Program has grown exponentially, with more and more customers seeking background

information from FBI files on individuals before bestowing a privilege, such as Government

employment or an appointment, a security clearance, attendance at a White House function, a

"green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and

local agencies regularly request FBI name searches. In addition to serving our regular

Government customers, the FBI conducts numerous name searches in direct support of the FBI's

counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)      The FBI's CRS enables the FBI to maintain all information which it has

acquired in the course of fulfilling mandated law enforcement responsibilities. The records

maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

compiled for law enforcement purposes. This system consists of a numerical sequence of files

broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter. Certain

records in the system are maintained at FBI Headquarters. Records which are pertinent to

specific FBI Field Offices are mostly maintained at those Field Offices.

(6)      FBI Headquarters and each Field Division can access the CRS through the

FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

indices on various subjects, including the names of individuals and organizations. Only the

information considered pertinent, relevant, or essential for future retrieval is indexed.

3

Exh 3 to Defendants' Reply

(7)     Communications directed to FBI Headquarters from various Field Offices
and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,
groups, or organizations which are listed in the case captions or titles as subjects, suspects, or
victims.  Searches made in the index to locate records concerning particular subjects are made by
searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

    (a)     "main" entries – entries that carry the name corresponding
with the subject of a file contained in the CRS.

    (b)     "reference" entries – entries (sometimes called "cross-
references") that generally only mention or reference an
individual, organization, etc., that is contained in a
document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS")
system for its Headquarters, Field Offices, and Legal Attaches.  More than 105 million records
were converted from automated systems previously utilized by the FBI.  The ACS system
consists of the following three automated applications that support case management functions
for all investigative and administrative cases:

    (a)     Investigative Case Management:  This application provides
the ability to open, assign, and close investigative and
administrative cases as well as to set, assign, and track
leads.  A case is opened by the Office of Origin, which sets
leads for itself and other field offices, as needed.  The
offices that receive the leads are referred to as Lead Offices.
When a case is opened, it is assigned a Universal Case File
Number, which is utilized by FBI Headquarters and all
offices conducting or assisting in the investigation.  Using
fictitious file number "111-HQ-12345" as an example, an
explanation of the Universal Case File Number is as
follows: "111" indicates the classification for that specific
type of investigation; "HQ" is the abbreviated form used for

4

Exh 3 to Defendants' Reply

the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)     Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)     Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 100.0 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)     The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the investigative FBI Special Agent, the supervisor in the field

division conducting the investigation, and the supervising FBI Special Agent at FBI

Headquarters.  The FBI does not index every name in its files, but indexes only that information

considered pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this

mass information, information essential to ongoing investigations could not be readily retrieved.

The FBI files would thus be merely archival in nature and could not be effectively used to serve

one of the mandated missions of the FBI, to investigate violations of federal criminal statutes.

Therefore, the General Indices to the CRS files are the means by which the FBI can determine

Exh 3 to Defendants' Reply

what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

Exh 3 to Defendants' Reply

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI

Exh 3 to Defendants' Reply

record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which

Exh 3 to Defendants' Reply

name checks are to be expedited based on criteria it determines. Once designated as an

"expedite," that name check proceeds to the front of the queue along with other prioritized name

check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort

agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by

prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million

name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the

number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4

million name checks.

(22)    A significant portion of the incoming name checks submitted over the past

few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of

the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45%

(~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year

2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)    In November 2002, heightened national security concerns prompted a

review of the former Immigration and Naturalization Service's ("INS's") procedures for

investigating the backgrounds of individuals seeking immigration benefits. It was determined

that deeper, more detailed clearance procedures were required to protect the people and the

9

Exh 3 to Defendants' Reply

interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 6,300 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team

members are working on only these applications, they are unavailable to process the normal submissions.

(26)     There are numerous factors that have contributed to delays in the processing of name check requests.  One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume.  As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks.  As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)     The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request.  A "hit" is a possible match with a name in an FBI record.  The number of times the name appears in FBI records correlates to the number of records which require review.

(28)     The processing of common names also contributes to a delay in processing a name check request.  The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on.  Without detailed information in both the file and agency submission, it is difficult to determine whether or not a

11

Exh 3 to Defendants' Reply

person with a common name is the same person mentioned in FBI records.  Common names can

often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a

delay in processing a name check request.  If the date of the record predates October 1995, the

paper record has to be located, retrieved, and reviewed; if the date of the record is later than

October 1995, the record text may or may not be available electronically depending on the type

of record and whether it has been uploaded electronically.  A paper record could be at one of over

265 possible locations across the country.  Requests often involve coordinating the retrieval and

review of files from the various 56 different FBI field offices.  One person's name check may

involve locating and reviewing numerous files, all at different physical locations.  Each request

must be communicated internally from the NNCPS to the field, and handled according to the

current priorities of the particular field office.  Since it is a paper based process, it is a process

subject to misplaced or misfiled files.  The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this

declaration is the expedited request.  Processing an expedited case means that an employee is not

available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process.  Over the

short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database

("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate

12

Exh 3 to Defendants' Reply

preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)   NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)   The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)   NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)   NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)   As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to

Exh 3 to Defendants' Reply

investigate ways to further automate the name check process. The goal is to incorporate

analytical software applications that reduce the time spent to verify the identity of the individual

and, once verified, assists in the adjudication analysis. This type of automation should decrease

the time required to process a name check, thereby increasing production. The FBI is building a

proof of concept system for eventual integration into the FBI's core databases.

      (38)    As a long-term improvement, the FBI is developing a Central Records

Complex that will create a central repository of records. Currently, paper files/information must

be retrieved from over 265 locations throughout the FBI. The Central Records Complex will

address this issue, creating a central repository-scanning of documents, and expediting access to

information contained in billions of documents that are currently manually accessed in locations

around the United States and world. In addition, the essential long term improvement for FBI

Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

services. Once in place, the FBI will be able to scale resources proportionally with workload

demands – pending name checks will pay for themselves. At this time fees do not cover the

basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to

processing name checks without pulling critically needed personnel and funding from other

programs. The FBI procured services to conduct a study to determine an appropriate fee

structure. The independent contractor hired to conduct the study has completed its work and the

proposed fee structure is undergoing the Federal rulemaking process.

      (39)    For the reasons stated earlier, the FBI cannot provide a specific or general

time frame for completing any particular name check submitted by USCIS. The processing of

name checks, including those which are expedited at the request of USCIS, depends upon a

Exh 3 to Defendants' Reply

number of factors, including where in the processing queue the name check lies; the workload of

the analyst processing the name check; the volume of expedited name checks the analyst must

process for, among others, military deployment, "age-outs," sunset provisions such as Diversity

Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or

other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed

and resolved; the number of records from various Field Offices that must be retrieved, reviewed

and resolved; and, more generally, the staff and resources available to conduct the checks.

Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report

where in the processing queue a particular name check request may lie vis-à-vis other name

checks. Additionally, until review of each case is undertaken no estimate for the time required to

complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will

be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in

processing name check requests, the consequence of the FBI's mission on homeland security

requires that its name check process be primarily focused on providing accurate and thorough

results. When the name check is completed, the FBI provides the results to USCIS as quickly as

possible.

   (40) It is important to note that the FBI does not adjudicate applications for

benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a

summary of available information to USCIS for its adjudication process.

Exh 3 to Defendants' Reply

## PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff YING LI was received by the FBI

from USCIS on or about July 14, 2004 and has not been completed.  The FBI is performing its

check in response to USCIS's request in accordance with the procedures outlined above.  The

results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

Executed this 20ᵗʰ day of December 2007.


*Michael A. Cannon*

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

16

Exh 4 to Defendants' Reply

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MOHAMMAD FAYYAZ and GIZELA FAYYAZ,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action 06-02016 (HHK)** |
| **DEPARTMENT OF HOMELAND SECURITY, et al.,** | |
| **Defendants.** | |

**ORDER OF TRANSFER**

Before the court is the motion of defendants to transfer or, in the alternative, to dismiss [#5].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion to transfer this action to the Southern District of Texas should be granted. The Southern District of Texas is the more appropriate venue for this action because plaintiffs reside in Houston, Texas, the United States Citizenship and Immigration Services Office with jurisdiction over plaintiffs' adjustment application is there, and plaintiffs' alleged harm occurred there.

Accordingly, it is this 25th day of October, 2007, hereby

**ORDERED** that the Clerk of the Court shall effect the transfer of  this action to the Southern District of Texas.

Henry H. Kennedy, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Ying Li

                          Plaintiff,

v.                                            Civ. Act. Number: **1:07-CV-00662-rmu**

Department of Homeland Security, et. Al

                          Defendants.

PERSONAL DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.  I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services. TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC has 51,221 pending employment based I-485s and projects receiving another 95,000 by the end of the FY 2007. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests.  Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

3.  Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication.  FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY.  An FBI Name Check that has been completed will be indicated by various entries depending on the result.

4. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check

request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

5. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

6. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

7. The Service Centers, to increase efficiency and provide better service on immigration benefits, reorganized, in a process called bi-specialization, so that two Service Centers would specialize in certain applications and petitioners, instead of each Service Center handling all types of applications and petitions. To implement this reorganization each center transferred pending applications to other centers that specialized in that type of application. Thus, a center that instituted a process, as is the case here, is not the center that completes the process on certain pending or transition cases.

8. I have custody of the TSC records of Ying Li, A98416314, and I supervise TSC officers who are processing Ying Li's applications. After reviewing the information pertaining to Ying Li, I attest that USCIS has referred this case for lawfully required security screening of aliens and that USCIS suspended adjudication in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

9. During the normal processing of this case, a national security screening was requested. The information and records pertaining to Ying Li shows that TSC Officers under my supervision make regular inquiries about the status of her security screening.


Robert D. Meyer
Supervisory Adjudications Officer
Texas Service Center

1/9/08
Date