UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| YING LI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07CV0662(RMU) |
| | ) | |
| MICHAEL CHERTOFF, Secretary, | ) | |
| U.S. Department of Homeland Security, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**DEFENDANTS' ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Defendants have moved that the case be dismissed for lack of subject matter jurisdiction or failure to state a claim or, in the alternative, transferred to the United States District Court for the Northern District of Texas.  See Dkt. Entry 12.  Defendants further move in the alternative that the Court award summary judgment to Defendants, pursuant to Federal Rule of Civil Procedure 56, if the Court denies Defendants' motion to dismiss.  A supporting memorandum, statement of material facts, and proposed order are submitted herewith.

Dated:  January 16, 2008                    Respectfully submitted,

_____/s/_____.
JEFFREY A. TAYLOR, D.C. BAR # 598610
United States Attorney

_____/s/_____.
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____.
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
YING LI,                                )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )    No. 1:07CV0662(RMU)
                                        )
MICHAEL CHERTOFF, Secretary,            )
U.S. Department of Homeland Security, et al., )
                                        )
            Defendants.                 )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## SUMMARY

Despite the good faith efforts of Defendants United States Citizenship and Immigration

Services ("USCIS") and the Federal Bureau of Investigation ("FBI"), the adjustment of status

application filed by Plaintiff Ying Li remains pending. That application seeks lawful permanent

resident status, memorialized in what is commonly known as a green card. USCIS has

determined that, in light of national security interests, it cannot complete its adjudication of an

adjustment of status application until all of the security checks — including the FBI's security

investigation and background check — have been completed. The FBI — which processed over

3.4 million background checks in Fiscal Year 2006 alone — has determined that accurate and

thorough background checks are a priority which cannot be sacrificed for speed.

Plaintiff asks this Court to disturb those judgments and issue an order compelling

Defendants to complete their adjudication of Plaintiff's pending application for lawful permanent

resident status. However, Plaintiff is not entitled to the extraordinary remedy of mandamus, and

Defendants' actions do not constitute "unreasonable delay" in violation of Section 706(1) of the Administrative Procedures Act. Instead, the Court should defer to Defendants' judgments concerning these security concerns, and respect the FBI's judgments concerning how to allocate the resources available to process background checks. Prioritizing Plaintiff's application over others which have been pending for even longer would not serve the interests of the agencies or other applicants. It would only reduce the resources available to process other applications and background checks, moving other individuals' applications and background checks farther back in the queue. The Court should therefore grant Defendants' alternative motion for summary judgment, and deny Plaintiff's motion for summary judgment.

## BACKGROUND

Defendants discussed the statutory, regulatory, and factual background in detail in their Motion to Dismiss, which is incorporated herein by reference. See Dkt. Entry 14. This case concerns Plaintiff's pending I-485 application to register permanent residence or adjust status. See Compl. ¶ 1. Defendant USCIS has not completed its adjudication of that application because the mandatory national security investigations and background checks remain pending. See Declaration of Robert D. Meyer, ¶ 8 (Exh. 1 hereto) ("Meyer Decl.").

## STANDARD OF REVIEW

Under Rule 56, summary judgment is required when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). A genuine issue of material fact is one that would change the outcome of the litigation. See Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 243 (1986). While all evidence and the inferences drawn therefrom must be

considered in the light most favorable to the nonmoving party, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), summary judgment should be granted if the moving party submits "affirmative evidence that negates an essential element of the nonmoving party's claim" or demonstrates "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Celotex, 477 U.S at 331. The nonmoving party has the burden of establishing more than the "mere existence of a scintilla of evidence" demonstrating a genuine issue in dispute for purposes of defeating the moving party's motion. See Lester v. Natsios, 290 F. Supp.2d 11, 19-20 (D. D.C. 2003), citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. "[M]atters of law rather than of fact" may be presented for summary judgment. Douglas v. First Nat'l Realty Corp., 437 F.2d 666, 669 (D.C. Cir. 1970).

## ARGUMENT

## I.    PLAINTIFF CANNOT ESTABLISH MANDAMUS JURISDICTION OR A *PRIMA FACIE* CASE FOR MANDAMUS RELIEF.

A petition for a writ of mandamus is an extraordinary remedy that can be applied only in exceptional circumstances. To meet the mandamus standard, there must be: 1) a clear right to relief; 2) a plainly defined and nondiscretionary duty on the part of the defendant; and 3) no other adequate remedy available. In re Medicare Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984); Ganem v. Heckler, 746 F.2d. 844, 852 (D.C. Cir. 1984) (citing United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543 (1937)); Whittle v. Moschella, 756 F. Supp. 589, 596 (D. D.C. 1991). The Court's decision whether or not to exercise mandamus jurisdiction is discretionary. Public Citizen v. Kantor, 864 F. Supp. 208 (D.D.C.1994).

As explained in Defendants' motion to dismiss, Plaintiff cannot establish mandamus jurisdiction or state a claim for mandamus relief. See Dkt. Entry 14. The approval of an

adjustment of status application and the timing of the FBI's security investigation and

background checks are subject to agency discretion, and Plaintiff has no clear right to agency

action. See id. Moreover, for the reasons discussed infra, agency action has not been

unreasonably delayed in this case. See Part II, infra. It follows that Plaintiff has no clear right to

relief, and the Court should dismiss her complaint or enter summary judgment for Defendants.

## II.    DEFENDANTS' ADJUDICATION OF PLAINTIFF'S I-485 APPLICATIONS AND THEIR COMPLETION OF THE RELATED SECURITY INVESTIGATION AND BACKGROUND CHECKS ARE PROCEEDING ON A REASONABLE PACE.

As the D.C. Circuit has made clear, the issuance of equitable relief under APA section

706 "is an extraordinary remedy" and requires "extraordinary circumstances to be present before

[courts] will interfere with an ongoing agency process." In re: United Mine Workers of America

Int'l Union, 190 F.3d 545, 549 (D.C. Cir. 1999). Accordingly, a finding of unreasonable delay is

appropriate only upon a showing "that the agency has a duty to act and that it has 'unreasonably

delayed' in discharging that duty." In re American Rivers and Idaho Rivers United, 372 F.3d

413, 418 (D.C. Cir. 2004) (quoting (5 U.S.C. § 706(1)); 5 U.S.C. § 555(b); In re Bluewater

Network, 234 F.3d 1305, 1315 (D.C. Cir. 2000). Moreover, the Court must find that the delay is

"egregious," Cobell v. Norton, 240 F.3d 1081, 1095 (D.C. Cir. 2001), and even then a court

should order an agency to complete its consideration of an issue only in "the exceptionally rare

cases." In re Barr Labs Inc., 930 F.2d 72, 76 (D.C. Cir. 1991). Even "a finding that delay is

unreasonable does not, alone, justify judicial intervention." Cobell, 240 F.3d at 1096 (quoting In

re Barr Labs., 930 F.2d at 75). These principles arise out of courts' recognition that an

administrative agency is entitled to substantial deference in establishing a timetable for

completing administrative action, and that the Court should properly be hesitant to upset an

agency's priorities by ordering it to expedite one specific action, and thus give it precedence over

others.  See Sierra Club v. Thomas, 828 F.2d 783, 794, 797 (D.C. Cir. 1987).  As such, "respect

for the autonomy and comparative institutional advantage of the executive branch has

traditionally made courts slow to assume command over an agency's choice of priorities."  Barr

Labs., 930 F.2d at 74.

Consistent with these principles, the D.C. Circuit has identified six factors courts should

consider when reviewing claims that allege unreasonable agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of
> reason"; (2) where Congress has provided a timetable or other indication of
> the speed with which it expects the agency to proceed in the enabling statute,
> that statutory scheme may supply content for this rule of reason; (3) delays
> that might be reasonable in the sphere of economic regulation are less
> tolerable when human health and welfare are at stake; (4) the court should
> consider the effect of expediting delayed action on agency activities of a
> higher or competing priority; (5) the court should also take into account the
> nature and extent of the interests prejudiced by delay; and (6) the court need
> not "find any impropriety lurking behind agency lassitude in order to hold
> that agency action is 'unreasonably delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d at 547 (quoting

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984)

("TRAC").  Significantly, under D.C. Circuit precedent, courts should not "grant relief, even

when all the other factors considered in TRAC favored it, where a judicial order putting the

petitioner at the head of the queue would simply move all others back one space and produce no

net gain."  Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir.

2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)).  In this case, the TRAC

factors favor Defendants.

### A.  Defendants' Actions Are Reasonable When Evaluated By Reference to a "Rule of Reason."

Defendants' delay in completing the security investigation and background checks, and in

completing the adjudication of Plaintiff's adjustment application, does not warrant judicial

intervention.  As to the first two factors of the <u>TRAC</u> test, Congress has provided no mandatory statutory timetable for USCIS to adjudicate applications for adjustment of status under the INA.  There are no federal statutes limiting the FBI's discretion to set the pace at which its security investigations and background checks can be completed.  Therefore, under <u>TRAC</u>, in evaluating whether agency delay constitutes an abuse of discretion, the Court must apply a "rule of reason" analysis.  <u>See</u> <u>TRAC</u>, 750 F.2d at 80.  Such an analysis "turns on the facts of each particular case."  <u>Midwest Gas Users Ass'n v. FERC</u>, 833 F.2d 341, 359 (D.C. Cir. 1988).

Plaintiff focuses on the amount of time that has passed since her application was filed (approximately 3 years).  <u>See</u> Dkt. Entry 15-3 at 21-23 ("Pl. MSJ").  District Judge Sullivan also focused on the length of time the application was pending when awarding summary judgment to the plaintiff in <u>Liu v. Novak</u>, an opinion on which Plaintiff principally relies.  <u>See</u> 509 F. Supp. 2d 1, 5-6 (D.D.C. 2007).  However, "this Circuit [has] made clear that measuring the delay by years alone cannot establish unreasonable delay."  <u>Liberty Fund, Inc. v. Chao</u>, 394 F. Supp. 2d 105, 115 (D.D.C. 2005); <u>see</u> <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430 (reasonableness "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful").  Instead, the relevant factors include "the complexity of the task at hand, the significance (and permanence) of the outcome, <u>and the resources available to the agency</u>."  <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430 (emphasis added).  Moreover where, as here, Congress has declined to establish a specific timetable for agency action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific timetable."  <u>In re American Fed. of Govt. Employees AFL-CIO</u>, 837 F.2d 503, 506 (D.C. Cir. 1988).

In this case, Defendants' actions survive review under a "rule of reason" standard. Although Plaintiffs are concerned only with their own applications and security investigations, the heavy volume of similar applications that Defendants have before them cannot be ignored. See Espin v. Gantner, 381 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (noting that plaintiff's mandamus complaint and request for preliminary injunction ignored the volume of applications pending in New York and nationwide). The Texas Service Center has over 50,000 employment-based I-485 applications pending. See Myer Decl. ¶ 1. The FBI processed over 3.4 million background checks in Fiscal Year 2006.[1] See Declaration of Michael Cannon, ¶ 21 (Exh. 2) ("Cannon Decl."). As of the end of Fiscal Year 2006, the FBI had over 364,600 pending background check requests, of which 157,800 involved adjustment of status applications; those pending background check requests represent only a fraction of the over 1.6 million background check requests that USCIS submitted to the FBI in that fiscal year. See id. ¶ 26. Moreover, the FBI has over 440,000 residual background checks which were among the 2.7 million background checks resubmitted to the FBI after September 11, 2001; those 440,000 background checks are still being processed because the FBI's initial responses indicated that the FBI might have information relating to the applicants. See id. ¶ 24. That high volume of background check requests has placed a significant burden on the FBI's resources, and it is processing most background checks in the order in which they are received. See id. ¶ 26 (noting that the volume of background check inquiries has outpaced the FBI's resources). Texas Service Center staff

---

[1]  The fact that the FBI completed so many background checks in that year, and averaged approximately 2.5 million per year prior to September 11, 2001, belies Plaintiff's suggestion that she will "be left in limbo permanently" or that Defendants will never act on the pending investigations. See Eldeeb v. Chertoff, 2007 WL 2209231, at * 5 (M.D. Fla. July 30, 2007) ("The fact that 90 percent to 99 percent of the name check requests are timely processed suggests that 100 percent of name check requests are initiated, and the requests without results after six months are so because those particular name checks require more time to investigate.").

makes regular inquiries about the status of the security screenings. <u>See</u> <u>id.</u> Accordingly, this is not a case in which Defendants have refused to take any action on Plaintiff's application. Instead, any delay is attributable to the agencies' limited resources and their desire to process applications and security screenings in an orderly fashion.[2] <u>See generally</u> <u>Saleh v. Ridge</u>, 367 F. Supp. 2d 508,513 (S.D.N.Y. 2005) (concluding five-year delay in adjudicating asylum based I-485 was not unreasonable in light of the volume of applications in the system).

The complexity of the task at issue, which is another factor contributing to the FBI's backlogs, also is relevant to the rule of reason analysis. <u>See</u> <u>Mashpee Wampanoag Tribal Council, Inc.</u>, 336 F.3d at 430. The FBI background check is a complex process. <u>See</u> Cannon Decl. ¶¶ 2-30; <u>Eldeeb v. Chertoff</u>, 2007 WL 2209231, at *2-*5 (M.D. Fla. July 30, 2007) (describing the steps and actions entailed in the process). It involves a check of a variety of sources, and although many background checks are resolved in a matter of days, approximately thirty two percent require additional, manual review. <u>See</u> <u>id.</u> ¶ 13. Most of those remaining checks typically are returned within three months. <u>See</u> <u>id.</u> ¶ 14. However, approximately ten percent are identified as possibly being the subject of an FBI record, and the FBI must retrieve and review the relevant records (many of which are in paper, and not electronic, form). <u>See</u> <u>id.</u> ¶ 15.

Further, background checks from applicants with "common names" typically take longer to process. <u>Id.</u> ¶ 28. Plaintiff admits that she has a common name. <u>See</u> Pl. MSJ at 23. Common names often have more than two hundred "hits," i.e., possible matches with a name in an FBI record. <u>See</u> Cannon Decl. ¶¶ 27-28.

---

[2]  The FBI has taken several steps to improve the background check program, including the use of contractors and hiring additional personnel. <u>See</u> Cannon Decl. ¶¶ 31-38.

The fact that the Texas Service Center has reported an average processing time of six months for adjustment applications does not change the foregoing analysis. See Pl. MSJ at Exh. 1. Plaintiff was not among the ninety percent of applicants whose background checks could be completed within three months. Instead, her background check remains pending. As a result, USCIS could not complete its adjudication of her application within that average processing time of six months. See Meyer Decl. ¶ 6 ("Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.").

**B. The Impact of the Delay Is Insubstantial Compared With the National Interest in Complete and Thorough Background Checks.**

The third TRAC factor, which somewhat overlaps with the fifth factor, asks whether the case is primarily about "human health and welfare" or "economic regulation." See In re Barr Laboratories, Inc., 930 F.2d 72, 75 (D.C. Cir.), cert. denied, 502 U.S. 906 (1991). The fifth factor addresses the nature and the extent of the interests prejudiced by the delay. Plaintiff may be inconvenienced by the delay in adjudication and completion of her background checks. However, in most cases, the adverse impact caused by the delay is not substantial. Applicants for adjustment of status who have pending applications may apply for and obtain employment authorization for the entire time the application is pending. Additionally, most applicants may apply for and receive advance parole to enable them to travel abroad during the pendency of their application. Plaintiff does not claim that the delay has prevented her from traveling abroad or finding gainful employment, but simply states that this could cause her to incur fees of $340 and $305. See Pl. MSJ at 26. Those fees would cause purely economic harm, if any, which is given less weight in the TRAC analysis. See In re Barr Laboratories, Inc., 930 F.2d at 75; see also

Potomac Electric Power Co. v. ICC, 702 F.2d 1026, 1027-28, 1034 (D.C. Cir. 1983) (delay

causing commercial harm found to be unreasonable after 9 years).  The fact that Plaintiff's

adjustment application remains pending is not itself sufficient to make her subject to deportation.

Further, it is far from certain that Plaintiff will be eligible to become a lawful permanent

resident; if the background checks or subsequent inquiries yield information that causes USCIS

to deny her application for lawful permanent residency, Plaintiff will be in a worse position after

adjudication than she is now.

   Turning to the fourth TRAC factor, whatever harm Plaintiff may face as a result of

waiting for the results of Defendants' adjudication and investigations, those individual interests

cannot outweigh Defendants' interests in fully and accurately completing each background

check.  For purposes of the TRAC analysis, the relevant question is whether the importance of

acting on the allegedly delayed action is outweighed by agency activities of a higher or

competing priority.  Courts view this as the most important of the TRAC factors.  See Wong Sze

v. INS, 1997 U.S. Dist. LEXIS 10822, *25 (N.D. CA. 1997) (citing Fraga v. Smith, 607 F. Supp.

517, 521 (D. Or. 1985)).  In this case, the competing agency priorities — namely, enforcing

USCIS's security investigation and background check requirement, and the FBI's interest in

obtaining thorough and accurate results for all investigations and background checks — are of

paramount importance, and cannot be sacrificed for Plaintiffs' personal desire to obtain a more

swift ruling on their pending applications.  See Liberty Fund, 394 F. Supp. 2d at 118.

   Security background checks for individuals seeking immigration benefits are a key

component to our nation's security.  See The 9/11 Commission Report, 2004 WL 1634382 at

352 (July 22, 2004) (finding that "had the immigration system set a higher bar for determining

whether individuals are who or what they claim to be . . . it could have potentially excluded,

removed, or come into further contact with several hijackers who did not appear to meet the terms for admitting short-term visitors"). These checks have revealed significant derogatory information on various alien applicants for immigration benefits, including information concerning involvement in criminal and terrorist activities. See USCIS Fact Sheet at 1 (Exh. 3). USCIS conducts security checks for all applicants, to "enhance national security and ensure the integrity of the immigration process." Id. at 2. USCIS will not grant an application before it receives the results of those security checks. See id. at 1.

As the highest of priorities, "our national security requires that caution and thoroughness in these matters not be sacrificed for the sake of expediency." Safadi v. Howard, 466 F. Supp. 2d 696, 701 (E.D. Va. 2006). Plaintiff dismisses the investigations as "valueless" and "dangerous."[3] Pl. MSJ at 24. But the FBI determined in 2002 that "deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively." Cannon Decl. ¶ 23. Moreover, the FBI has determined that it must ensure that the results of the investigatory process are "accurate and thorough," id. ¶ 39, and that those security interests cannot yield to speed. Likewise, USCIS has determined that all checks must be completed before it adjudicates an application. See Fact Sheet at 1-2; Meyer Decl. ¶ 6. Although a delay in processing may have some negative impact upon individual applicants like Plaintiffs, "in this post-9/11 context, agencies must have the freedom to carefully and thoroughly investigate these applications without judicial interference in their priorities." Patil v. Mueller, 2007 WL 1302752, at *2 (E.D. Va. Apr. 30, 2007).

---

[3] The "USCIS" Ombudsman whose remarks Plaintiff has cited is not a part of USCIS. The Ombudsman reports to the Secretary of the Department of Homeland Security. See 5 U.S.C. § 452. The Ombudsman's function is to identify problems individuals and employers have with USCIS, and to propose solutions to those problems. See id. § 452(b). The Ombudsman does not have the authority to dictate the terms upon which adjustment of status applications will be adjudicated, or to eliminate the background check requirement. See id.

Plaintiff contends that she should be awarded summary judgment because Defendants have not provided particularized information concerning the factors causing the delay in completing her pending background checks.  However, disclosing specific information concerning the results of the FBI's investigation into Plaintiff's background would be contrary to the longstanding privileges afforded to sensitive law enforcement information.  See generally Fact Sheet at 3 (explaining that USCIS does not share information about any hits or the nature of the status of any investigation with respect to applicants with the applicant or his/her representative).  The background and security check process determines, inter alia, whether the applicant's identifying information (i.e., name, social security number, or date of birth) matches that of an individual whose name has been recorded in the FBI's databases in connection with an FBI investigation.  See Cannon Decl. ¶ 11.  The FBI databases searched contain records compiled for law enforcement purposes, and may include files concerning individuals, organizations, activities, or foreign intelligence matters.  See id. ¶ 5. Thus, if an applicant is a suspected criminal and/or terrorist, or a known associate of such a person, the background check process should reveal that information.  As a result, Defendants cannot disclose whether or not Plaintiff is the subject of an ongoing criminal investigation, or the number of "hits" (if any) found upon electronically submitting Plaintiff's name for batch processing, regardless of the fact that Plaintiff may wish to know that information.  However it is reasonable to infer that, due to her common name and/or other factors, Plaintiff's background check was among the 10 percent of those which cannot be resolved through electronic batch processing or the manual name searches that typically are completed within 30-60 days.  See Eldeeb, 2007 WL 2209231, at *5.

### C.  Prioritizing Plaintiff's Application Would Simply Delay Defendants' Adjudication and Screening of Other Individuals Seeking Immigration Benefits.

Finally, even if the TRAC factors favored Plaintiff, this case would not warrant judicial

intervention into Defendants' processing of adjustment of status applications, security investigations, or background checks.  See Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100.  As of the end of Fiscal Year 2006, there were approximately 364,600 pending USCIS background check requests, of which over 157,800 were related to adjustment-of-status applications.  See Cannon Decl. ¶ 26.  USCIS has reported that, as of May 2007, there were 329,160 immigration applications awaiting completion of background checks, of which 31,144 had been pending for over thirty three months.  See Pl. MSJ at 24.  Giving Plaintiff's background checks priority over those other individuals' checks would simply delay the completion of those other investigations.  That would not be equitable, and

> would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer.  Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

Dmitrenko v. Chertoff, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); Orlov v. Howard, __ F. Supp. 2d __, 2007 WL 4293490, at *7 (D.D.C. Dec 10, 2007) (quoting same). Thus this is a case in which "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain."  Mashpee Wampanoag Tribal Council, Inc., 336 F.3d at 1100.

Given that USCIS and the FBI are treating Plaintiff in the same manner as other applicants, and are working conscientiously to reduce the backlog, the Court should not require them to move Plaintiff ahead of other applicants awaiting background check results.  See id. at 1100-01; In re Barr Laboratories, Inc., 930 F.2d at 75-76 (concluding that interfering with the FDA's priorities in order to place one applicant ahead of other similarly situated applicants was inappropriate); Espin, 381 F. Supp. 2d at 266 (concluding that Plaintiff "has given no reason for the Court to compel the CIS to devote immediate attention to her adjustment application" and

prioritize it over the over 250,000 applications filed in New York alone that year).  As explained supra, the volume of background checks has surpassed the FBI's resources, but the FBI is taking steps to address the delays and reduce the backlog.  See Cannon Decl. ¶¶ 31-38. Unless the applicant's background check meets the criteria for being expedited, the FBI "generally works on the oldest name checks first — a first-in, first-served protocol."  Cannon Decl. ¶ 18.  This order applies at "each stage of processing," and reflects the FBI's judgment that "all applicants are equally deserving" and should be treated fairly.  Id.

Plaintiff focuses on the fact that most background checks are completed within a matter of months, and contends that this contradicts Defendants' assertions concerning the first-in protocol.  See Pl. MSJ at 22-23.  That argument conflates the order of processing with the order of completion. To the extent that there may be individuals who filed their adjustment of status applications after Plaintiff but have received a final adjudication of the application, that simply indicates that those individuals' background checks could be completed at the earlier (and typically shorter) stages of the FBI's process, or that they were expedited.[4]

Agencies maintain "great latitude in determining their agendas."  In re Monroe Communications, Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).  As the Court of Appeals stated:

> [W]e have no basis for reordering agency priorities.  The agency is in a unique - and authoritative - position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.

In re Barr Laboratories, Inc., 930 F.2d at 76.  Here, within the confines of the resources allocated to them, USCIS and the FBI have developed a process for handling the millions of applications and background checks submitted to them.  A court should be loathe to upset the balance they have struck.  An order requiring the shifting of priorities, accelerating one

---

[4] One other exception to the first-in policy is the FBI and USCIS effort to reduce name checks by prioritizing "single hit" name checks.  See Cannon Decl. ¶ 20.

application over another, or giving some kind of preferential treatment to one group of cases would upset this delicate balance without full appreciation of the consequences to the agencies and other applicants.  In sum, Plaintiff should be required to wait her turn, like all other applicants, rather than being moved forward in the queue to the detriment of others.

**D.  Defendants Are Making a Good Faith Effort to Address the Delay.**

The sixth and final TRAC factor provides that a court need not find impropriety to hold that an agency action is unreasonably delayed.  Conversely, "the good faith of the agency in addressing the delay weighs against mandamus."  Liberty Fund, 394 F. Supp. 2d at 120.  Here, the delay in USCIS's completion of the adjudications is attributable to the pendency of Plaintiff's background checks.  See Meyer Decl. ¶ 8.  As discussed supra, the FBI is processing the background checks to the best of its ability, and USCIS is monitoring the case to ensure that once the background checks are complete, it can complete adjudication.  Further, the FBI has taken several steps to reduce the backlog, and is continuing to explore means of improving the name check program.  See Cannon Decl. ¶¶ 31-38.  Given that both agencies are taking active steps towards completing the background checks and adjudicating Plaintiff's application, this final factor of the TRAC analysis supports entry of judgment for Defendants.  See Saleh, 367 F. Supp. 2d at 513 (finding five-year delay was not unreasonable under APA); Espin, 381 F. Supp. 2d at 266 (three-year delay not unreasonable because of government's limited resources and substantial caseload); Alkenani v. Barrows, 356 F. Supp. 2d 652, 656-57 (N.D. Tex. 2005) (no unreasonable delay in naturalization context because of need to wait for completion of FBI investigation).

**CONCLUSION**

For the foregoing reasons and those set forth in Defendants' Motion to Dismiss,

Defendants respectfully request that the Court DENY Plaintiffs' Motion for Summary Judgment

and GRANT Defendants' motion to dismiss, or in the alternative, GRANT Defendants' motion

for summary judgment, or, in the alternative, TRANSFER this case to the Northern District of

Texas.

Dated:  January 16, 2008                          Respectfully submitted,


                                                  /s/
                        JEFFREY A. TAYLOR, D.C. BAR # 598610
                        United States Attorney


                                                  /s/                                                          .
                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                        Assistant United States Attorney


                                      /s/ Robin M. Meriweather                    .
                        ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                        Assistant United States Attorney
                        555 Fourth St., N.W.
                        Washington, D.C.  20530
                        Phone: (202) 514-7198 Fax: (202) 514-8780
                        Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| YING LI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07CV0662(RMU) |
| | ) | |
| MICHAEL CHERTOFF, Secretary, | ) | |
| U.S. Department of Homeland Security, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rules 7(h) and 56.1, Defendants hereby submit the following statement of

material facts as to which there is no genuine dispute.  Defendants believe that there are no

material facts in dispute that would preclude disposition of this case on the merits by entry of

summary judgment.  The facts established below are sufficient to support the award of summary

judgment to Defendants.

1.  Plaintiff Ying LI filed an I-485 application for adjustment of status to that of a lawful

permanent resident.  <u>See</u> Compl. ¶ 1.

2.  United States Citizenship and Immigration Services requested national security

screenings in connection with Plaintiff's adjustment of status application.  <u>See</u>

Declaration of Robert D. Meyer, ¶¶ 8-9 (Exh. 1).

3.  USCIS will never grant an immigration service or benefit before the required security

checks are complete.  <u>See</u> USCIS Fact Sheet (Exh. 3).

4.  The FBI has not yet completed the background checks for Plaintiff.  <u>See</u> Declaration of

Michael Cannon, ¶ 41 (Exh. 2); Meyer Decl. ¶ 9.

5. The FBI has determined that its "mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results." Cannon Decl., ¶ 39.

Dated: January 16, 2008                                   Respectfully submitted,

                                        _____/s/_____
                                        JEFFREY A. TAYLOR, D.C. BAR # 598610
                                        United States Attorney

                                        _____/s/_____
                                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                                        Assistant United States Attorney

                                        _____/s/ Robin M. Meriweather_____.
                                        ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                                        Assistant United States Attorney
                                        555 Fourth St., N.W.
                                        Washington, D.C.  20530
                                        Phone: (202) 514-7198 Fax: (202) 514-8780
                                        Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————————— )
YING LI,                                                    )
                                                            )
                            Plaintiff,                      )
                                                            )
            v.                                              )   No. 1:07CV0662(RMU)
                                                            )
MICHAEL CHERTOFF, Secretary,                                )
U.S. Department of Homeland Security, <u>et al.</u>,        )
                                                            )
                            Defendants.                     )
—————————————————————————— )

**ORDER**

Upon consideration of Defendants' Alternative Motion for Summary Judgment, it is this _____ day of _____, 2008,

        ORDERED that Defendants' Alternative Motion for Summary Judgment be and hereby is GRANTED;

        It is further ORDERED that summary judgment be and hereby is entered in favor of Defendants.

        SO ORDERED.


                                    _____
                                    United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Ying Li

                Plaintiff,


v.                                          Civ. Act. Number: **1:07-CV-00662-rmu**


Department of Homeland Security, et. Al

                Defendants.

## PERSONAL DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.  I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services.  TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC has 51,221 pending employment based I-485s and projects receiving another 95,000 by the end of the FY 2007. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. Once USCIS receives an I-485, a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests.  Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

3.  Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication.  FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY.  An FBI Name Check that has been completed will be indicated by various entries depending on the result.

4. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check

request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

5. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

6. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

7. The Service Centers, to increase efficiency and provide better service on immigration benefits, reorganized, in a process called bi-specialization, so that two Service Centers would specialize in certain applications and petitioners, instead of each Service Center handling all types of applications and petitions. To implement this reorganization each center transferred pending applications to other centers that specialized in that type of application. Thus, a center that instituted a process, as is the case here, is not the center that completes the process on certain pending or transition cases.

8. I have custody of the TSC records of Ying Li, A98416314, and I supervise TSC officers who are processing Ying Li's applications. After reviewing the information pertaining to Ying Li, I attest that USCIS has referred this case for lawfully required security screening of aliens and that USCIS suspended adjudication in accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

9. During the normal processing of this case, a national security screening was requested. The information and records pertaining to Ying Li shows that TSC Officers under my supervision make regular inquiries about the status of her security screening.

Robert D. Meyer
Supervisory Adjudications Officer
Texas Service Center

1/9/08
Date

Exh 3 to Defendants' Reply

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| YING LI, Individually<br>1320 North Veitch Street<br>Apartment No. 1934<br>Arlington, VA 22201<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO R. GONZALES<br>Attorney General of the United States<br>950 Pennsylvania Avenue, N.W<br>Washington D.C. 20530-0001,<br><br>MICHAEL CHERTOFF<br>Secretary of the Department of Homeland Security<br>U.S. Department of Homeland Security<br>Washington, D.C. 20528<br><br>EMILIO T. GONZALEZ<br>Director of the United States Citizenship and<br>Immigration Services ("CIS")<br>20 Massachusetts Avenue, N.W.<br>Washington D.C. 20529,<br><br>and<br><br>ROBERT S. MUELLER<br>Director<br>Federal Bureau of Investigation<br>J. Edgar Hoover Building<br>935 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No:<br>)  1:07-cv-00662<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Exh 3 to Defendants' Reply

# DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for YING LI, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for

2

Exh 3 to Defendants' Reply

prospective Government employees. The FBI performs the primary National Agency Check

conducted on all United States Government employees. From this modest beginning, the

Program has grown exponentially, with more and more customers seeking background

information from FBI files on individuals before bestowing a privilege, such as Government

employment or an appointment, a security clearance, attendance at a White House function, a

"green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and

local agencies regularly request FBI name searches. In addition to serving our regular

Government customers, the FBI conducts numerous name searches in direct support of the FBI's

counterintelligence, counterterrorism, and homeland security efforts.

## <u>EXPLANATION OF THE CENTRAL RECORDS SYSTEM</u>

(5)      The FBI's CRS enables the FBI to maintain all information which it has

acquired in the course of fulfilling mandated law enforcement responsibilities. The records

maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

compiled for law enforcement purposes. This system consists of a numerical sequence of files

broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter. Certain

records in the system are maintained at FBI Headquarters. Records which are pertinent to

specific FBI Field Offices are mostly maintained at those Field Offices.

(6)      FBI Headquarters and each Field Division can access the CRS through the

FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

indices on various subjects, including the names of individuals and organizations. Only the

information considered pertinent, relevant, or essential for future retrieval is indexed.

3

Exh 3 to Defendants' Reply

(7)    Communications directed to FBI Headquarters from various Field Offices

and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

victims.  Searches made in the index to locate records concerning particular subjects are made by

searching the name of the subject requested in the index.

(8)    The entries in the General Indices fall into two categories:

    (a)    "main" entries – entries that carry the name corresponding
        with the subject of a file contained in the CRS.

    (b)    "reference" entries – entries (sometimes called "cross-
        references") that generally only mention or reference an
        individual, organization, etc., that is contained in a
        document located in another "main" file.

(9)    In 1995, the FBI implemented the Automated Case Support ("ACS")

system for its Headquarters, Field Offices, and Legal Attaches.  More than 105 million records

were converted from automated systems previously utilized by the FBI.  The ACS system

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

    (a)    Investigative Case Management:  This application provides
        the ability to open, assign, and close investigative and
        administrative cases as well as to set, assign, and track
        leads.  A case is opened by the Office of Origin, which sets
        leads for itself and other field offices, as needed.  The
        offices that receive the leads are referred to as Lead Offices.
        When a case is opened, it is assigned a Universal Case File
        Number, which is utilized by FBI Headquarters and all
        offices conducting or assisting in the investigation.  Using
        fictitious file number "111-HQ-12345" as an example, an
        explanation of the Universal Case File Number is as
        follows: "111" indicates the classification for that specific
        type of investigation; "HQ" is the abbreviated form used for

the Office of Origin of the investigation (in this case, FBI
Headquarters); and "12345" indicates the individual case
file number for that particular investigation.

(b)   Electronic Case File:  This application serves as the central
electronic repository for the FBI's official text-based
documents.  It supports the universal serial concept, where
only the creator of a document serializes it into a file,
providing single source entry of serials into the
computerized system.  All serials originated by the Office
of Origin are maintained in the Office of Origin's case file.

(c)   Universal Index:  This application, sometimes referred to as
"UNI", continues the universal concepts of the ACS system
by providing a complete subject/case index to all
investigative and administrative cases.  Only the Office of
Origin is required to index.  However, the Lead Offices
may index additional information as needed.  The Universal
Index, which consists of an index of approximately 100.0
million records, functions to index names to cases, and to
search names and cases for use in the FBI investigative and
administrative cases.  Names of individuals or entities are
recorded with identifying information such as the date or
place of birth, race, sex, locality, social security number,
address, or date of event.

(10)   The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the investigative FBI Special Agent, the supervisor in the field

division conducting the investigation, and the supervising FBI Special Agent at FBI

Headquarters.  The FBI does not index every name in its files, but indexes only that information

considered pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this

mass information, information essential to ongoing investigations could not be readily retrieved.

The FBI files would thus be merely archival in nature and could not be effectively used to serve

one of the mandated missions of the FBI, to investigate violations of federal criminal statutes.

Therefore, the General Indices to the CRS files are the means by which the FBI can determine

Exh 3 to Defendants' Reply

what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

Exh 3 to Defendants' Reply

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI

Exh 3 to Defendants' Reply

record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)     Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)     Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(18)     At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)     The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which

Exh 3 to Defendants' Reply

name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the

9

Exh 3 to Defendants' Reply

interests of the United States effectively. One of the procedures identified was the FBI's name

check clearance. Before November 2002, only those "main" files that could be positively

identified with an individual were considered responsive to the immigration authorities name

check requests. However, because that approach ran a risk of missing a match to a possible

derogatory record, the FBI altered its search criteria to include "reference" files as well. From a

processing standpoint, this meant the FBI was required to review many more files in response to

each individual background check request.

       (24)   In December of 2002 and January of 2003, the former INS resubmitted 2.7

million name check requests to the FBI for background investigations of all individuals with

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

individual who was the subject of the request, approximately 16 percent – or over 440,000 –

resubmitted requests indicated that the FBI <u>may</u> have information relating to the subject of the

inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than

6,300 of those resubmitted requests remain pending.

       (25)   The FBI's processing of the more than 440,000 residuals has delayed the

processing of regular submissions from USCIS. A dedicated team within NNCPS has been

assigned to handle only these re-submitted name check requests. To the extent that the team

Exh 3 to Defendants' Reply

members are working on only these applications, they are unavailable to process the normal submissions.

(26)    There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks. As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a

11

Exh 3 to Defendants' Reply

person with a common name is the same person mentioned in FBI records. Common names can

often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a

delay in processing a name check request. If the date of the record predates October 1995, the

paper record has to be located, retrieved, and reviewed; if the date of the record is later than

October 1995, the record text may or may not be available electronically depending on the type

of record and whether it has been uploaded electronically. A paper record could be at one of over

265 possible locations across the country. Requests often involve coordinating the retrieval and

review of files from the various 56 different FBI field offices. One person's name check may

involve locating and reviewing numerous files, all at different physical locations. Each request

must be communicated internally from the NNCPS to the field, and handled according to the

current priorities of the particular field office. Since it is a paper based process, it is a process

subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this

declaration is the expedited request. Processing an expedited case means that an employee is not

available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process. Over the

short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database

("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate

12

preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)    The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to

13

Exh 3 to Defendants' Reply

investigate ways to further automate the name check process. The goal is to incorporate

analytical software applications that reduce the time spent to verify the identity of the individual

and, once verified, assists in the adjudication analysis. This type of automation should decrease

the time required to process a name check, thereby increasing production. The FBI is building a

proof of concept system for eventual integration into the FBI's core databases.

   (38) As a long-term improvement, the FBI is developing a Central Records

Complex that will create a central repository of records. Currently, paper files/information must

be retrieved from over 265 locations throughout the FBI. The Central Records Complex will

address this issue, creating a central repository-scanning of documents, and expediting access to

information contained in billions of documents that are currently manually accessed in locations

around the United States and world. In addition, the essential long term improvement for FBI

Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

services. Once in place, the FBI will be able to scale resources proportionally with workload

demands – pending name checks will pay for themselves. At this time fees do not cover the

basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to

processing name checks without pulling critically needed personnel and funding from other

programs. The FBI procured services to conduct a study to determine an appropriate fee

structure. The independent contractor hired to conduct the study has completed its work and the

proposed fee structure is undergoing the Federal rulemaking process.

   (39) For the reasons stated earlier, the FBI cannot provide a specific or general

time frame for completing any particular name check submitted by USCIS. The processing of

name checks, including those which are expedited at the request of USCIS, depends upon a

Exh 3 to Defendants' Reply

number of factors, including where in the processing queue the name check lies; the workload of

the analyst processing the name check; the volume of expedited name checks the analyst must

process for, among others, military deployment, "age-outs," sunset provisions such as Diversity

Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or

other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed

and resolved; the number of records from various Field Offices that must be retrieved, reviewed

and resolved; and, more generally, the staff and resources available to conduct the checks.

Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report

where in the processing queue a particular name check request may lie vis-à-vis other name

checks.  Additionally, until review of each case is undertaken no estimate for the time required to

complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will

be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

complete the review once it has begun.  While the FBI is sensitive to the impact of the delays in

processing name check requests, the consequence of the FBI's mission on homeland security

requires that its name check process be primarily focused on providing accurate and thorough

results.  When the name check is completed, the FBI provides the results to USCIS as quickly as

possible.

   (40) It is important to note that the FBI does not adjudicate applications for

benefits under the Immigration and Nationality Act.  If appropriate, the FBI generally provides a

summary of available information to USCIS for its adjudication process.

Exh 3 to Defendants' Reply

## PLAINTIFF'S NAME CHECK REQUEST

(41)     The name check request for plaintiff YING LI was received by the FBI

from USCIS on or about July 14, 2004 and has not been completed.  The FBI is performing its

check in response to USCIS's request in accordance with the procedures outlined above.  The

results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in

accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

Executed this 20th day of December 2007.


_Michael A. Cannon_

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

# Fact Sheet

**Immigration Security Checks—How and Why the Process Works**

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the

sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS.  Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.