## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**YING LI**                              )
                                         )
         **Plaintiff,**                  )
                                         )
    **v.**                               )  **CIVIL ACTION NO. 07-0662(RMU)**
                                         )
**MICHAEL CHERTOFF, et al.,**            )
                                         )
         **Defendants.**                 )
_____)

### RESPONSE TO DEFENDANTS' ALTERNATIVE MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff Jamil Ying Li, by counsel, respectfully opposes the Defendants' Alternative Motion for Summary Judgment in the above-captioned case, for the reasons set forth below, and prays that this Court grant Plaintiff's motion for summary judgment previously filed. Plaintiff discussed the statutory, regulatory and factual background in detail in her complaint, opposition to Defendants' motion to dismiss, and surreply, and those arguments are incorporated herein by reference.

### I.    ARGUMENT

This Court should deny the Defendants' alternative motion for summary judgment and should grant Plaintiff's motion for summary judgment. Plaintiff opposes the Defendants' statement of material facts as to which Defendants allege there is no genuine dispute. Particularly, Plaintiff disagrees with statement No. 3. Defendants state that "USCIS will never grant an immigration service or benefit before the required security checks are complete." Defendants further argue that Plaintiff's case is treated in the same manner as other applicants, first-in, first-out. *See* Defendants' Memorandum in Support of Alternative Motion for Summary

Judgment at 13-14 9"Def. Memo," hereinafter).    However, this allegation is belied by the Cannon Declaration (Court Doc. 20-3 at par. 19), which states that USCIS can "direct[…] that a name check be handled on an 'expedited' basis.    USCIS determines which name checks are to be expedited based on criteria it determines.    Once designated as an 'expedite,' that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the other waiting to be processed."    Cannon. Decl. at par. 19.    Therefore, while it might be somewhat correct, although unverified, that no benefit will be granted until all security checks are completed, it is clear that there is a way for USCIS to request the FBI to complete such checks within a reasonable time.    What Defendants fail to reveal, in counsel's experience, is that such request for expedite of security background checks is consistently made in petitions for hearing on naturalization filed pursuant to 8 U.S.C. § 1447(b) before the U.S. District Court for the Eastern District of Virginia, and before the U.S. District Courts in Maryland.

Furthermore, Defendants' allegations in their statement of material facts that no benefit can be granted unless checks are complete, relies on the underlying assumption that such background checks are proper and that USCIS has authority to require an FBI name check.    *See Mocanu v. Mueller,* Slip Copy, 2008 WL 238443 (E.D.Pa. Jan. 25, 2008) (challenging the propriety and legality of name checks for naturalization applicants).

The material facts as to which there is no genuine dispute as represented by Plaintiff are listed in the enclosed Statement of Material Facts at Exhibit 1.    Those facts are that Plaintiff properly filed her application for adjustment on June 24, 2004, with the USCIS Vermont Service Center; that on March 2, 2007, USCIS unilaterally decided to transfer her file to the USCIS Texas Service Center, under the allegation "in order to speed up processing."    *See* Exh. 9 attached to Complaint.    As of today, three years and seven months after having filed her

application with Defendants, Plaintiff's application remains unadjudicated.  The sole issue before

this Court is whether Plaintiff Ying Li is entitled to the relief of having her application

adjudicated within a reasonable time.  Some recent decisions have thoroughly analyzed that

issue, and Plaintiff urges this Court to adopt their sound reasoning.  As the U.S. District Court

for the Eastern District of Virginia recently ruled in a case involving the same facts as Plaintiff's:

> Under 5 U.S.C. § 706(1), a reviewing court has the authority to "compel agency
> action unlawfully withheld or unreasonably delayed."  Aslam may invoke the
> remedy of mandamus "by proving the co-existence of three elements: (1) the
> petitioner has shown a clear right to the relief sought; (2) the respondent has a
> clear duty to do the particular act requested by the petitioner; and (3) no other
> adequate remedy is available." *Estate of Michael ex rel. Michael v. Lullo*, 173
> F.3d 503, 512-13 (4th Cir. 1999).  As the government notes, a suit to compel
> agency action under the APA is conceptually similar to a petition for mandamus
> based on agency delay.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corp. of
> Engineers*, 417 F.3d 1272, 1280 (D.D.Cir. 2005).

*Aslam*, 2007 WL 220708, at *4.  Like the Court in *Aslam*, to evaluate Plaintiff's claim, this Court

"must first determine whether the two agencies-CIS and the FBI-owe a legal duty to [Plaintiff] to

act on her application and the associated name check.  If so, the Court must then determine

whether those agencies have unreasonably delayed in discharging that duty." *Id.*

### 1. <u>Legal Duty</u>

The Defendants have a legal and mandatory duty to adjudicate Plaintiff's application for

adjustment of status that was duly filed and feed in before Defendant USCIS.  The Court in

*Aslam* ruled that "it is clear from the text of the INA that Congress intended the

Secretary of Homeland Security to process and act on applications." *Id.* at *4. The Court

referred to the "INA's enabling regulations" which "impose a duty on the Secretary of Homeland

Security to process adjustment of status applications. *See* 8 C.F.R. § 245.2(a)(5)(i) (requiring

that each 'applicant *shall* be notified of the decision of the director') (emphasis added); § 245.6

(requiring that '[e]ach applicant for adjustment of status under this part *shall* be interviewed by

an immigration officer') (emphasis added)." *Aslam* at *FN5. The Court concluded that "the Secretary of Homeland Security has a non-discretionary duty to act on [Plaintiff's] adjustment of status application. The *Aslam* Court is in fact joined by the majority of the district courts that have ruled on the issue and have agreed that Defendants owe Plaintiff a non-discretionary duty to adjudicate her application for adjustment of status. *See also Xia v. Gonzales*, 2008 U.S.Dist. LEXIS 3273, *3-4 ("This Court is not convinced by Defendants' argument that the nature of processing the application is 'discretionary' […] Adjudication of a status application is mandatory, not discretionary.); *see also Liu v. Novak,* 509 F.Supp.2d 1 (D.D.C. 2007); *Huang v. Gonzales,* 2007 WL 1302555, at *7-10 )(W.D.Was. May 2, 2007); *Chen v. Heinauer*, 2007 U.S.Dist. LEXIS 36661, at *3 (W.D.Was. May 18, 2007); *Duan v. Zamberry*, 2007 U.S.Dist. LEXIS 12697, at *7 (W.D.Penn. Feb. 23, 2007); *Tang v. Chertoff*, 493 F.Supp.2d 148, 153-54 (D.Mass. 2007).

Not only do Defendants have a legal duty to adjudicate Plaintiff's application for adjustment of status, but they have a duty to do so within a reasonable time. Again, the majority of district courts that have ruled on the issue agree that, although the INA mandates no particular time frame to adjudicate an application for adjustment of status, Defendants are nonetheless bound to act within a reasonable time under the APA, 5 U.S.C. § 555(b) and 28 U.S.C. § 1331.

> The D.C. Circuit […] allows review of agency inaction for certain types of claims. One type are claims that allege that "the pace of the agency decisional process lags unreasonably." *Sierra Club v. Thomas*, 828 F.2d 783, 794 (D.C.Cir. 1987). In such cases, "the statutory duty involved…does not specify what course of action shall be taken. Rather, regardless of what course it chooses, the agency is under a duty not to delay unreasonably in making that choice." *Id.* Agencies most often bear this duty of timeliness as a result of the APA's broad prohibition against "unreasonable delay." *Id.* (citing 5 U.S.C. § 555(b), 706(1)). In addition, […] the D.C. Circuit has established a meaningful standard by which to judge agency inaction in cases such as this one. *See Telecomms. Research & Action Ctr v. FCC*, 750 F.2d 70, 80 (D.C.Cir. 1984). Therefore, the Court does have

jurisdiction over plaintiff's APA claim that defendants have unreasonably delayed adjudicating his application. *See Thomas*, 828 F.2d at 794; *Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1131 (D.C.Cir. 1997) (stating that plaintiff could challenge the EPA's unreasonable delay in making a discretionary decision under the APA).

*Liu v. Novak*, 509 F.Supp.2d at 8-9.

The INA mandates no particular time frame in which the Secretary must complete his review of adjustment of status application. Nevertheless, as an agency of the Executive Branch, the Department of Homeland Security is subject to the catchall time requirement of the APA:

With due regard for the convenience and necessity of the parties or their representatives and *within a reasonable time*, each agency shall proceed to conclude a matter presented to it.

5 U.S.C. § 555(b) (emphasis added). Absent this timeliness requirement, the Secretary could defeat the clear intent of Congress simply by withholding performance of his statutory duty indefinitely. *See Tang*, 493 F.Supp.2d at 150 ("The duty to act is no duty at all if the deadline is eternity.") Accordingly, the Court concludes that CIS has a legal obligation to adjudicate [Plaintiff's] petition within a reasonable time.

*Aslam v, Mukasey*, 2008 WL 220708, at *5.

Defendants correctly argue that the enabling statute and regulations provide no clear time frame for the adjudication of an application. However, Congress has expressed an expectation that the agency will proceed in a timely manner. For example, Section 555(b) of the APA provides that each agency shall proceed to conclude a matter "within a reasonable time." 5 U.S.C. § 555(b). Further, the Immigration Services Infrastructure Improvements Act of 2000 provides that it is "the sense of Congress that the processing of an immigration benefit application should be completed no later than 180 days after the initial filing of the application." 8 U.S.C.§ 1571(b). While the "180 days" deadline is non-binding, the standard of reasonableness must still be applied. Defendants do "not posse[ss] unfettered discretion to relegate aliens to a state of limbo, leaving them to languish there indefinitely." *Salehian v. Novak*, 2006 U.S.Dist. LEXIS 77028, at *9 (D.Conn. Oct. 23, 2006) (quoting *Kim v. Ashcroft*, 340 F.Supp.2d 384, 393 (S.D.N.Y. 2004) (internal quotations omitted).

*Xia v. Gonzales*, 2008 U.S.Dist. LEXIS 3273, at *4-5. Plaintiff urges this Court to conclude

likewise that Defendants have a legal duty to adjudicate her application for adjustment of status

within a reasonable time.

2.  **Unreasonable Delay**

Plaintiff filed her application for adjustment of status with Defendants on June 24, 2004, more than three years and seven months ago.  Her name check has been pending with the FBI since July 14, 2004.  *See* Cannon Decl. at par. 41 (Court Doc. 20-3 at par. 41).  Plaintiff urges this Court to conclude that she has established a prima facie case of unreasonable delay.  The D.C. Circuit has identified six factors ("TRAC" factors) relevant to determine whether agency delay is unreasonable.  *See Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C.Cir. 1984).

a.  **The time agencies take to make decisions must be governed by a "rule of reason."**

Defendants invoke the complexity of the name check process to justify the delay. Defendants state that [t]here are numerous factors that have contributed to delays in the processing of name check requests."  *See* Cannon Decl. at par. 26 (Court Doc. 20-3 at par. 26). The Defendants cite, as potential sources of delay, the volume of incoming name checks; the number of hits when it is reviewed; the processing of common names; the accessibility of the FBI record needed for review; CIS requesting that some checks be expedited, and therefore, jump in line before other cases.  *See* Cannon Decl. at par. 26-30.  As the Court in *Aslam* rightfully points out, "it is the government's burden to offer an explanation for a particular delay. A multi-year delay might be reasonable for a name check that generated several hundred of hits, but probably not for a name check that generated only one hit."  *Aslam v. Mukasey*, 2008 WL 220708, at *6.  In the case at bar, just as in the case of *Aslam, Liu and Xia,* Defendants have failed to meet this minimum burden.  The Defendants have only provided a generic description of the name check process, with generic explanations as to why a name check could be delayed

in the abstract; however, they have failed to provide any particularized explanation as to why Plaintiff Ying Li's name check has been delayed.

The Defendants also advance the limited financial resources for justifying-again in the abstract-the delay in this matter.  As the Court in *Aslam* judiciously noted, "[t]he APA imposes a *legal* obligation on CIS" to complete adjudication of applications for adjustment of status within a reasonable period of time.  "If the FBI's name check process is obstructing compliance with that legal obligation, CIS must either remove the obstruction or accept the legal penalties. Bureaucratic inadequacy is not a justification, especially because the cost of noncompliance are imposed on the applicant."  *Aslam v. Mukasey,* 2008 WL 220708, at *6.

Therefore, this Court should find that a three-year and seven months delay is unreasonable.  *See also Liu v. Novak,* 509 F.Supp.2d at 9 (a four-year delay is unreasonable); *Xia v. Gonzales*, 2008 U.S.Dist. LEXIS 3273, at *6-7 (a 43-month delay is unreasonable); *Singh v. Still*, 470 F.Supp.2d 1064, 1071 (N.D.Cal. 2007) (four-year delay is not reasonable); *Haidari v. Frazier*, 2006 WL 3544922, at *6 (D.Minn. Dec. 8, 2006) (four-year delay was not reasonable due to FBI name checks); *Yu v. Brown*, 36 F.Supp.2d 922, 935 (D.N.M. 1999) (two and a half years delay was not reasonable).

### b.  <u>Where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed.</u>

In the absence of timetable provided by Congress, this second TRAC factor is inapplicable.  *See*

*Liu v. Novak,* 509 F.Supp.2d at FN4; *Aslam v. Mukasey*, 2008 WL 220708, at FN8.

### c.  <u>Competing interests.</u>

The third and fifth TRAC factors look at the competing interests at stake: delays that

might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; and the court should also take into account the nature and extent of the interests prejudiced by delay. *See Telecommunications Research & Action Center v. FCC*, 750 F.2d at 80. Delaying adjudication of her application for adjustment of status has impaired Plaintiff Ying Li's benefit to sponsor close family relatives, thus preventing family unity, and has also prevented indefinitely her goal to become a U.S. citizen indefinitely, thus depriving her of the right to vote in elections.

Defendants are quick to retreat to the justification that is all too often advanced by the government in these cases – unlimited deference is required in the post-9/11 world. However, the reality is, Defendants cannot provide even the most basic specifics as to what is being done to complete Plaintiff's name check. Furthermore, if Plaintiff were a threat to national security, then national interest would be better served by having the name check promptly completed, rather than delayed for almost four years, during which time Plaintiff has been allowed to live and work on U.S. soil. Obviously, Plaintiff's unmonitored presence in the U.S. does not make the U.S. and its people any safer. It is abundantly clear that there is no ongoing investigation of Plaintiff due to Defendants' failure to show that they have taken any of the actions required of them by their own regulation when a prolonged undisclosed investigation is necessary to protect U.S. interests, 8 C.F.R. § 103.2(b)(18). In accordance with 8 C.F.R. §103.2(b)(18), the USCIS is required to undertake periodic review at certain specified intervals "if an [undisclosed] investigation has been undertaken and has not been completed within one year of its inception."

Under that regulation, after a year has passed from the inception of the investigation, the district director of USCIS is to:

> review the matter and determine whether adjudication of the petition or application
> should be held in abeyance for six months or until the investigation is completed,

whichever comes sooner. If, after six months of the district director's determination, the investigation has not been completed, the matter shall be reviewed again by the district director and, if he/she concludes that more time is needed to complete the investigation, adjudication may be held in abeyance for up to another six months. If the investigation is not completed at the end of that time, the matter shall be referred to the regional commissioner, who may authorize that adjudication be held in abeyance for another six months. Thereafter, if the Associate Commissioner, Examinations, with the concurrence of the Associate Commissioner, Enforcement, determines it is necessary to continue to withhold adjudication pending completion of the investigation, he/she shall review that determination every six months.

Defendants have failed to supply any evidence that they have undertaken any of these mandated actions. This implies that there is no ongoing investigation of Plaintiff, but rather, that the delay is due to purely bureaucratic inertia. Clearly, Defendants are not foreclosed by national security concerns from providing at least some evidence that they have acted in accordance with 8 C.F.R. §103.2(b)(18). In fact, the U.S. Supreme Court required the government to satisfy more than a "very deferential 'some evidence' standard" to prove that a given individual poses a threat to national security interests and should be labeled a "enemy combatant" in Hamdi v. Rumsfeld, 542 U.S. 507, 527-28 (U.S. 2004). That case involved the detention of a suspected al-Qaeda operative, which implicates far more sensitive national security interests than those at issue here. In her opinion, Justice O'Connor noted that:

> As critical as the Government's interests may be in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict, history and common sense teach us that an unchecked system of detention caries the potential to become a means for oppression and abuse of others who do not present that sort of threat. Id. at 530.

Therefore, Justice O'Connor concluded, that the government must provide more than 'some evidence' to support its national security interests and cannot merely invoke "9/11" as a justification for their inaction. Id. at 533. As the *Aslam* Court noted:

> As for CIS's interests, the government repeatedly invokes the mantra of national security: "mandating a decision without the benefit of the FBI's complete analysis would require CIS to adjudicate those applications that it knows (given the

> passage of time without FBI completion) are the most likely to be inimical to our
> national security." This is rank speculation. There is no evidentiary basis to
> assert a nexus between the pendency of Aslam's name check and a threat to
> national security because CIS does not inquire into the reasons behind the FBI's
> delay. For all the Court knows, Aslam's name check file is sitting in an analyst's
> inbox collecting dust.

*Aslam v. Mukasey*, 2008 WL 220708, at *7. *See also Liu v. Novak,* 509 F.Supp.2d at 9 (mere

invocation of national security, without a particular explanation of how it caused the delay, is

insufficient to justify the delay); *Xia v. Gonzales*, 2008 U.S.Dist. LEXIS 3273, at *7 ("The Court

is unconvinced by Defendants' argument that the security interests of the nation, particularly in

the post 9/11 era, are sufficient excuse for failing to act on Mr. Xias' application. Defendants

have failed to produce *any* particular evidence about the information found during the processing

of Mr. Xias' background check that might offer some valid reason for the delay.")

Plaintiff, a professor at Georgetown University, urges this Court to find that there is

absolutely no evidence in the record that would justify why her particular background check has

been delayed for over three years and seven months, and to rule that Defendants' argument of

national security are meaningless when as the same time, Defendants allow Plaintiff to remain

unmonitored in the U.S.

    d.   Effect of expediting delayed action.

The fourth TRAC requires the court to consider the effect of expediting delayed

action on agency activities of a higher or competing priority. *See Telecommunications Research

& Action Center v. FCC*, 750 F.2d at 80. Defendants argue that any order directing CIS to

complete adjudication of Plaintiff's application for adjustment of status would be fundamentally

unfair as it would put Plaintiff on top of the queue. Plaintiff urges this Court to rule that

argument meritless. This argument does not take into account that CIS chooses to expedite some

security checks over others. *See* Cannon. Decl. at par. 19 (Court Doc. 20-3 at par. 19). Thus,

CIS itself chooses that some applicants go in front of the line over others.  Furthermore, "Defendants have failed to submit any information regarding the extent of this potential impact on the processing of other applications."  *Liu v. Novak*, 509 F.Supp.2d at 9.  "[The Defendants'] argument has no merit.  A full review of the record demonstrates that [Plaintiff] has more than 'waited patiently' for CIS to finish its adjudication.  He has complied with every request for additional information and, before filing this civil action, he inquired with CIS about his application."  *Aslam v. Mukasey*, 2008 WL 220708, at *8.  Similarly, Plaintiff Ying Li has made inquiries with CIS prior to filing her complaint with this Court (*see* Amended Complaint at 5).  She has waited more than patiently for three years and seven months.  "Furthermore, the prospect that other applicants deprived of timely adjudications may follow [Plaintiff] and seek judicial recourse is no justification for withholding relief that is legally warranted."  *Aslam v. Mukasey*, 2008 WL 220708, at *8.

Wherefore, Plaintiff prays that this Court rule that the fourth TRAC factor weighs in favor of finding for the Plaintiff.

e.  <u>Agency impropriety</u>.

The sixth TRAC factor directs the court to examine the motives behind the agency's delay ("the court need not find any impropriety lurking behind agency lassitude in order to hold agency action is 'unreasonably delayed.'"  ) *Telecommunications Research & Action Center v. FCC*, 750 F.2d at 80.  Defendants argue that they are making good faith efforts to address the delay and reject the fault of the delay upon the FBI agency.  As the Court in *Aslam* has rightfully analyzed and found;

The most recent data on this issue speaks for itself:

FBI name checks may be the single biggest obstacle of the timely and efficient delivery of immigration benefits.  The problem of long pending FBI name check

cases *worsened* during the reporting period…While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased.  There are now 93,358 more cases pending the name check than last year.  Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year-over a 44 percent increase in the number of cases pending more than 33 months.

Department of Homeland Security, Citizenship and Immigration Services Ombudsman Annual Report 37 (June 11, 2007) (citing USCIS FBI Pending Name Check Aging Report).  Furthermore, despite its status as the contracting agency, there is no evidence of any efforts by CIS to take responsibility for and help remedy the existing name check process.  Rather, CIS forwards the request to the FBI and then disclaims any accountability for a delay.  This is the very definition of agency recalcitrance-and inability or unwillingness to fix an obvious problem that it helped create.

CIS's decision to await an FBI name check does not vitiate its legal responsibility under the APA to complete its adjudication within a reasonable time period.

*Aslam v. Mukasey*, 2008 WL 220708, at *8-9.  *see also* Ombdusman Report at Exhibit 2.

Plaintiff urges this Court to also rule that the evidence in the record shows that Defendants have not made any effort or progress to resolve the delay, and that CIS, although it delegates the name check, is the agency ultimately responsible for a timely adjudication of Plaintiff's application for adjustment of status.

**Conclusion**

Plaintiff prays this Court to deny Defendants' motion for summary judgment.  Plaintiff further prays this Court to compel CIS to adjudicate her application for adjustment of status within 30 days of the Court's order, or any other time the Court may deemed reasonable.

February 1, 2008                    Respectfully submitted,


_____/s/_____
Thomas A. Elliot, Esquire
D.C. Bar No. 259713
Elliot & Mayock
1666 Connecticut Avenue, N.W., 5th Floor

Washington, D.C. 20009
202-429-1725

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **YING LI** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. 07-0662(RMU)** |
| | ) |
| **MICHAEL CHERTOFF, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

_____)

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE DISPUTE

Pursuant to Local Rules 7(h) and 56.1, Plaintiff hereby submits the following statement of material facts as to which there is no genuine dispute, in support of her motion for summary judgment previously filed:

1. Plaintiff submitted an application for adjustment of status with Defendant USCIS at its Vermont Service Center on June 24, 2004.  See Exh. 1 attached to Complaint.

2. On March 2, 2007, Defendant USCIS unilaterally transferred Plaintiff's case to its Texas Service Center "in order to speed up processing."  See Exh. 9 attached to Complaint.

3. As of today, three years and seven months later, Plaintiff's application for adjustment of status remains pending, unadjudicated by Defendants.

Dated: February 1, 2008                    Respectfully submitted,

                             _____/s/_____
                             Thomas A. Elliot, Esquire
                             D.C. Bar No. 259713
                             Elliot & Mayock
                             1666 Connecticut Avenue, N.W., 5th Floor

Washington, D.C. 20009
202-429-1725

Attorney for Plaintiff



Citizenship and Immigration Services Ombudsman

# Annual Report 2007

**Submitted to:**

**United States Senate**
**Committee on the Judiciary**

**United States House of Representatives**
**Committee on the Judiciary**

**June 11, 2007**



Homeland
Security

## MESSAGE FROM THE OMBUDSMAN



The Citizenship and Immigration Services Ombudsman's 2007 Annual Report marks 46 months of cumulative analysis and recommendations since the establishment of the office. The Ombudsman's office is Congressionally-mandated to assist individuals and employers in resolving problems with the U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security (DHS) by advancing recommendations on improving USCIS services and operations. It is an independent DHS office that reports directly to the DHS Deputy Secretary with an annual report to Congress without prior review and comment by DHS or the executive branch, as directed by the Homeland Security Act of 2002.

The Ombudsman's first three annual reports focused on the systemic issues that caused delay in granting immigration benefits and customer service complaints. These reports identified pervasive and serious issues that were addressed in 28 formal recommendations directed at solving problems faced by individuals and employers in their interactions with USCIS. The USCIS Director and the Ombudsman generally agree on the identified problems and their need for priority attention, although the solutions proposed and those adopted by USCIS may differ.

Challenges still exist within USCIS. Customers continue to have difficulties with confusing forms and processes and many customers wait months, and perhaps years, for final adjudication of their cases. The Ombudsman will continue to assist individuals to receive lawful benefits in a timely, customer-friendly, secure, and efficient manner.

I want to thank DHS Secretary Michael Chertoff, Deputy Secretary Michael P. Jackson, former Secretary Tom Ridge, former Deputy Secretary Jim Loy, former Deputy Secretary Gordon England, USCIS Director Emilio Gonzalez, Deputy Director Jonathan "Jock" Scharfen, and former Director Eduardo Aguirre for their dedication to our mission of providing secure, efficient, and expeditious immigration services. I have been privileged to work with committed professionals in DHS, USCIS, and the Ombudsman's office.

The preparation of this annual report was accomplished by tireless efforts of a dedicated staff of professionals who spent many hundreds of hours reviewing and validating facts and figures, as well as drafting and editing the report. I thank them for assisting me in completing it and for their public service in addressing national security and customer service. I especially would like to thank Wendy Kamenshine who again this year skillfully managed this complicated project.

We have accomplished a great deal, but there is much more to do in the spirit of responsive government.

*Prakash Khatri*

Prakash Khatri
Citizenship & Immigration Services Ombudsman

support centers, field offices, and service centers, there has been a substantial reduction in the backlog. Unfortunately, the agency's redefinition of the backlog obscures the issue and raises questions about its backlog reduction efforts.

**C.    Processing Times** – On August 23, 2006, USCIS announced changes that would improve the reporting methodology for processing times of immigration benefit applications. The Ombudsman disagrees that this change provides better information and urges USCIS to return to the practice of providing the public with the actual processing time for each field office.

**D.    Customer Service** – During the reporting period, USCIS made important strides in customer service. USCIS increased the number of appointments available via INFOPASS and began two new contracts in the effort to improve its toll-free customer service line. Nevertheless, the Ombudsman continued to observe other areas where communication issues with customers persist: (1) limited customer access to USCIS immigration officers who know about individual cases to resolve an inquiry accurately and efficiently; (2) questionable accuracy of information provided by customer service representatives; and (3) the practice of providing minimal information in response to customer inquiries.

**E.    Untimely Processing and Systemic Problems with Employment-Based Green Card Applications** – USCIS' inability to process enough green card applications and accurately track employment-based green card applications has resulted in a perpetual backlog of employment-based green card applications and widespread issuance of interim benefits. This lack of accurate data also has resulted in the underutilization of statutorily limited visa numbers.

**F.    Name Checks and Other Security Checks** – FBI name checks, one of the security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reduction efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits, and the problem of long-pending FBI name check cases worsened during the reporting period.

**G.    Interim Benefits** – The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit. Legitimate customers should not have to pay filing fees for interim benefits they would not need if the underlying petition were timely processed. Interim benefits also allow ineligible and fraudulent applicants to receive work authorization and travel documents because of processing delays.

**H.    Funding of USCIS** – Due to the congressional requirement that USCIS be self-funded from fees, USCIS may make decisions that compromise operational efficiency to ensure revenue flow. The manner in which USCIS obtains its funding affects every facet of USCIS operations, including the ability to: (1) implement new program and

were approved. This process would ensure that USCIS does not accept more applications than the number of visas available.

Another issue with priority dates and workloads is connected to the new fee rule. The Ombudsman anticipates that when the new fee rule goes into effect in July, delays in adjudication will significantly impact the agency if it does not track visa information, including visa classifications, priority dates, and country of chargeability. Without tallying cases receipted by visa category, USCIS inevitably will accept ineligible applications and more applications than it can process in the given timeframe. The agency will not collect fees for interim benefits issued for new green card applicants, as the new fee rule requires only one payment for both. In addition, there may be large numbers of retrogressed cases and, eventually, multiple issuances of interim benefits.

As described in the Ombudsman's 2006 Annual Report (at pp. 13-16), the Ombudsman continues to be concerned about USCIS' data integrity and failure to meet its obligation to maintain an accurate count of pending employment- and family-based preference applications. Although the focus is on employment-based visa applications, similar concerns exist for family-based preference cases. The continued collaboration of these agencies supports the Ombudsman's vision of cooperation to provide benefits in a timely and efficient manner.

### F.    Name Checks and Other Security Checks

FBI name checks, one of several security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reductions efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits. The problem of long-pending FBI name check cases worsened during the reporting period.

### 1.    Background

As of May 2007, USCIS reported a staggering 329,160 FBI name check cases pending, with approximately 64 percent (211,341) of those cases pending more than 90 days and approximately 32 percent (106,738) pending more than one year.[40] While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased. There are now 93,358 more cases pending the name check than last year. Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year – over a 44 percent increase in the number of cases pending more than 33 months.[41]

---

[40] *See* USCIS FBI Pending Name Check Aging Report (May 4, 2007). It is important to note that USCIS does not include within its backlog cases pending due to FBI name checks. There are 155,592 FBI name check cases pending more than six months that otherwise may be part of USCIS' backlog. See section III.B for a discussion of USCIS backlogs.

[41] *See id.*

---

Figure 10: Pending FBI Name Checks

| Age of Pending Response | Total Count (May 4, 2007) | Total Count (May 17, 2006) |
|---|---|---|
| < 3 months | 117,819 | 82,636 |
| 3 - 6 months | 55,749 | 33,450 |
| 6 - 9 months | 28,029 | 20,047 |
| 9 - 12 months | 20,825 | 16,845 |
| 12 - 15 months | 14,133 | 15,064 |
| 15 - 18 months | 13,931 | 10,636 |
| 18 - 21 months | 11,035 | 8,144 |
| 21 - 24 months | 12,398 | 8,325 |
| 24 - 27 months | 11,765 | 9,754 |
| 27 - 30 months | 6,600 | 4,435 |
| 30 - 33 months | 5,732 | 4,896 |
| > 33 months | 31,144 | 21,570 |
| **Total Pending** | **329,160** | **235,802** |

During the reporting period, processing delays due to FBI name checks were an issue in approximately 25 percent of all written case problems received by the Ombudsman. Resolving the FBI name check issue is included in the Ombudsman's top five priorities posted on the office website.[42] Unlike FBI name checks, other types of background and security checks – *e.g.*, fingerprint checks, the Interagency Border Inspection Systems name checks (IBIS), and the Automated Biometric Identification System (IDENT) checks – return results within a few days, if not a few minutes. These law enforcement and watch list checks do not significantly prolong USCIS processing times or contribute to the USCIS backlog.

As described in the Ombudsman's 2006 Annual Report (at p. 24), the FBI provides information to USCIS regarding anyone who is the principal subject of an investigation or is a person referenced in a file. USCIS adjudicators and the Fraud Detection and National Security (FDNS) unit use this information to determine if applicants are ineligible for benefits. The FBI provides the name check results at USCIS' request. Name checks are not conducted by the FBI as part of ongoing investigations or from a need to learn more about an individual because of any threat or risk perceived by the FBI. Instead, the name checks are a fee-for-service that the FBI provides to USCIS and according to USCIS-defined standards.

Once USCIS forwards records to the FBI for name checks, the process and the turnaround time for the checks are outside of USCIS' control. Completion of the name check process may take considerable time because manual reviews of FBI files are sometimes required. This review may include FBI reporting on fragments of names of people who are not necessarily central or directly related to an investigation or law enforcement matter. In discussions with the

---

[42] *See* section VI.F.

Ombudsman, the FBI has stated that it lacks the resources to perform the function in a timely manner.

### 2. Impact of Long-Pending FBI Name Checks on USCIS Customers

The delay caused by the FBI name check has substantial consequences to applicants and their families, as well as to our country and the economy. Examples of how legitimate applicants suffer include:

- Loss of employment and employment opportunities where the position requires green card status or U.S. citizenship;

- Possible termination of employment due to the inability to comply with required Form I-9 employment verification procedures where USCIS delays interim EAD issuance;

- Difficulties obtaining drivers' licenses;

- Inability to qualify for certain federal grants and funds;

- Limitations on the ability to purchase property;

- Difficulties obtaining credit and student loans; and

- Disqualification from in-state tuition.

---

*CASE PROBLEM*

   *The applicant's green card application has been pending since early 2005 due to the FBI name check. The applicant is a valued researcher at a U.S. pharmaceutical company.*

---

*CASE PROBLEM*

   *The applicant's green card application has been pending with USCIS for approximately four years due to the FBI name check. The applicant is a researcher at a U.S. university and, because of the adjudication delay, the university and the individual have been disadvantaged in seeking grant proposals and funding. Specifically, the individual reports that he is currently working on federal research projects. The applicant's inability to advance critical work for the project is a serious impediment to the university, its competitiveness, and the applicant's professional advancement.*

---

> **CASE PROBLEM**
>
> *In fall 2003, an applicant filed a green card application, which remained pending due to FBI name checks until spring 2007. During the course of the adjudication, the applicant was fingerprinted and applied for interim benefits several times. Although the applicant applied for most of the interim benefits in a timely manner, the filing of the last EAD was not timely, and the applicant had to end his employment. In correspondence to the Ombudsman in the winter of 2007, the applicant related that he is a cancer patient who no longer has income necessary to pay for treatments.*

In February 2007, USCIS made public the criteria for expedited treatment of FBI name checks. While this change should help with specific cases, the *status quo* for FBI name check completion is unacceptable from the standpoint of national security and immigration benefits processing.

### 3.    Value of the FBI Name Checks

The challenge for USCIS (and perhaps the challenge for DHS and the entire federal government) is to evaluate the value of maintaining the current FBI name check process relative to considerations of threat, vulnerability, and consequence. The Ombudsman agrees with the assessment of many case workers and supervisors at USCIS field offices and service centers that the FBI name check process has limited value to public safety or national security, especially because in almost every case the applicant is in the United States during the name check process, living or working without restriction.

The Ombudsman recommended in the 2006 Annual Report (at p. 25) that the FBI name check process be re-examined. Delays in the name check process actually prolong an individual's presence in the United States while the check is pending. In this sense, the current USCIS name check policy may increase the risk to national security by extending the time a potential criminal or terrorist remains in the country.

In its 2006 Annual Report Response (at p. 10), USCIS stated:

> Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means . . . in, a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. Information contained in 39 [percent] of the FBI positive responses (letterhead memoranda) received in FY 06 was not contained in IBIS/TECS, USCIS' primary background check tool. . .. [A]lthough a heavy price is paid in inquiries, mandamus actions, and other forms of litigation, USCIS is committed to effective

background checks, and thus is committed to the FBI name check. In fact, under the new fee rule currently under review, USCIS proposes to dedicate more funds to the FBI name check process as the FBI has indicated the fees they charge for these checks will increase and additional staff will be added to the process. This should help to speed up the name check process and reduce the backlog significantly.

Use of the 39 percent positive response rate as referenced by USCIS to justify continuing this program may exaggerate the value of the FBI name check. It is unclear how many of the FBI name check "responses" also were revealed by one or more of the other security checks conducted for the applications. To date, the Ombudsman has been unable to ascertain from USCIS the total number of actual problem cases that the agency discovered exclusively as a result of the FBI name check. The Ombudsman understands that most, if not all, of the problem cases which would result in an eventual denial of benefits also can be revealed by the other more efficient, automated criminal and security checks that USCIS initiates.

---

*COMMENTS FROM OMBUDSMAN'S TELECONFERENCE*

*One caller mentioned that USCIS does not schedule applicants for interviews because security clearances are not yet completed. He suggested that USCIS needs to look at the cost-benefit of doing these clearances. The caller stated he is in the military and has a top secret clearance.*

*Another caller suggested that information could be sent every "X" number of months to the applicant or attorney that the application still is held up for pending name checks, which would avert the many update requests.*

---

### 4.    Possible Solutions to the FBI Name Check Delays

During this and previous reporting periods, the Ombudsman had numerous meetings with USCIS leadership on FBI name checks and discussed a number of solutions to the name check logjam.

#### a.    Pre-Application Security Checks

A possible solution to the name check problem is pre-application security checks. USCIS has not chosen to implement such a process, which would dramatically impact the agency's revenue stream for a short period of time. Simultaneously, USCIS is failing to make basic changes to its processing methodology to reduce fraud and ineligible applicants. Instead, USCIS continues to substantially fund a process with questionable value. USCIS maintains that the name check process is of value, but it remains unclear whether the process has added any additional value over the security processes already in place.

Figure 11: Ombudsman's Suggested Pre-Application Security Check Process



1. May be performed in the United States or abroad.
2. Can include individuals applying for nonimmigrant visas or changes of status, individuals applying for immigrant status (adjustment or consular process), refugees, and naturalization applicants.
3. DHS/USCIS will collect and share data through an integrated case (person-based) management system. A component of this system will be an immigration case management system.

Figure 11 outlines the security screening steps to clear an applicant prior to interview, where necessary, and for adjudication of the immigration benefits application. The applicant/petitioner would register intent and pay a fee to cover the costs of the process. Pre-application is more than a pre-screening that determines *prima facie* eligibility. It moves the case to an adjudicating officer who reviews the file and interviews the applicant, if necessary. Since all fingerprints, biometrics, security clearances, necessary documents, medical evaluation, financial support, and visa availability are cleared, the applicant can be processed to conclusion immediately after interview. A Clearance Report is documentary proof that the applicant successfully completed the pre-application process. This process would place biometrics capture and security screening in the hands of appropriate law enforcement/contract employees, trained in the pre-screening process, and the determination of eligibility for benefits in the hands of USCIS officers trained in immigration law.

The agency also should review the DHS resources available to assist in exploring options to solve the backlogged FBI name check process. A number of DHS law enforcement entities perform security checks similar to those performed by USCIS.

### b.    USCIS Background Check Service IT System for Tracking FBI Name Check Cases

USCIS' 2006 Annual Report Response (at p. 10) indicates that the agency's planned Background Check Service (BCS), a new IT system that will track the status of background and security checks for pending cases, was to be implemented in late April with deployment beginning in May 2007. As of this writing, the BCS is not yet deployed. Currently, USCIS has limited capability to produce reports detailing the status of long-pending FBI name check cases. In addition, USCIS systems do not automatically indicate when a delayed name check is complete and the case can be adjudicated. Often, this leads to a situation where the validity of other checks expire before USCIS reviews the case. Those other checks then need to be reinitiated, adding financial and time costs for applicants and USCIS. The Ombudsman fully supports the expeditious rollout of the BCS system.

### c.    A Risk-Based Approach to FBI Name Checks

Name checks do not differentiate whether the individual has been in the United States for many years or a few days, is from and/or has traveled frequently to a country designated as a State Sponsor of Terrorism, or is a member of the U.S. military. Many individuals subject to lengthy name checks are either already green card holders or have been issued Employment Authorization Documents (EADs). These documents allow them to receive Social Security cards and state drivers' licenses. Most green card applicants are also eligible to receive advance parole enabling them to travel outside the United States and return as long as their cases are pending, which can be for many years under the current process.

> **CASE PROBLEM**
>
> *In early 2006, the applicant applied for naturalization. USCIS informed the applicant that the application is pending due to the FBI name check. The applicant currently is a contract employee for a federal agency and was security screened prior to beginning that employment.*

> **CASE PROBLEM**
>
> *The applicant's green card application was filed in early 2004. The application remains pending due to the FBI name check. The applicant previously served as a security officer at a U.S. embassy and was subject to rigorous security screening for the position.*

In November 2006, Secretary Chertoff discussed a risk-based approach to homeland security threats, vulnerabilities, and consequences:

> [T]he core principle that animates what we do at DHS . . . is risk management. It is a recognition of the fact that management of risk is not elimination of risk. There is no elimination of risk in life, and anybody who promises every single person protection against every threat at every moment in every place in the country is making a false promise . . .. What we do have to do is identify and prioritize risks -- understanding the threat, the vulnerability and the consequence. And then we have to apply our resources in a cost-effective manner, using discipline and common sense in order to minimize the risk without imposing undue cost on our communities and our families.[43]

Despite Secretary Chertoff's continuing emphasis on risk management, USCIS performs FBI name checks without the benefit of risk management modeling. In recent visits to USCIS field offices, a number of leaders have questioned the usefulness of the FBI name checks citing some of the same concerns discussed here. The process is not working and consideration should be given to re-engineering it to include a risk-based approach to immigration screening and national security. The U.S. Government Accountability Office recently noted in a report that "[w]hile the Secretary of DHS has expressed a commitment to risk management, DHS has not

---

[43] DHS Secretary Michael Chertoff, Prepared Remarks at the 2006 Grants & Training National Conference, Washington, D.C. (Nov. 28, 2006); http://www.dhs.gov/xnews/speeches/sp_1164738645429.shtm (last visited June 3, 2007).

performed comprehensive risk assessments in . . . immigration and customs systems to guide resource allocation decisions."[44]

Every effort should be undertaken to identify and remove persons who pose threats to the United States, which would include rescinding immigration benefits after USCIS has granted them. It would be irresponsible for law enforcement entities to stop their investigation of a potential crime merely because the person who is the subject of their investigation has obtained a green card or U.S. citizenship. Similarly, it would be illogical to think that delaying issuance of a green card or U.S. citizenship will prevent a criminal from committing a crime. Considering the protection the FBI name check provides, the cost of government resources used, and mental and actual hardships to applicants and their families, USCIS should reassess the continuation of its policy to require FBI name checks in their current form.

---

*RECOMMENDATION AR 2007 -- 06*

*In addition to the Ombudsman's recommendation in the 2006 Annual Report, AR 2006 –04, the Ombudsman recommends that USCIS: (1) evaluate the value of the name check in its current format and establish a risk-based approach to screening for national security concerns; (2) work with the FBI to provide the necessary resources to perform name checks in a timely manner; and (3) provide greater transparency to customers by publishing monthly the number of long-pending FBI name check cases.*

---

### G.    Interim Benefits

The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit.

#### 1.    Background

Generally, USCIS issues interim benefits -- EADs and advance parole documents (international travel documents) -- to individuals who have green card applications pending with the agency for over 90 days.[45] The Ombudsman is encouraged by constructive dialogue with USCIS during the reporting period that addresses funding and security issues related to the processing of interim benefits.

On May 30, 2007, USCIS established new filing fees for immigration benefits.[46] Under the new fee schedule, USCIS will charge a single fee for green card applications to include recovery of the processing costs for interim benefits. The Ombudsman supports this approach to

---

[44] U.S. Government Accountability Office Report "Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security," GAO-07-398T at 2 (Feb. 2007); http://www.gao.gov/new.items/d07398t.pdf (last visited June 6, 2007).

[45] *See* 8 C.F.R. § 274a.13(d).

[46] *See* "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29,851 (May 30, 2007); *see also* section III.H.1.